1  PETITION FOR A WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY

2  Name ___ CASTILLO, FRANCISCO P.
          (Last)         (First)        (Initial)

3

4  Prisoner Number ___ C-85768

   Institutional Address ___ P.O. Box 689, Soledad, CA 93960

5  Correctional Training Facility - Central

6

7  **UNITED STATES DISTRICT COURT**
   **NORTHERN DISTRICT OF CALIFORNIA**

8  FRANCISCO P. CASTILLO, Jr.,
   (Enter the full name of plaintiff in this action.)                        CV 08 2343

9

10                    vs.                                        Case No. _____
                                                                (To be provided by the clerk of court)
   B. CURRY, Warden, et al.,

11                                                              PETITION FOR A WRIT
                                                                OF HABEAS CORPUS  CW
12  _____

13  _____

14  _____
   (Enter the full name of respondent(s) or jailor in this action)

15                                                                        (PR)

16                    Read Comments Carefully Before Filling In

17  When and Where to File

18        You should file in the Northern District if you were convicted and sentenced in one of these

19  counties: Alameda, Contra Costa, Del Norte, Humboldt, Lake, Marin, Mendocino, Monterey, Napa,

20  San Benito, Santa Clara, Santa Cruz, San Francisco, San Mateo and Sonoma. You should also file in

21  this district if you are challenging the manner in which your sentence is being executed, such as loss of

22  good time credits, and you are confined in one of these counties. Habeas L.R. 2254-3(a).

23        If you are challenging your conviction or sentence and you were not convicted and sentenced in

24  one of the above-named fifteen counties, your petition will likely be transferred to the United States

25  District Court for the district in which the state court that convicted and sentenced you is located. If

26  you are challenging the execution of your sentence and you are not in prison in one of these counties,

27  your petition will likely be transferred to the district court for the district that includes the institution

28  where you are confined. Habeas L.R. 2254-3(b).

PET. FOR WRIT OF HAB. CORPUS         - 1 -

1    Who to Name as Respondent

2         You must name the person in whose actual custody you are. This usually means the Warden or

3    jailor. Do not name the State of California, a city, a county or the superior court of the county in which

4    you are imprisoned or by whom you were convicted and sentenced. These are not proper

5    respondents.

6         If you are not presently in custody pursuant to the state judgment against which you seek relief

7    but may be subject to such custody in the future (e.g., detainers), you must name the person in whose

8    custody you are now <u>and</u> the Attorney General of the state in which the judgment you seek to attack

9    was entered.

10   A. INFORMATION ABOUT YOUR CONVICTION AND SENTENCE

11        1. What sentence are you challenging in this petition?

12             (a)    Name and location of court that imposed sentence (for example; Alameda

13                    County Superior Court, Oakland):

14        Los Angeles County Superior Ct.      Los Angeles, CA 90012

15             Court                                    Location

16             (b)    Case number, if known ___A965649_____

17             (c)    Date and terms of sentence _7-6-88_ , _15-years-to-Life_

18             (d)    Are you now in custody serving this term? (Custody means being in jail, on

19                    parole or probation, etc.)       Yes _XXX_    No ____

20             Where?

21             Name of Institution: _Correctional Training Facility_

22             Address: _P.O. Box 686, Soledad, CA 93960-0686_

23        2. For what crime were you given this sentence? (If your petition challenges a sentence for

24   more than one crime, list each crime separately using Penal Code numbers if known. If you are

25   challenging more than one sentence, you should file a different petition for each sentence.)

26   _Homicide of the second degree_____

27   _____

28   _§ 187_____

3. Did you have any of the following?

    Arraignment:                       Yes __XX__    No _____

    Preliminary Hearing:         Yes __XX__    No _____

    Motion to Suppress:         Yes _____    No __XX__

4. How did you plead?

    Guilty __xx__    Not Guilty _____    Nolo Contendere _____

    Any other plea (specify) _____

5. If you went to trial, what kind of trial did you have?

    Jury _____    Judge alone_____    Judge alone on a transcript _____

6. Did you testify at your trial?         Yes _____    No _____

7. Did you have an attorney at the following proceedings:

    (a)    Arraignment             Yes __XX__    No _____

    (b)    Preliminary hearing      Yes __XX__    No _____

    (c)    Time of plea            Yes __XX__    No _____

    (d)    Trial                   Yes _____    No _____

    (e)    Sentencing             Yes __XX__    No _____

    (f)    Appeal                Yes __XX__    No _____

    (g)    Other post-conviction proceeding    Yes _____    No __XX__

8. Did you appeal your conviction?         Yes __XX__    No _____

    (a)    If you did, to what court(s) did you appeal?

        Court of Appeal         Yes __XX__    No _____

        Year: _____    Result:_____

        Supreme Court of California    Yes __XX__    No _____

        Year: _____    Result:_____

        Any other court         Yes _____    No __XX__

        Year: _____    Result:_____

    (b)    If you appealed, were the grounds the same as those that you are raising in this

PET. FOR WRIT OF HAB. CORPUS    - 3 -

1    petition?                                    Yes _____    No _XX_

2    (c)    Was there an opinion?               Yes _XX_    No_____

3    (d)    Did you seek permission to file a late appeal under Rule 31(a)?

4                                              Yes _____    No_XX_

5    If you did, give the name of the court and the result:

6    _____

7    _____

8    9. Other than appeals, have you previously filed any petitions, applications or motions with respect to

9    this conviction in any court, state or federal?          Yes _XX_    No_____

10    [Note: If you previously filed a petition for a writ of habeas corpus in federal court that

11    challenged the same conviction you are challenging now and if that petition was denied or dismissed

12    with prejudice, you must first file a motion in the United States Court of Appeals for the Ninth Circuit

13    for an order authorizing the district court to consider this petition. You may not file a second or

14    subsequent federal habeas petition without first obtaining such an order from the Ninth Circuit. 28

15    U.S.C. §§ 2244(b).]

16    (a)    If you sought relief in any proceeding other than an appeal, answer the following

17            questions for each proceeding. Attach extra paper if you need more space.

18    I.    Name of Court: Los Angeles County Superior Court

19          Type of Proceeding: _____ habeas corpus petition

20          Grounds raised (Be brief but specific):

21          a. state/federal denial of due process

22          b. state/federal denial of equal protection

23          c._____

24          d._____

25          Result: petition denied     Date of Result: 1/09/08

26    II.    Name of Court: Second Dist. Court of Appeals/Div 1

27          Type of Proceeding: _____ habeas corpus petition

28          Grounds raised (Be brief but specific):

a. _____ (See attached) _____

b. _____

c. _____

d. _____

Result: ___denied_____ Date of Result: 2/14/08

III.   Name of Court: __California Supreme Court__

Type of Proceeding: __Petition for Review__

Grounds raised (Be brief but specific):

a. __(See attached copy of writ and Exhibits)__

b. _____

c. _____

d. _____

Result: ___denied_____ Date of Result: 4/16/08

IV.   Name of Court: _____

Type of Proceeding: _____

Grounds raised (Be brief but specific):

a. _____

b. _____

c. _____

d. _____

Result: _____ Date of Result: _____

(b)   Is any petition, appeal or other post-conviction proceeding now pending in any court?

Yes _____   No_ X __

Name and location of court: _____

B. GROUNDS FOR RELIEF

State briefly every reason that you believe you are being confined unlawfully. Give facts to support each claim. For example, what legal right or privilege were you denied? What happened? Who made the error? Avoid legal arguments with numerous case citations. Attach extra paper if you

PET. FOR WRIT OF HAB. CORPUS        - 5 -

1 | need more space. Answer the same questions for each claim.

2 |     [Note: You must present ALL your claims in your first federal habeas petition. Subsequent

3 | petitions may be dismissed without review on the merits. 28 U.S.C. §§ 2244(b); McCleskey v. Zant,

4 | 499 U.S. 467, 111 S. Ct. 1454, 113 L. Ed. 2d 517 (1991).]

5 |     Claim One:_____

6 |            _____ PLEASE SEE ATTACHED PAPERWORK _____

7 | Supporting Facts:_____

8 | _____

9 | _____

10 | _____

11 | Claim Two:_____

12 | _____

13 | Supporting Facts:_____

14 | _____

15 | _____

16 | _____

17 | Claim Three:_____

18 | _____

19 | Supporting Facts:_____

20 | _____

21 | _____

22 | _____

23 |     If any of these grounds was not previously presented to any other court, state briefly which

24 | grounds were not presented and why:

25 |     ALL ISSUES ALLEGED HEREIN ARE FULLY EXHAUSTED

26 | _____

27 | _____

28 | _____

PET. FOR WRIT OF HAB. CORPUS    - 6 -

1    List, by name and citation only, any cases that you think are close factually to yours so that they

2  are an example of the error you believe occurred in your case.  Do not discuss the holding or reasoning

3  of these cases:

4  Martin v. Marshall (N.D. Cal. 2006) 431 F.Supp.2d 1038

5  Rosenkrantz v. Marshall (C.D. Cal. 2006) 444 F.Supp.2d 1063

6  In re Scott (2005) 133 Cal.App.4th 573

7  Do you have an attorney for this petition?                Yes_____      No_ X_

8  If you do, give the name and address of your attorney:

9  _____

10    WHEREFORE, petitioner prays that the Court grant petitioner relief to which s/he may be entitled in

11  this proceeding.  I verify under penalty of perjury that the foregoing is true and correct.

12

13  Executed on _April 28_ , _2008_          _____

14              Date                              Signature of Petitioner

15

16

17

18

19

20  (Rev. 6/02)

21

22

23

24

25

26

27

28

PET. FOR WRIT OF HAB. CORPUS          - 7 -

ATTACHMENT

Court of Appeal, Second Appellate District, Div. 1 - No. B205212
**S161096**

# IN THE SUPREME COURT OF CALIFORNIA

**En Banc**

---

In re FRANCISCO P. CASTILLO on Habeas Corpus

---

The petition for review is denied.

George, C.J., was absent and did not participate.

SUPREME COURT
FILED

APR 1 6 2008

Frederick K. Ohlrich Clerk

_____
Deputy

_____
Acting Chief Justice

This petition concerns:

[ ] A conviction                    [xx] Parole

[ ] A sentence                      [ ] Credits

[ ] Jail or prison conditions       [ ] Prison discipline

[xx] Other (specify): __Federal violations of due process, equal protection__

1. Your name: __Francisco P. Castillo , Jr.__

2. Where are you incarcerated? __Correctional Training Facility-Central, Soledad, CA 93960__

3. Why are you in custody?   [XX] Criminal Conviction    [ ] Civil Commitment

   *Answer subdivisions a. through i. to the best of your ability.*

   a. State reason for civil commitment or, if criminal conviction, state nature of offense and enhancements (for example, "robbery with use of a deadly weapon").

   __Homicide of the second degree with use of a weapon__

   b. Penal or other code sections: __§§ 187; 12022(b)__

   c. Name and location of sentencing or committing court: __L.A. County Superior Court, 210 W. Temple St., L.A., CA 90012__

   d. Case number: __A965649__

   e. Date convicted or committed: __June 13, 1988__

   f. Date sentenced: __July 6, 1988__

   g. Length of sentence: __fifteen (15) years to life plus one (1) year__

   h. When do you expect to be released? __unknown, M.E.P.D. was 11-2-1998__

   i. Were you represented by counsel in the trial court?   [xx] Yes.   [ ] No. If yes, state the attorney's name and address:

   __Donald Prigo, L.A. County Public Defender__

4. What was the LAST plea you entered? *(check one)*

   [ ] Not guilty   [XX] Guilty   [ ] Nolo Contendere   [ ] Other: _____

5. If you pleaded not guilty, what kind of trial did you have?

   [ ] Jury   [ ] Judge without a jury   [ ] Submitted on transcript   [ ] Awaiting trial

6. GROUNDS FOR RELIEF
   Ground 1: State briefly the ground on which you base your claim for relief. For example, "the trial court imposed an illegal enhancement." *(If you have additional grounds for relief, use a separate page for each ground. State ground 2 on page four. For additional grounds, make copies of page four and number the additional grounds in order.)*

**PETITIONER'S FEDERAL AND STATE CONSTITUTIONAL RIGHTS TO DUE PROCESS AND EQUAL PROTECTION WERE VIOLATED BY RESPONDENTS WHEN THEY DENIED TO HIM THE INDIVIDUALIZED CONSIDERATIONS MANDATED AND REQUIRED BY STATUTORY AUTHORITIES AND ALL THE CLEARLY ESTABLISHED FEDERAL LAWS.**

a. Supporting facts:
   Tell your story briefly without citing cases or law. If you are challenging the legality of your conviction, describe the facts upon which your conviction is based. *If necessary, attach additional pages.* CAUTION: You must state facts, not conclusions. For example, if you are claiming incompetence of counsel you must state facts specifically setting forth what your attorney did or failed to do and how that affected your trial. Failure to allege sufficient facts will result in the denial of your petition. (See *In re Swain* (1949) 34 Cal.2d 300, 304.) A rule of thumb to follow is: *who* did exactly *what* to violate your rights at what time *(when)* or place *(where)*. (If available, attach declarations, relevant records, transcripts, or other documents supporting your claim.)

   **On June 26, 2007, Francisco P. Castillo (Petitioner), appeared before the Board of Parole Hearings (BPH) for his 2nd subsequent hearing (3rd overall), during which Mr. S. Kubochi was Presiding Commissioner and Ms. N. Blonien was Deputy Commissioner. A copy of the Hearing transcript is attached hereto as Exhibit "A", and incorporated by reference to bolster a claim of a "no parole" policy and/or practice which has been found to be patently unconstitutional by numerous state and federal courts that have ruled on the matter.**

   **Petitioner was represented by Mr. M. Gunning. A staff psychologist, Dr. R. Starrett, Ph.D., testified utilizing a filed Report dated: 4-30-07, that in his opinion Petitioner is NOT a risk of CURRENT danger to the public safety. A copy of that Report and Reports of 2000 and 2004 are attached as Exhibit "B". A copy of**
   **(continued on attached pages)**

b. Supporting cases, rules, or other authority (optional):
   *(Briefly discuss, or list by name and citation, the cases or other authorities that you think are relevant to your claim. If necessary, attach an extra page.)*

**(SEE ATTACHED POINTS AND AUTHORITIES)**

1    (continued from previous page):

2    the 2007 Counselor's Report is attached as Exhibit "C", it was prepared and filed but not cited to at the Hearing.

3           Copies of the 1997 and 2001 BPT Decisions denying parole are attached hereto as Exhibit "D" and are

4    clearly anecdotal evidence to further advance the allegation of a "no parole" policy and/or practice that has been

5    held to be unconstitutional as well as illegal by all courts that have ruled on the subject matter and, with the

6    Court's leave, are also incorporated by reference to this pleading as though fully set forth herein. This allegation

7    of a "no parole" policy and/or practice is not idle nor wishful thinking but is fully documented after many months

8    of discovery conducted in a group of cases out of Santa Clara county: In re Lewis, et al., case no. 68038, a copy

9    of that Order is attached as Exhibit "E".

10          Also present at the hearing was Ms. S. Carbaugh, d.d.a. from Los Angeles county, parole division.

11          Parole statutes and regulations bestow on life prisoners a liberty interest in parole protected by due

12    process. McQuillen v. Duncan (9th Cir. 2002) 306 F.3d 895, 901-903; In re Rosenkrantz[1] (2002) 29 Cal.4th 616,

13    661 [Rosenkrantz V]. Petitioner's liberty interest required the BPH panel to find him suitable for parole and set

14    his prison term and a parole date because, when his MEPD lapsed, his parole was evaluated to no longer pose

15    an unreasonable risk of danger to society or public safety. (Penal Code (PC) §3041(a); 15 California Code of

16    Regulations (CCR) §§ 2280, 2281(a).)

17          In some cases, a lifer who otherwise qualifies for parole may be found unsuitable for and denied parole if

18    the commitment offense was especially egregious when compared to other instances of the same offense. Such

19    cases, however, are exceptions, and not per the rule. Accordingly, the conduct of an up-to-life sentenced inmate

20    who committed second degree murder **must** be especially violent when compared to that of other second

21    degree murderers for parole to be denied on the basis of the offense in the case of an otherwise qualified

22    inmate. However, the offense cannot serve as a basis for denying parole interminably. In re Ramirez (2001) 94

23    Cal.App.4th 549, 569-570; Rosenkrantz V, 658. (cf: Biggs v. Terhune    (9th Cir. 2003) 34 F.3d 910; Irons v.

24    Warden (E.D. Cal. 2005) 358 F.Supp.2d 936; Martin v. Marshall (N.D. Cal. 2006) 431 F.Supp.2d 1038 (Martin I);

25    Rosenkrantz v. Marshall (C.D. Cal. 2006) 444 F.Supp.2d 1063 Rosenkrantz VI].)

26    _____

27    [1] There have been seven (7) "Rosenkrantz" decisions: People v. Rosenkrantz (1988) 198 Cal.App.3d 1187; In re Rosenkrantz (2000) 80
      Cal.App.4th 409; Davis v. Superior Court (2-22-01, B146421 [non-pub.]; In re Rosenkrantz (2002) 95 Cal.App.4th 358; In re Rosenkrantz (2002)

28    29 Cal.4th 616; In re Rosenkrantz L.A. County Sup.Ct. no. BH003529, filed 6-26-2006 ;Rosenkrantz v. Marshall (2006) 444 F.Supp.2d 1036.

A

1   Here, Petitioner did not intend that anyone would die as a result of his alcohol-fueled rage and he was

2   unaware of the depth of the violence committed and any violent consequences and he was therefore sentenced

3   to serve a crime not based on deliberation, and cannot have committed any crime in any definitive manner which

4   suggestive of P.C. § 190.2 or that his crime was committed in "an exceptionally cruel manner" nor with an

5   "especially callous disregard for the suffering of another" because he did not intend the logical consequences of

6   the actual perpetrator and had no specific intent to do any harm to anyone.

7   Substantive due process requires that the grounds set forth by a BPH panel for its decision must be

8   supported by at least some credible, relevant evidence in the record. The panel was required to base its findings

9   on a weighing of all relevant, reliable evidence. (15 CCR § 2281(b); In re Minnis (1972) 7 Cal.3d 639, 646; In re

10  Rosenkrantz (2000) 80 Cal.App.4th 409, 424-427 (Rosenkrantz V); Rosenkrantz V, 655; Ramirez, supra, 566.

11  The "some evidence" standard is satisfied if there is substantial, reliable evidence in the record that could

12  support the conclusion reached. Powell v. Gomez (9th Cir. 1994) 33 F.3d 39, 40; Cato v. Rushen (9th Cir. 1987)

13  824 F.2d 703, 705. And federal due process requires substantial evidence having indicia of reliability Jancsek v.

14  Oregon Bd. Of Parole (9th Cir. 1987) 833 F.2d 1389, 1390; In re Powell (1988) 45 Cal.3d 894, 904; Rosenkrantz

15  V, 658; McQuillen, supra, 306; Biggs, supra, 915; Caswell v. Calderon (9th Cir.2004) 363 F.3d 832, 839.

16  Black's Law Dictionary 5th Ed. 1979 defines **SUBSTANTIAL EVIDENCE** as follows:
    "Such evidence that a reasonable mind might accept as adequate to support a conclusion.

17  *It is that quality of evidence necessary for a court to affirm a decision* of an *Administrative board*. (Black's p. 1281, citing State v. Green (1974) 544 p.2d 356, 362. emphasis added.)

18  The Due Process clause of the Fourteenth Amendment prohibits state action that deprives a

19  person of life, liberty, or property without due process of law. A person alleging a due process violation must first

20  demonstrate that he or she was deprived of a liberty or property interest protected by the Due Process Clause,

21  and then show that the procedures that led to the deprivation were constitutionally insufficient. Kentucky Dept. of

22  Corrections v. Thompson (1989) 490 U.S. 454; McQuillen, supra, 900.

23  In the parole context, a prisoner alleging a due process claim must demonstrate the existence of a

24  protected liberty interest in parole, and the denial of one or more of the procedural protections that must be

25  afforded when a prisoner has a liberty interest in parole. The Supreme Court held in 1979, and reiterated in

26  1987, that "a state's statutory scheme, if it uses mandatory language, creates a presumption that parole release

27  will be granted when or unless certain designated findings are made, and thereby gives rise to a constitutional

28

B

1   liberty interest." McQuillen, supra, 901 (citing Greenholtz v. Nebraska Penal Inmates (1979) 442 U.S. 1, 7 and

2   Board of Pardons v. Allen  (1987) 482 U.S. 369, 373. Because no evidence supported the panel member's

3   finding that Petitioner's parole poses an "unreasonable risk of danger to society" or to "public safety," and the

4   finding was inapposite to the record, parole denial on that basis subverted due process and substantiates those

5   who contend that this state is without an excuse as to why the denial rate is what it is.

6        The reason stated by the panel for finding Petitioner unsuitable was BPH's boilerplate statement that his

7   parole "would pose an unreasonable risk of danger to society or a threat to public safety." (Exhibit "A", p. 63) the

8   sole ground set forth by the panel in support of its Decision to AGAIN, for the third (3rd) time, deny suitability and

9   dismiss his warrant of parole which is tremendously long overdue! (His M.E.P.D. was 11-2-1998.)

10       Parole denial based on the "unreasonable risk" subterfuge abandoned principles of independence and

11  abrogated due process because it is supported by NO EVIDENCE whatsoever. All of the competent,

12  professionally-sanctioned evidence that addresses Petitioner's current and future dangerousness, parole risk,

13  etc., found it to be "low to moderate," "less than the average citizen," or "below average," nor has it been for over

14  a decade. "Significantly, *the evidence underlying THE DECISION must be supported by '"some indicia of*

15  *reliability.'"* Rosenkrantz VI, supra, at p. 1083, emphasis added. (See again Exhibit "B", Exhibit "A", at p.43.)

16       Utilizing the legal precedent established as the focal criteria, all relevant, reliable evidence in Petitioner's

17  records that addresses his dangerousness and parole "risk" all assess these factors to be low. And, because not

18  a scintilla of reliable, relevant evidence supports the panel's flawed findings, the sole relevant reason for finding

19  him unsuitable for parole sensibly suggests this was an illegitimate (ongoing) basis for denial. Martin v. Marshall

20  (N.D. Cal. 2006) 431 F.Supp.2d 1039, (Martin I), Martin v. Marshall  448 F.Supp.2d 1143, (Martin II), et al.

21       In Martin II, supra, Justice Patel found NO justification for the panel's boilerplate lack of individual

22  consideration and in her July 21, 2006 Memorandum and Order she stated:

23       "In light of the Board's apparent abandonment of its independent role"—which occurred AFTER

24  Governor Schwarzenegger took office---, *"the court finds that a remand would indeed be futile."* There can be

25  no question but that the implication here is exactly what it means: NO INDEPENDENT PAROLE DECISION BY

26  THE WILSON, DAVIS, OR SCHWARZENEGGER regimes for this Petitioner. Id. at p. 1144. (Emphasis added.)

27       In Rosenkrantz V, supra, at p. 655, the Supreme Court explained that parole release decisions "entail

28  the [BPH]'s attempt to predict by subjective analysis whether the inmate will be able to live in society without

C

1   committing additional antisocial acts." Such a prediction requires analysis of individualized factors on a case-by-

2   case basis and the BPH's discretion in that regard is almost unlimited. Notwithstanding that the BPH's discretion

3   is exceedingly broad, it is circumscribed by the requirements of procedural due process. (Rosenkrantz, id., Calif.

4   Const. article I, § 7(a), and statutory directives mandating a fair and unbiased Hearing.)

5       Absent substantial evidence of the presence of unsuitability factors, there must be some relevant,

6   reliable evidence that a petitioner is otherwise unsuitable for parole, such as by his having failed to meet the

7   suitability criteria under 15 CCR § 2402, subd. (d); §§ 1-4, 6-9. And, while the BPH has exceedingly broad

8   discretion in its parole decisions, the Findings must reflect "*an individualized consideration of the specified

9   criteria and cannot be arbitrary or capricious.*" Rosenkrantz V, supra, 677; "[t]he liberty interest is created, not

10  upon the grant of a parole date, but upon the incarceration of the inmate." Biggs, supra, 914.

11      The failure to properly consider the post-incarceration factors highlights the inherent misunderstanding

12  and application of the "some evidence" standard and triggers the required scope of judicial review of the federal

13  questions presented here.

14      There are two sets of parole criteria regulations, not one. 15 CCR §§ 2402, subd. (c) [Circumstances

15  Tending To Show Unsuitability], and 2402 subd. (d) [Circumstances Tending To Show Suitability]. It appears that

16  the BPH's focused emphasis has been on, and remains on, subdivision (c), with little or no regard given to

17  subdivision (d). Petitioner asserts, as a matter of statutory construction, the "public safety" concern in PC §

18  3041(b), demands an equal (or neutral) emphasis at the outset of a panel's deliberations AND on its Findings

19  under both sets of criteria and any balanced and reasonable interpretation should compel this approach

20  throughout the entire process due any inmate and to do so would virtually assure a Finding of suitability.

21      Factors TENDING to show suitability or unsuitability must be weighed and balanced within the

22  parameters of a standard of proof. Without this critical, reliable component, the process is inherently arbitrary,

23  capricious, and defective. This standard-less analysis would vitiate the individualized consideration held

24  appropriate in Rosenkrantz V. The crux of the matter is that of a standard of proof with indicia of reliability as set

25  forth below and reinforced with significant legal precedent.

26      The "some evidence" standard is NOT the sole standard of evidence to be applied to the BPH's

27  decisions. It is only one aspect of *judicial* review employed by a habeas court. Edwards v. Balisok (1997) 520

28  U.S. 640, 647. And, if the Rosenkrantz V decision implies, as it does, that the "some evidence" standard should

1  be applied to the BPH Findings, then this is a clear and unreasonable application of well-established federal

2  Constitutional law set forth by the High Court. Nothing in <u>Superintendent v. Hill</u> (1985) (<u>Hill</u>) 472 U.S. 445, 456,

3  implies that it IS A STANDARD OF EVIDENCE to be applied by any agency, board, or executive body outside a

4  disciplinary committee within an exigent-circumstances prison setting that has no pressing need for more formal

5  evidentiary standards or anything warranting standard-less precedents

6       What IS implied by the <u>Rosenkrantz V</u> court, when it held that a habeas court can't reverse a decision

7  denying parole even if it determines that the evidence overwhelmingly preponderates towards a finding of

8  suitability is completely unreasonable because it prevents effective habeas relief from an arbitrary and capricious

9  decision, and worse, stymies effective judicial review. This court is not obliged nor compelled to defer to a state

10 decision misapplying federal constitutional principles. <u>Hubbart v. Knapp</u> (9th Cir. 2004) 379 F.3d 773, 780;

11 referencing <u>Mullaney v. Wilbur</u> 421 U.S. 684, 691; see also <u>Peltier v. Wright</u> (9th Cir. 1994) 15 F.3d 860, 862.

12      In <u>Oxborrow v. Eikenberry</u> (9th Cir. 1989) 877 F.2d 1395, 1399, the Circuit held that: "Our deference to

13 the [state court] is suspended only upon a finding that the court's interpretation of [state law] is untenable or

14 amounts to a subterfuge to avoid federal review of a constitutional violation." Thus, it is petitioner's contention

15 that respondents seek to avoid federal review by asserting that the "some evidence" standard 1) is applied by the

16 BPH and/or, 2) limits judicial review ONLY to the BPH's ultimate decision and not to a finding of a defective pre-

17 Decision process.

18      If Petitioner were the beneficiary of an individualized consideration utilizing real evidence with reliable,

19 articulate proof, it would have logically flowed that he is now MORE suitable than his previous hearing wherein

20 he encouraged that if he continued his positive programming and rehabilitation he would likely be found suitable.

21 (Exhibit "B".) All those laudatory words at his Hearing would have had a consistent ring of truth to them in that he

22 has progressed towards a more-suitable mien, not the reverse. This highly illegal "boilerplate" denial now rises to

23 the level of a federal due process violation. <u>Biggs</u>, supra, pp. 916-917; <u>Martin I</u>, supra, 1042.

24      Please note that the previous Decisions denying parole also gave advice; the present denial is almost a

25 carbon copy of the last panel's decision. This summary denial of suitability leading to parole now rises to the

26 level of a federal due process violation. <u>Biggs</u>, supra, p. 917; <u>Martin I</u>, supra, 1048-49.

27      The High Court in <u>Greenholtz</u> (at p. 7) <u>Allen</u> (at p. 373) , supra, established that:

28      "While there is no constitutional or inherent right of a convicted person to be con- ditionally
        released before the expiration of a valid sentence, a state's statutory scheme, if it uses

                                                     E

mandatory language, creates a presumption that parole release will be granted when or unless certain designated findings are made, and thereby gives rise to a constitutional liberty interest." (Citing McQuillen, supra, at 901.)

In the absence of any evidence in the record supporting the BPH's decision, remanding the case back to be reheard is a futile act, and the appropriate remedy is release of the Petitioner. McQuillen II, supra, p. 1015-15; Martin II, supra, p. 1145; Rosenkrantz VI, supra, p. 1087.

A petitioner is entitled to "something more than mere pro forma consideration.", e.g. meaningful individual consideration. Not a sham hearing using rote words and repeating boilerplate from a pre-printed form. The only mandate "normally" being followed under P.C. § 3041 (a), is a multi-year denial under § 3041 (b) to "swallow" the due process required under the 14th Amendment, an ingestion violating the equal protection guarantees and abridges Petitioner's civil rights under both state and federal Constitution's proscription against this tactic for all similarly-situated inmates. In re Sturm (1974) 11 Cal.3d 258, 268; Ramirez, supra, at 570; Rosenkrantz V, at pp. 658, 683.

> "Judicial oversight must be extensive enough to protect the limited right of parole applicants '"to be free from an arbitrary parole decision ... and to something more than mere pro forma consideration."' [citation omitted] The courts may properly determine whether the [BPH]'s handling of parole applications is consistent with the parole policies established by the Legislature. [ ] while courts must give great weight to the [BPH]'s interpretation of the parole statutes and regulations, final responsibility for interpreting the law rests with the courts. [ ] Courts must not second-guess the [BPH]'s evidentiary findings [ ] However, it is the proper function of judicial review to ensure that the [BPH] has honored in a '"practical sense"' the applicant's right to '"due consideration."'" [ ] Ramirez supra, at 564.

(Since it is clear that parole should be the rule and not the exception, a moderate or average risk cannot be construed as "unreasonable." Were an average risk grounds for parole denial, then the exception would "operate so as to swallow the rule that parole is 'normally' to be granted. Rosenkrantz V, at pp. 658, 683.)

> "All violent crime demonstrates the perpetrator's potential for posing a grave risk to public safety ... [However] the [BPH] '"shall normally set a release date."' [citation omitted] The [BPH]'s authority to make an exception ... should not operate to swallow the rule that parole is 'normally' to be granted. ...Therefore, a life term offense must be *particularly egregious* to justify the denial of a parole date. In order to comply with the parole policy established by the Legislature in P.C. § 3041, the [BPH] must weigh the inmate's criminal conduct not against ordinary social norms, but against other instances of the same crime or crimes." (Ramirez, supra, at 570, disapproved on other grounds, emphasis added as usual in published cases.)

The applicability of this standard to the review of decisions applies and Petitioner's right to due consideration does not appear to have been honored in any practical sense by the panel in this case and their Decision is facially and legally deficient. In the instant case the BPH made no effort to comply with the controlling

F

1    rules and seems to have merely stated its "predetermined conclusion." (See: In re Caswell (2001) 94 Cal.App.4th

2    1017, 1030.)

3        In In re Smith (2003) (Smith II) 114 Cal.App.4th 343, 369, the Sixth District Court of Appeals found that

4    there was not some evidence that Smith's crime was more callous than the average second degree murder.

5    There was nothing to "distinguish th[e] crime from other second degree murders ... the record provides no

6    reasonable grounds to reject, or even challenge, the findings and conclusions of the psychologist and

7    counselor[s] concerning [his] dangerousness."

8        The Second District Court of Appeals, in the case of another life-term inmate named Smith similarly

9    found no evidence to support a parole denial based on the commitment offense. In re Smith (2003) (Smith I) 109

10   Cal.App.4th 489.

11       Compare In re Scott (2004) 119 Cal.App.4th 871, 876-877 [Scott I], where the First District reversed the

12   BPH's standard statement of reliance on the gravity of the crime because in truth, "the relevant evidence

13   show[ed] no more callous disregard for human suffering than is shown by most second degree murder offenses."

14   (Governor's rescission of Scott's parole unanimously reversed on 10-18-05, see: In re Scott 133 Cal.App.4th 538,

15   Scott II.)

16       On 5-18-05, in Coleman v. BPT (E.D. Cal. No. 97-0783), Honorable Judge L. Karlton adopted the

17   Findings and Recommendations IN FULL. There, it was found that ex-governors Davis and Wilson (and NOW

18   Governor Schwarzenegger, too. See infra at p. 3), had/have panels with a sub rosa "no parole" policy and

19   were/are carrying it out. Martin I, supra, pp. 1048-49; Martin II, supra, p. 1144; (see Coleman and Final Order,

20   attached as Exhibit "E".)

21       It is beyond debate that neither a state agency interpreting an enabling statute nor any court of the state

22   can construe a statute contrary to Legislative intent or the ordinary meaning of the words used in a statute. Our

23   Court, in the entire history of the statute, has never construed it with any adequacy according to the plain

24   meaning to create guidance and instill compliance by both the BPH panels and those who serve the governors

25   otherwise, although it would seem enough time and toil has passed to have done so.

26       Instead, this lack of judicial construction has led to the many years of overwhelming denials that DO

27   NOT reflect in any clear way the presumptions of § 3041. Nor does it reflect instruction as to what the agency's

28   burden of proof is or the legal significance of relevant, reliable, or material evidence. This lack of judicial

G

1  guidance has left unfettered discretion in the hands of lay appointees to determine the legal import of evidence

2  (or lack thereof) although these persons are arguably unqualified by a dearth of professional standing to make

3  these determinations upon which a federal liberty interest depends.

4      Determining the legality and weight and of evidence requires some specific legal training in evidentiary

5  law; not by lay persons, and which lack of training is visibly evident in the incongruously inapposite findings thus

6  made. (McQuillen I, supra, 907-912; Rosenkrantz V, supra, 680; Rosenkrantz II, supra, 424-426; Smith II, supra,

7  361; Smith I, supra, 501-506.) These are only a few of the published cases but unpublished absurdities

8  exponentially abound!

9      The Sixth district held for the proposition in Smith II at 361 that "[t]he weight given the specified factors

10  relevant to parole suitability lies within the discretion of the BP[H]."; a court's determination "of whether the

11  *preponderance of the evidence* supports a finding of suitability is irrelevant." (Emphasis added.) This is the first

12  time a published decision on the BPH has even mentioned a burden of proof. This reference infers the BPH must

13  honor this evidentiary standard as faithfully to the letter as legally possible.

14      Yet there is no settled bright line rule for a court to determine if the BPH has met that standard.  Just the

15  opposite, in fact, since Smith II strongly suggests that even if a reviewing court finds the agency did not meet the

16  standard, an allegation of "some evidence" is sufficient to automatically require judicial deference.

17      The Third District Court of Appeals stated the following as fact:

18  "It is without doubt that a blanket no-parole policy would be contrary to the law, which
19  contemplates that persons convicted of murder without special circumstances may eventually
   become suitable for parole and that, when eligible, they should be considered on an
20  individualized basis. Thus, blanket policies have long been deemed to be improper. ¶ In Roberts
   v. Duffy (1914) 167 Cal. 629, a decision that predates the enactment of our state's old
21  indeterminate sentencing law, the Court condemned a blanket parole policy that was contrary to
   the statutory parole scheme then in place. It appeared that the statutory law *allowed a prisoner to*
22  *apply for parole after serving ONE YEAR* but that, **contrary to the statute, the parole authority**
   **adopted a rule precluding application until one-half the sentence was served.**

23      The Court held that, "'while the prisoner had no right to apply to release on parole at any
   time, *he was entitled to apply* and have his application duly considered on an individualized
24  basis.'" Id. at 640-641.

25      (Does this sound familiar? Emphasis added to original citation.)

26  "With respect to persons sentenced to indeterminate terms, the purpose of punishment is
   satisfied by the requirement of service of a minimum period before eligibility for parole and, when
27  suitable for parole, by determination of a release date **in a manner that will provide** UNIFORM
   TERMS for offenses of similar gravity and magnitude with respect to their threat to the public."
28  (P.C. §§ 3041, 3041(a), 3041.5, citing In re Morrall (2002) 102 Cal.App.4[th] 280, 291-292.)

1    The arbitrary or capricious misapplication of statutory law violates both state and federal due process.

2    Hill, supra, at p. 428; Gordon v. Duran (9th Cir. 1990) 895 F.2d 610, 613; In re Edsel P. (1985) 165 Cal.App.3d

3    763, 779. "The touchstone of due process is protection of the individual against [the] arbitrary action of

4    government." Wolff v. McDonnell (1974) 418 U.S. 539, 558.)

5    These principles apply in equal force to incarcerated prisoners. (In re Jones (1962) 57 Cal.2d 860, 862;

6    ["a convicted felon, although civilly dead, is nevertheless a 'person' entitled to protection of the 14[th]

7    Amendment."]; In re Price (1979) 24 Cal.3d 448, 453 [acknowledging that P.C. § 2600 limits a prisoner's

8    deprivation to only such rights "as is necessary in order to provide for the reasonable security of the institution in

9    which he is confined."].)

10    In interpreting a prisoner's rights of substantive due process the High Court has held that a prisoner may

11    derive a due process liberty interest from administrative regulations, as well as state law and the U.S.

12    Constitution.

13    Sandin v. Conner (1995) 515 U.S. 472, 484; Hewitt v. Helms 459 U.S. 460, 469, receded from on p. 484, fn. 5;

14    Meachum v. Fano (1976) 427 U.S. 215, 226; Wolff, supra, at p. 557. In applying these standards here, the BPH

15    violated Petitioner's right to constitutional due process but he is not challenging the BPH's right to conduct

16    professional psychological assessments as the main focus of the parole evaluation process, but does challenge

17    their "normal" practice of summarily dismissing and patently ignoring their own experts.

18    Predictions of future conduct necessarily relate to public safety concerns but Judge Karlton in Irons v.

19    Warden  (E.D. Cal. 2004) 358 F.Supp.2d 936 (9th Cir. Review pending, filed on 5-18-05, No. 05-15275),

20    discussed this conundrum and noted that the propensity analysis thusly:

21    "To a point, it is true, the circumstances of the crime and motivation for it may indicate a
petitioner's instability, cruelty, impulsiveness, violent tendencies and the like. However, after 15

22    or so years in the cauldron of prison life, not exactly an ideal therapeutic environment to say the
least, and after repeated demonstrations that despite recognized hardships of prison, [petitioner]

23    does not possess these attributes, the predictive ability of the circumstances of the crime is near
zero." [2]

24

_____

25    [2] "It is worth noting, as has our [Calif.] Supreme Court (People v. Murtishaw (1981) 29 Cal.3d 733, 768, disapproved on other grounds in

26    People v. Boyd (1985) 38 Cal.3d 762,, that a large number of legal and scientific authorities believe that, even where the passage of time is
not a factor and the assessment is made by an expert, predictions of future dangerousness are exceedingly unreliable. (See, e.g., Monahan,
Violence Risk Assessment: Scientific Validity and Evidentiary Admissibility, 57 Wash. & Lee L. Rev. 901 (2000); Otto, On the Ability of Mental

27    Health Professionals to 'Predict Dangerousness,' 18 Law & Psychol. Rev. 43 (1994); Lidz, et al., The Accuracy of Predictions of Violence to
Others, 269, Jour.Am.Med.Assn. 1007 (1993); Diamond, The Psychiatric Prediction of Dangerousness, 123 Pa.L.Rev. 439 (1974);
Dershowitz, The Law of Dangerousness: Some Fictions About Predictions (1970) 23 J. Legal Ed. 24. According to a Task Force of the

28    American Psychiatric Assn., "[n]either psychiatrists nor anyone else have demonstrated an ability to predict future violence or dangerousness.
(Am.Psych.Assn., Task Force Rpt. 8, Clinical Aspect of the Violent Individual (1974) at p. 28.) As our [Calif.] Supreme Court has also noted,
"the same studies which proved the inaccuracy of psychiatric predictions [of dangerousness] have demonstrated BEYOND DISPUTE the no

I

(Irons, supra, at p. 947, fn. 2, this 'dicta' was also cited as Headnote #10 at p. 937; see additional discussion of "need for more therapy" used as a ruse to deny suitability at p. 948.)

P.C. § 3041(a) governs parole suitability determination processes and does not define more than one class of persons. The statute generalizes that it's focus is "any prisoner" who is serving an indeterminate term. Through application, however, the agency's discrimination amongst the class serving indeterminate sentences is in violation of the right to equal protection ensconced in the Fourteenth Amendment. Equal protection is "[in essence] a direction that [a person] similarly situated should be treated alike." (City of Cleburne v. Cleburne Living Ctr. (1985) 473 U.S. 432, 439, citing Plyler v. Doe (1982) 457 U.S. 202, 216, "To state a claim ... for violation of the Equal Protection Clause of the 14th Amendment a plaintiff must show that the defendants acted with an intent or purpose to discriminate against the plaintiff based upon membership in a protected class." Barren v. Harrington (9th Cir. 1998) 152 F.3d 1193, 1194, cert. denied 525 U.S. 1154 (1999).)

Strict scrutiny, alternatively, is utilized if the government distributes benefits or burdens in a manner inconsistent with fundamental rights. (See Sosna v. Iowa (1975) 419 U.S. 393; Shapiro v. Thompson (1969) 394 U.S. 618.) The fundamental right here is the due process right to relevant, reliable evidence being considered when analyzing a right to release on parole. McQuillen I, supra, at 900; McQuillen II, supra, at 1012; Martin I, supra, at 1043: ("[T]he deferential 'some evidence' standard has outer limits. [citing Coleman, supra, with approval slip op. at 9] If it is established that a particular judgment was predetermined, then a prisoner's due process rights will have been violated even if there is 'some evidence' to support the decision. [See Bakalis v. Golembeski (7th Cir. 1994) 35 F.3d 318, 326] (a decision-making "body that has prejudged the outcome cannot render a decision that comports with due process. ... The California Supreme Court has explicitly stated that a blanket no-parole policy as to a certain category of prisoners is illegal. [In re Minnis; In re Morrall] " ... Because petitioner cannot change the past, denying [P]etitioner parole based only on the facts surrounding the crime itself effectively changes his sentence ... into life imprisonment without the possibility of parole." Ibid. at 1046.) (cf: Martin II, supra, at 1144: "In sum, the Board appears to have capitulated to the blanket no-parole policy

---

less disturbing manner in which such prophecies consistently err: they predict acts of violence which will not take place ('false positives'", thus branding as 'dangerous' many persons who are in reality totally harmless. [citation.]" (People v. Burnick (1975) 14 Cal.3d 306, 327.) (all emphasis in original). (See: copy of Order denying Review, dated 11/30/05, Daily Journal 12/2/05, p. 13803, attached as Exhibit "B"). Scott, II, supra, footnote #9.

1  described by this court in its previous [Martin I] Order, abandoning its role as an independent assessor of

2  petitioner's eligibility. This capitulation is particularly troubling in light of the Board' vigorous assertions of

3  independence during the 2003 hearing." This Honorable Court should grant the writ and Order all appropriate

4  relief including a complete discharge from custody and sanction full redress for Petitioner.

5

6                                              CONCLUSION

7         WHEREFORE, Petitioner respectfully submits that the writ should be granted in full and all available

8  remedies leading to his immediate release from custody be Ordered at the earliest possible moment and

9  forthwith. It is respectfully requested that an evidentiary hearing be Ordered as an alternative to the above

10  should there be consideration of the "no parole" policy and/or practice by this or previous administrations.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                                  K

Ground 2 or Ground _____ (if applicable):

PETITIONER'S FEDERAL RIGHTS TO DUE PROCESS AND EQUAL PROTECTIONS WERE
VIOLATED WHEN RESPONDENTS UTILIZED A LESSER STANDARD OF LEGAL PROOF
REQUIRING EVIDENCE WITH SOME INDICIA OF RELIABILITY TO FIND THAT PETI-
TONER IS UNSUITABLE TO PAROLE AND IS THEREFORE AN UNREASONABLE RISK.

a. Supporting facts:

Nowhere is there any codification that avers petitioners must
prove his or her suitability. Only if an inmate is found unsuitable
does evidence become citable. (See Dannenberg, at 1095; Rosenkrantz
at 658, 683.) Evidence must be specific, articulable, and have "some
indicia of reliability." Respondents have the burden of proof to
demonstrate, in the Record, why an inmate is not suitable and a
denial of more than one year requires that the BPH panel state for
the Record why it isn't likely that petitioners would be found suit-
able any time sooner. There is a wholesale vitiation going on here.

Procedural safeguards require: a hearing one year prior to
the MEPD, CCR §§2268(b)[2400 et sqq.], 2270(d), (e), (f); PC §3041
(a), CDC v. Morales (1995) 115 S.Ct. 1597, 1600; service and prior
examination of all material considered; representation if desired.

The one-year lead on a MEPD imparts that the Legislature
intended that some inmates will be suitable at an initial hearing
otherwise why would such a gratuitous mandate exist? Govenor's-
level review presumes a neutral, well-defined, professional body
that will follow all the state and federal laws. Only this practice

(continued on attached pages)

b. Supporting cases, rules, or other authority:

(SEE ATTACHED POINTS AND AUTHORITIES)

1  Ground 2, continued:

2  would meet the constitutional burden under the discretionary methods

3  needed to quickly resolve an uncertain matter.

4      The "some evidence" relied on to deny parole must be relevant

5  and reliable in establishing Petitioner is a <u>current</u>, unreasonable

6  threat to public safety and must not be grounded in an incomplete

7  or unreasonable assessment of the relevant factors.

8      In explaining what the "some evidence" standard meant, the

9  Court in <u>In re Rosenkrantz</u> (2002) 29 Cal.4th 616 at 677, stated

10 that "[o]nly a modicum of evidence is required." On its face, this

11 standard could thus be seen as remarkably broad--that a scintilla

12 of evidence (or the BPH's assessment of it)--would be enough to

13 completely immunize BPH decisions from judicial review. However,

14 such a reading would effectively serve to nullify the <u>Rosenkrantz</u>

15 court's holding rejecting the Executive's position that factual

16 decisions rejecting parole were immune from examination by the courts

17 and in point of fact were required.

18     A disection of the "some evidence" standard itself--both

19 conceptually and through a review of the application of the

20 <u>Rosenkrantz</u>' standard (and its progeny)--makes clear that this is

21 the meaningful standard. Properly understood, it strikes an

22 appropriate balance between judicial deference to difficult BPH

23 decisions and the protection of constitutional liberty interests.

24     The "some evidence" standard of review is laid out here:

25     "[W]e conclude that the judicial branch is authorized
       to review the factual basis of a decision of the [BPH]
26     denying parole in order to ensure that the decison comports
       with the requirements of due process of law, but that
27     in conducting such a review, the court may inquire only
       whether some evidence in the record before the [BPH] sup-
28     ports the decision to deny parole, <u>based</u> <u>upon</u> <u>the</u> <u>factors</u>

4-A

1    specified <u>by statute and regulation</u>. <u>Rosenkrantz</u>, 658.

2    "[a]s long as the [BPH] decision reflects due consideration
     of the <u>specified factors</u> as applied to the INDIVIDUAL
     PRISONER <u>in accordance with applicable legal standards</u>,

3    the court's review is limited to ascertaining whether
     there is some evidence in the record that supports the

4    [BPH] decision." <u>Id</u>. at 677. (emphasis added).

5        Thus, the inquiry into whether there is "some evidence" is

6    more complex than it might otherwise seem, as the standard MUST

7    be applied within the context of the statutory framework in which

8    it arises. This framework imposes at least 3 requirements on the

9    "some evidence" standard if it is used to deny parole.

10       First, the BPH must base their decisons only on evidence that

11   serves to establish that the inmate will or will not pose a

12   continuing, "unreasonable risk of danger to society if relesed from

13   prison." CCR, title 15, §2402(a), and PC §3041(b).

14       Second, the evidentiary basis for parole decisions must be

15   based on the factors specified in the regulations after

16   <u>individualized considerations of all of the factors</u>. <u>Rosenkrantz</u>

17   at 677 ("The precise manner in which the specified factors relevant

18   to parole suitability are considered and balanced lies within the

19   discretion of the [executive branch], but the decision must reflect

20   an individualized consideration of the specified criteria and CANNOT

21   BE ARBITRARY AND CAPRICIOUS."); see also <u>In re Stanley</u> (1976) 54

22   Cal.App.3d 1030, 1038 n.7 ("Other courts place more weight on the

23   prisoner's record of crime. We abstain from any argument over the

24   relative primacy of various parole factors. It is enough to say

25   that the Adult Authority must apply all the factors.") (citing <u>In</u>

26   <u>re Minnis</u> (1972) 7 Cal.3d 639). These factors naturally all relate

27   to whether the inmate poses <u>a continuing, unreasonable risk of danger</u>

28   <u>to society if released from prison</u>. (emphasis added).

4-B

Third, the evidence upon which the BPH relies must be relevant and reliable. CCR §2402(b) ("All relevant, reliable information available to the panel shall be considered in determining suitability for parole.") (cf. CCR §§2402(d)(1-9).

In sum, a court examining parole decisions must determine whether, after all consideration of all the factors enumerated in the statute and regulations, the decison was based on: 1) some evidence; 2) a reasonabe consideration of all the factors specified by the statutory guidelines; 3) evidence that is both relevant and reliable; and 4) factual determinations that suggest an inmate poses a CURRENT, UNREASONABLE THREAT TO PUBLIC SAFETY.

A review of the post-Rosenkrantz legal panorama reveals that California courts of appeals and federal courts have routinely applied the above boundaries and checkpoints of relevance, reliability and reasonableness to the "some evidence" standard. The California Supreme Court has so far utterly failed to establish a brightline Plimsoll mark to define the full depth of the inquiry.

The courts continue to assess the reasonableness of the BPH's interpretation of the facts and circumstances used to legally sustain a finding of parole suitability denial. The court in In re Van Houten (2004) 116 Cal.App.4th 339, 356, assessed whether the BPH was reasonably able to conclude that there was some evidence of the inmate's need of continuing therapy and her dangerousnes to the public. Though it found in the affirmative, the court took a close look at whether the BPH "could reasonably conclude that [her] defense, that Manson's influence overwhelmed [her], was exagerated such that she is fully responsible for the LaBianca murders" and whether "[t]he BPH could infer with sufficient

4-C

1  reasonableness to satisfy a minimal 'some evidence' standard that

2  [she] is a danger to the public and in need of continued therapy

3  and programming." Her denial was affirmed with instructions.

4       Judicial inquiry into the stated reasons for parole denial

5  have their place and numerous state and federal courts--in a wide

6  range of contexts--have similarly held the judicial inquiry into

7  the reasonableness of BPH determinations and conclusions is

8  appropriate, even when such determinations and conclusions are

9  accorded broad deference. (See, e.g., In re Farley (2003) 109

10 Cal.App.4th 1356, 1361-2: "Judicial review of a CDC custody

11 determination is limited to determining whether the classification

12 decision is arbitrary, capricious, irrational, or an abuse of the

13 discretion granted those given the responsibility for operating

14 prisons. While we must uphold respondent's classification action

15 if it is supported by "some evidence" and we must afford great

16 deference to an administrative agency's expertise, where the agency's

17 interpretation of the regulation is clearly arbitrary or capricious

18 or has no basis, COURTS SHOULD NOT HESITIATE TO REJECT IT."

19      Federal courts likewise require parole decisions to be

20 reasonable. As an example, in a parole rescission case, a federal

21 court in this state held: "the Court of Appeals conclusory findings

22 that there was 'some evidence' to support the rescinding, the BPH's

23 decision that parole was improvidently granted to petitioner are

24 contrary to clearly established federal law and, to the extent they

25 are fact-based, represent unreasonable determinations of the facts

26 in light of the evidence presented in the state court preceedings."

27 Stockton v. Hepburn (N.D Cal. 2005) 2005 U.S. Dist. LEXIS 4877 at

28 43; see also Irons v. Warden (N.D. Cal 2004) 358 F.Supp.2d 936,

1  948 ("Clearly, a conclusion by lay BP[H] commissioners that

2  petitioner has not yet acheived required therapy for insight OR

3  OTHER REASONS is not reasonably sustainable, and a state court's

4  conclusion to the contrary is patently unreasonable.")

5     The federal liberty interest is made an adjunct to the state

6  requirements of due process by and through the 14th Amendment to

7  the U.S. Constitution and the substantial evidence of the federal

8  standard must be overcome to meet federal guarantees to its citizens

9  who, before they became entitled to state civil rights, were first

10  bestowed by operation of their federal citizenship. A state cannot

11  lawfully deny any federal right to its citizens but that is exactly

12  what respondents are demanding of their agents in the BPH, and will

13  no doubt now ask this Honorable Court to signoff on. That must not

14  be allowed if the judiciary is to be truly separated from the

15  Executive charades disguised is a legitimate exercise in freedom.

16     The goal of indeterminate sentences and the parole system is

17  not only to punish, but also to provide for reformation and

18  rehabilitation as the CDC's renaming suggests:

19       "The belief no longer prevails that every offense in
         a like legal category calls for an identical punish-

20       ment without regard to past life and habits of a parti-
         cular offender. ... Retribution is no longer the domi-

21       nant objective of the criminal law. Reformation and
         rehabilitation of offenders have become important goals

22       of criminal jurisprudence."

23  People v. Morse (1964) 60 Cal.2d 631, 643 n.8 (quoting Williams

24  v. State of New York (1949) 337 U.S. 241, 247). In a lengthy discus-

25  sion of this topic, the Supreme Court stated the following:

26       "[T]he purpose of the indeterminate sentence law, like
         other modern laws in relation to the administration

27       of criminal law, is to migitate the punishment which
         would otherwise be imposed upon the offender. These

28       laws place emphasis upon the reformation of the offender.

1    They seek to make the punishment fit the criminal rather
     than the crime. They endeavor to put before the prisoner
2    great incentive to well-doing in order that his will
     to do well should be strengthened and confirmed by the
3    habit of well-doing. [...] [The] interests of society
     require that under prison discipline every effort should
4    be made to produce a reformation of the prisoner. ...
     The legislative policy [was to provide a system whereby]
5    a hope was to be held out to prisoners that through
     good conduct in prison and a disposition shown toward
6    reformation, they might be permitted a conditional liber-
     ty upon restraint under which they might be restored
7    again to society. ... Although good conduct while in-
     carceratd and potential for reform are not the only
8    relevant factors, this court has acknowledged their
     significance. Furthermore, the Authority has declared
9    that these factors are among those of 'paramount impor-
     tance. In re Minnis, 7 Cal.3d 644-45.
10

11    The Rosenkrantz Court, at 656, citing to Minnis, reaffirmed

12   these principles: "[E]ven before factors relevant to parole de-

13   cisions had been set forth expressly by statute and regulations,

14   we concluded that '[a]ny official or board vested with discretion

15   is under an obligation to consider all relevant factors [], and

16   the [BPH] can't, consistently with its obligation, ignore post-

17   conviction factors UNLESS DIRECTED TO by the Legislature." (citing

18   Minnis at 645; emphasis added for illumination).

19    Petitioner has a Constitutional liberty interest in parole

20   decisions and "[P]arole applicants in this state have an expectation

21   that they will be granted parole unless the BPH finds, in its

22   reviewable discretion, that they are unsuitable for parole in light

23   of the circumstances specified by statute and regulation."

24   Rosenkrantz at 654 and at 659-61 this liberty interest is an

25   expectation protected by due process of law. (holding that the

26   California Constitution Art. V, §8(b) and PC §3041 "give rise to

27   a protected liberty interest" in that "a prisoner granted parole

28   by the BPH has an expectation that the Governor's decision to affirm

1    modify, or reverse the BPH's decision will be based upon the same

2    factors the BPH is required to consider," and that "this liberty

3    interest underlying a Governor's parole review decision is protected

4    by due process of law.").

5        Federal courts have also unequivocally held that California's

6    parole system gives rise to a liberty interest constitutionally

7    protected by due process. See: Allen, infra at 376-78; Greenholtz

8    v. Inmate of Neb. Penal & Corr. Complex (1979) 442 U.S. 1, 11-12

9    (holding a state's statutory parole scheme that uses mandatory

10   language may create a presumption that parole release will be

11   granted upon certain circumstances or findings, thus giving rise

12   to a constitutionally protected liberty interest); McQuillen, supra

13   at 902-3 n.1 (holding that because parole scheme uses mandatory

14   language and is largely parallel to the schemes found in Allen

15   and Greenholtz do give rise to a protected libety intrest in RELEASE

16   ON PAROLE, "California's parole scheme gives rise to a cognizable

17   liberty interest in release on parole.") Biggs v. Terhune (9th

18   Cir. 2003) 334 F.3d 910, 914-15 (same) and, ("[t]he liberty interest

19   is created, not upon the grant of a parole date, but upon the

20   incarceration of the inmate."

21       Rosenkrantz specifically rejected any position that a court

22   may not properly examine the factual basis of parole decisions

23   at 667, "[W]e conclude that the courts properly can review a

24   Governor's decisions whether to affirm, modify, or reverse a parole

25   decision by the BPH to determine whether they comply with due

26   process of law, and that such review properly can include a determi-

27   nation of whether the factual basis of such a decision is supported

28   by some evidence in the record that was before the BPH.

1    Post-_Rosenkrantz_, courts have reaffirmed the concepts of broad

2    executive deference but vigilent judicial review, by engaging care-

3    ful analysis, will ensure that the boundaries of due process are

4    respected and upheld. "[t]he exceedingly deferential nature of

5    the "some evidence" standard of judicial review set forth in

6    _Rosenkrantz_ does not convert a court reviewing the denial of parole

7    into a potted plant." _In re Scott_ (119 Cal.App.4th 871, 898, re-

8    cently affirmed).

9        The Court, in _In re Dannenberg_ (2005) 34 Cal.4th 1061 at 1095

10   n.16 reaffirmed that effective judicial review is critical to due

11   process. Rejecting the dissent's suggestion that the opinion "per-

12   mits untethered pro forma parole denials that are insulated from

13   effective judicial review, thus contravening California life in-

14   mates' due process rights to individualized parole consideration,"

15   the majority made clear that the [BPH] must apply detailed standards

16   in evaluating individual inmates' suitability for parole on public

17   safety grounds, and that the Executive's broad discretion is subject

18   to meaningful judicial oversight.

19       There is no question that the discretion afforded to the BPH

20   with respect to parole decisions is great. However, the parole

21   system's very purpose is to provide for the reentry into society

22   of inmates who no longer pose a danger or unreasonable threat to

23   public safety, and those rights afforded thereunder are

24   constitutionally protected.

25       The BPH must abide by due process considerations, and the

26   courts are entrusted with ensuring that such considerations are

27   adequately respected and thus protected. Neither _Rosenkrantz_ or

28   _Dannenberg_ permits respondents to immunize themselves from re-

1   view by unreasonable and possibly unlawful assertion that certain

2   facts support a denial of parole. On the contrary, <u>Rosenkrantz</u>

3   and <u>Dannenberg</u> make clear that the courts have a vital and therefore

4   important role to play in ensuring that parole decisions are

5   actually supported by "some evidence" having a basis in fact, and

6   an indicia of reliability supported in the record.

7        Petitioner submits that there is a real danger that, improperly

8   understood, the guidelines articulated in <u>Rosenkrantz</u>, <u>Dannenberg</u>,

9   and the court of appeals will serve to provide respondents with

10  de facto immunity from judicial review, a result anathema to state

11  and federal due process protections. Properly understood, the "some

12  evidence" standard provides a fair and proper framework for review

13  of parole decisions in any venue, one that provides respondents

14  with an appropriate level of deference in making extremely difficult

15  decisions relating to inmates' liberty interests and public safety

16  concerns, while ensuring that statutory and constitutional liberty

17  interests are being adequately and lawfully safeguarded through

18  judicial review. And, when this standard is properly applied to

19  this case, there should be no doubt but that the BPH's denial of

20  suitability seems unsustainable and must be reversed, a new hearing

21  granted, and an Order with instructions issued.

22       WHEREFORE, Petitioner prays that the writ be granted in full

23  and all available relief be accorded to Petitioner to comply with

24  and comport to the state and federal Constitutions and the legal

25  adversarial process and resolution of a judicious nature in this

26  most important matter herein. Petitioner hereby incorporates by

27  reference, as though fully set forth, all papers, pleadings,

28  transcripts, exhibits and matters of record in the instant matter.

7. Ground 2 or Ground __3__   (if applicable):

PETITIONER HAS A FEDERALLY-COGNIZABLE LIBERTY INTEREST IN RELEASE

TO PAROLE CREATED BY RESPONDENT'S STATUTORY SCHEME AND MANDATORY

LANGUAGE OF THE ENABLING STATUTES THAT REQUIRES A SUITABILITY FINDING

UNDER STATUTORY CRITERIA AND RESPONDENTS' BURDEN IS NOT MET HEREIN

a. Supporting facts:

This petition is intended to give legitimate meaning to petition-
er's fifteen (15) years-to-Life sentence by seeking an Order in this
Court granting the writ to discharge petitioner from state prison,
or alternatively, compelling the BPH to conduct a new parole
consideration hearing and correctly weight their statutory findings
to view suitability and consequent release to parole for Petitioner.

The issues raised are of constitutional dimension, comporting
to petitioner's federal constitutional rights, and questioning the
legality of petitioner's continued confinement in the face of over-
whelming evidence of legally-sustainable proof of suitability and
unquestioned state-hired professionals and their proffered opinions
of reasonable assurance in adhering to concerns of public safety.

There is NO evidence having indicia of reliability that this
petitioner poses an unreasonable risk of danger to the public and
P.C. §3041(a) and California Code of Regulations (CCR), Title 15,
Division II §§2402(d)(1,2,3,4,6,7,8 & 9) (parole suitability criteria)
all make it clear that there IS A MANDATE, based on a legally-
sufficient standard, and that standard is subject to judicial review

b. Supporting cases, rules, or other authority:

(SEE ATTACHED POINTS AND AUTHORITIES)

1    (continued from previous page):

2    for abuse of discretion under a federal due process and equal protection umbrella with safeguards required in a

3    review of the "evidence" of unsuitability that is burdened upon respondents.

4         The California Supreme Court recognizes that prisoners have procedural due process protections in

5    connection with parole determinations. A legitimate expectancy of release to parole is created by PC § 3041. If

6    the statute creates the legitimate expectancy of parole, it is not legally sufficient to answer that the BPH may, in

7    its broad discretion, deny parole suitability.

8         This argument, that the BPH's broad discretion swallowed Petitioners liberty interest and expectation of

9    release was squarely rejected by the High court in Allen, supra. Additionally, the Court stated in Rosenkrantz IV:

10   "[P]arole applicants in this state *Have an expectation that they will be granted parole* unless the BP[H] finds in its

11   discretion, that they are unsuitable for parole **in light of the circumstances specified by statute and**

12   **regulation**." Rosenkrantz IV, supra, 29 Cal.4[th] at p. 654. And, [O]ur past decisions make clear that the

13   *requirement* of procedural due process embodied in [Art. I,   § 7, subd. (a)], places some limitations upon the

14   broad discretionary authority of the BP[H]." Id. at p. 655.

15        Therefore, it is inherently clear that the presence of discretion held by the BPH does not, under either

16   state or federal law, diminish nor extinguish the expectancy of release to parole and in no ways Petitioner's due

17   process rights. It thus follows that a liberty interest has existed under PC § 3041 that is embodied in, and

18   protected by, the Fourteenth Amendment's Due Process Clause.

19        Also, CCR regulations use the "shall/unless" language (§§ 2401-2402) and recognize all available rights

20   to Petitioners. Further, these regulations AS ORIGNIALLY WRITTEN, made it even clearer that parole was to

21   normally to be granted. This remained so until political operatives, presumably with a criminal bent, manipulated

22   the executive and legislative branches to repeal this proviso and substitute a "Willie Horton" revision that was

23   never fully explained to the public nor openly voted upon for acceptance and would've probably failed it there

24   had been an honest attempt to do so.

25        For respondents to abrogate this federal liberty interest they must provide substantial relevant, reliable

26   evidence having some indicia of credibility that Petitioner poses a CURRENT *unreasonable* threat to the public

27   safety, as noted in In re Lee (10-10-06) Second District Court of Appeals, Division Eight; 49 Cal.Rptr.3[rd] 931,

28   where the court cautioned:

A

"The commitment offense can negate suitability [for parole] only if circumstances of the crime ... rationally indicate that the offender will present an unreasonable public safety risk if released from prison. In re Scott (2005) 133 Cal.App.4[th] 573, 595, (however, In re Lowe (2005) 130 Cal.App.4[th] 1405 suggested "some evidence" applies to the factors, not dangerousness.) Some evidence of the existence of a particular factor does not necessarily equate to some evidence the [inmate's] release unreasonably endangers public safety." Lee, supra, pp. 936-37.

¶The board and governor must focus their parole decisions on whether a prisoner continues to pose an unreasonable risk to public safety. Such a practical inquiry, rooted in real world crime and law and order, has no obvious intersection with incorporeal realm of legal constructs." Id. at p. 940.

This is something they have patently failed to do, as testified by virtually all of their own witnesses as noted in attached Exhibit "B", which has been previously generated BY RESPONDENTS and provided to all concerned parties prior to Petitioner's various hearings and with NO OBJECTIONS from respondents as being accurate and meaningful to ascertain PRESENT DANGEROUSNESS.

"Unreasonable risk" evidence that meets the federal level of reliability must be drawn from an individualized analysis of fifteen (15) factors identified by regulations: CCR § 2402(b); Rosenkrantz IV at pp. 653-54. "Such information shall include circumstances of the prisoner's social history; past and present mental state; past criminal history; [] the base and other commitment offenses; past and present attitude toward (sic) the crime; any conditions of treatment or control ...; and any other information that bears on the prisoner's suitability for release." (Emphasis added.)

This extensive list of factors, including other relevant reliable information that must be considered, makes it clear that the Legislature did not intend for any single factor to initially or consis-tently trump all the others. This is exactly what is happening here however. Decision upon decisions by the BPH suggests that their focus is exclusively on the commitment offense, a sub-factor among the total. The BPH insistently attempts to insulate their failure to individually consider circumstances of suitability using makeweight exceptions to state by rote that, 'although post-conviction behavior was DULY CONSIDERED, and the inmate is otherwise suitable for release to parole, the offense was so heinous, atrocious, or cruel, that Petitioner is ineligible for a finding of suitability. "The evidence under-lying the BPH's decision must have some indicia of reliability." Jancsek v. Oregon Board of Parole (9th Cir. 1987) 833 F.2d 1389, 1390.

The reduction of the parole assessment process to an occluded, myopic pseudo-consideration of the one factor, and it alone—unerringly as an unwritten but accepted general rule practiced in all circumstances— was never intended by the Legislature and cannot be permitted nor allowed to continue and still comport with

B

1    Rosenkrantz, Biggs, Martin, Morrall, Irons, Coleman, et cetera. See also: Environmental Defense Center, Inc. v.

2    E.P.A. (2003) 344 F.3d 832, 858, fn. 36, (holding that a federal agency has acted in an arbitrary and capricious

3    fashion, if "the agency has relied on factors that Congress has not intended to consider, entirely failed to

4    consider an important aspect of the problem, and offered no explanation for its decision that runs counter to the

5    evidence before the agency, or is so implausible that it could not be ascribed to a different view or the product of

6    agency expertise."); Arizona Cattlegrower's Ass'n v. U.S. Fish & Wildlife, B.L.M. (9th Cir. 2001) 273 F.3d 1229,

7    1236 (holding judicial review under the "arbitrary and capricious" standard is "meaningless … unless we carefully

8    review the record to ensure that agency decisions are founded on a reasoned evaluation of the relevant factors

9    …[;] while reviewing courts should uphold reasonable and defensible constructions of an agency's enabling act,

10   they must not rubber-stamp … administrative decisions that they deem inconsistent with a or that frustrate the

11   congressional policy underlying a statute.")

12       Second degree murder is not a crime automatically allows one to be deemed unsuitable for release and

13   parole. And, given the above directive in Environmental Defense Center, Inc. v. E.P.A and Arizona

14   Cattlegrower's Ass'n v. U.S. Fish & Wildlife, B.L.M., coupled with Rosenkrantz, Biggs, Martin, Morrall, Irons,

15   Coleman, et al., there must be a base set of factors upon which a second degree murderer would have to be

16   paroled or the BPH would risk violating due process. To determine what would qualify as more than the minimum

17   necessary for a conviction, the courts must first consider what is required, at the minimum, for a conviction of

18   second-degree murder.

19       The Second District Court of Appeals has explained, in In re Sandra Davis Lawrence (2007, Rev.

20   granted 9-21-07), 150 Cal.App.4[th] 1511; "Combining the California and federal standards of review, as they have

21   been articulated thus far by the California Supreme Court, respectively, the commitment crime can lack the

22   power to supply "some evidence" supporting a denial of parole because of the interplay between two factors—

23   the nature of the crime and the passage of time since its commission. That is, the fact there is "some evidence"

24   the crime was committed and committed a certain way at a certain time dies not mean that the crime necessarily

25   represents "some evidence" the prisoner's release on parole will pose an unreasonable risk of danger to the

26   public safety at the present time. Whether it possesses the necessary predictive value depends both on the

27   nature of the crime and how long ago it happened. … Slip O.o. pp. 22-23.

28       "When the Legislature sets an indeterminate maximum term with a fixed minimum term, the latter can be

C

1    viewed as setting the period of imprisonment deemed necessary to satisfy the first two purposes, while the

2    justification for continued imprisonment beyond that fixed minimum depends on the need for continued

3    incapacitation of the offender. California's sentencing structure in murder cases makes it clear the denial of

4    parole can only be justified by the third of these purposes—the need for further incapacitation of the prisoner.

5    Unless there is an *unreasonable risk* the parole applicant will re-offend and thus pose a risk to public safety she

6    or he **is supposed to be released on parole**. Neither the Board nor the Governor properly takes account of

7    whether release on parole will impair the retributive or the deterrent value of continued imprisonment at this late

8    stage of the inmate's incarceration. (Ibid., p. 24, emphasis added to original.)

9        "[R]eturning to the statutory test, only evidence bearing on the likelihood of recidivism and only to the

10   extent it reveals an "unreasonable risk" of same is relevant to the decision whether to grant or deny parole. As a

11   recent court of appeal opinion emphasized, a parole release decision authorizes the Board [] only to '"identify

12   and weigh the factors relevant to predicting ... ""whether the inmate will be able to live in society *without*

13   *committing additional antisocial acts*."'" In re DeLuna (2005) 126 Cal.App.4th 585, 591, quoting Rosenkrantz V at

14   p. 655 (Emphasis in original); Lawrence , supra, Id. p. 25), 150 Cal.App.4th 1511, _____.

15       The Sixth District Court of Appeals has explained that "[s]econd degree murder requires ... malice—i.e.,

16   the perpetrator must kill another person with the specific intent to do so; or he or she must cause another

17   person's death by intentionally performing an act, knowing it is dangerous to life and with conscious disregard for

18   life." In re smith (2003) 114 Cal.App.4th 343, 366, citing P.C. §§ 187-189; and CALJIC No. 811. (Noting "all

19   second degree murders by definition involve some callousness, i.e., lack of emotion or sympathy, emotional

20   insensitivity, indifference to the feelings and suffering of others" and that the facts of the instant crime were

21   callous, but not exceptionally callous.) Id. at pp. 366-7.

22       From this instructive dialog, the limits on the "minimum necessary to sustain a conviction" of second

23   degree murder can be defined. There must be: 1) a killing of another, 2) malice, 3) no premedi-tation or

24   deliberation, planning, lying in wait, torture, etc., as would be present in a first degree murder, a crime that

25   Petitioner was specifically acquitted by a jury of his peers.

26       Now that the crime is defined, the question must be what evidence indicates that any particular second

27   degree murder was somehow "beyond the minimum necessary to sustain a conviction." In sum: what evidence

28   indicates the commitment offense was "*especially* heinous" or "*exceptionally* grave", given that there typically

D

1   must be a finding of some level of heinousness, callousness, and/or gravity of violence in order for a defendant

2   to have had his second degree murder conviction sustained by the appellate courts in the first place?

3          There was no weapon enhancement that could reasonably demonstrate that this crime was "beyond the

4   minimal elements" of a second-degree murder conviction, and is in no way some evidence establishing that he is

5   _currently_ an unreasonable threat to public safety. Petitioner was not the shooter and lacked the requisite intent to

6   charge an enhancement. Indeed, if the BPH were to be able to rely on "weapon of choice" evidence in every

7   case, **every** second degree murder would be "beyond the minimal elements" and there would be no way to

8   commit a second degree murder in California that did not qualify as an "especially" heinous crime and thereby

9   justify imprisonment for life, without any chance of parole. This is not what the Legislature wrote the

10  enhancement statutes for nor the intended outcome of any additional punishment attached thereto, and exceeds

11  the bounds of common sense in every conceivable manner.

12         Having doubts as to these elements, the People accepted a plea to agreement to second degree

13  murder and there has never been any contention that the admission should have been otherwise. The unique

14  elements present here were duly recounted: (by **PRESIDING COMMISSIONER KUBOCHI**): "In regard to your

15  personal history I'm looking all the way back to a board report of 2000 for a detailed – oh, excuse me, I'm

16  actually looking at the psychological evaluation of 2002, 2000 (sic) – and that psychological evaluation was

17  done by doctor C-O-A-T-E. I was looking for more details in regard to your personal history. That you told (sic)

18  Dr. Coate you were raised by you mother and father in Michigan until the age of 13, **when you mother died of**

19  **cancer. ....**  You reported an extremely close relationship with your mother and that after her death you r life

20  drastically changed. Your father retired from the Coast Guard and he was rarely at home. After the death of your

21  mother, your father had difficulty handling the loss, as well as taking care of six children. You were the oldest of

22  six children and that you had been in and out of law enforcement (sic), probation, facilities since your teenage

23  years. You described your home life as very, (sic) as having conflict, and was full of stress, as your father drank

24  heavily and abused both your mother and the children. **You described your teenage years** as living in fear

25  **and not having anyone to confide** in. after the death of your mother the physical abuse by you r fatehr

26  escalated to the point that the children were taken out of the home by social services, of juvinile authorities and

27  placed in the care of your mother's grandmother. The grandmother could not handle the responsibility of raising

28  six children and _ultimately the children in the family were separated and placed in differnet foster care homes._

E

1  You ran away ..., and you, to use the phrasing of the psychologist, were on the street.  You do not make contact

2  with you r brothers and sisters, although you do exchange holiday cards, but don't receive much correspondence

3  from any of them. Who visits you here, sir? INMATE **CASTILLO: I haven't had a visit since I've been**

4  **incarcerated, Sir**. .... **PRESIDING COMMISSIONER KUBOCHI: How would you describe your personality?**

5  INMATE **CASTILLO:** My personality? **PRESIDING COMMISSIONER KUBOCHI: Yeah, outgoing, loner?**

6  INMATE **CASTILLO:** Well, it's changed throughout the years since I've been incarcerated and if you go back

7  before the committed offense, I could say that I was lost, I didn't have no sense of direction (sic). But, given the

8  time I've been incarcerated I've actually taken the time to reflect on why I'm here and to understand that and I

9  could say, I would say that I'm actually outgoing, but also – what's another way of saying that – *caring*? For the

10 things I do, and the things – **and knowing it's important to make up for my mistakes**. **PRESIDING**

11 **COMMISSIONER KUBOCHI:** How would you characterize your ability to get along with people in a group

12 setting? INMATE **CASTILLO:** ... Although that we have differences there's people in a group setting that I have

13 differences, and, I have no problems getting along with people." (Exhibit "A", pages 13-16, emphasis added.)

14 Certainly not an ideal childhood for any person nor appropriate role models for a culturally confused young boy

15 who felt he had to leave home, his family, and survive as best he could. The courts have routinely noted at all

16 levels that youth is not to be held to adult standards of behavior where the development of the person is still

17 ongoing and not fully competent nor mature.

18    Rosenkrantz VI 444 F.Supp.2d 1036 noted such a nexus insofar as age, maturity, situational factors and

19 rage are concerned by stating:

20    "The reliability of the facts of his crime as a predictor for his dangerousness is further diminished
      by petitioner's age at the time of the offense. Petitioner turned 18 [**prior to the crime**], and
21    committed his offense one month later. While *petitioner* was not legally a minor, he was very
      close to being one. [FN17]  As the [U.S.] Supreme Court recently recognized, the
22    evidentiary/predictive value of the conduct of such a young person is diminished. The
      susceptibility of juveniles to immature and irresponsible behavior means '"**their irresponsible**
23    **conduct is not as morally reprehensible as that of an adult**."' Thompson v. Oklahoma (1988)
      487 u.s. 815, 835 (plurality opinion). Their own vulnerability and comparative lack of control over
24    their immediate surroundings mean *juveniles have a greater claim than adults to be forgiven*
      *for failing to escape negative influences in their WHOLE ENVIRONMENT*. (Emphasis
25    added.)

26    This rendition illustrates further, the importance (given the short tenure of the suggestion that "some

27 evidence" may be found in facts 'beyond the minimum necessary elements' of the commitment offense) of all

28 courts providing enhanced guidance regarding what set of facts are sufficient to support a denial of parole

F

1  suitability. Invariably, any such guidance should summarily relate to the relevance of the evidence; whether or

2  not it is substantial for federal due process purposes; its relevance and its reliability; and the reasonableness one

3  should exact in being able to conclude that the evidence sub-stantiates that the inmate is a CURRENT,

4  UNREASONABLE THREAT to the safety and security of the public and the ability to lawfully abide within the

5  community.

6     Sole reliance on the commitment offense to deny parole not only augurs the serious risk of being

7  arbitrary but is almost always counter-instructive. In the parole determination process, the panel is tasked with

8  assuring the Executive branch by determining if the prisoner is a CURRENT threat to the public safety. This

9  determination is, in total, the only decision that the BPH is sanctioned to make by the Penal Code and

10  Regulations codified for that purpose. All interpretations of mitigating and aggravating factors, and the weight

11  given to the special circumstances of the offense, merely go to instruct this final conclusion. "A determination of

12  unsuitability I simply shorthand for a finding that a prisoner CURRENTLY would pose an unreasonable risk of

13  danger if released at this time." Smith, supra, at p. 370, (citing C.C.R. § 2402(d), emphasis added.)

14

15     WHEREFORE, Petitioner respectfully submits these issues, arguments and Exhibits and prays this

16  Honorable Court and all Honorable Justices will grant the writ and Order Petitioner's release forth-with. Or, in the

17  alternative, Order a Rehearing within thirty (30) days of the Order with instructions to individualize his complete

18  suitability consideration without bias or political, personal, or considerations of tenure, and in accordance with the

19  statutory mandate of P.C. § 3041(a), and any further relief as the Court may deem just and proper to protect

20  Petitioner's civil rights.

21  ///

22  ///

23  ///

24

25

26

27

28

G

8. Did you appeal from the conviction, sentence, or commitment? ☐ Yes. ☐ No.    If yes, give the following information:

   a. Name of court ("Court of Appeal" or "Appellate Dept. of Superior Court"):

<u>                                             N/A                                  </u>

   b. Result: _____    c. Date of decision: _____

   d. Case number or citation of opinion, if known: _____

   e. Issues raised:  (1) _____

            (2) _____

            (3) _____

   f. Were you represented by counsel on appeal? ☐ Yes. ☐ No.  If yes, state the attorney's name and address, if known:

   _____

9. Did you seek review in the California Supreme Court? ☐ Yes. ☐ No.    If yes, give the following information:

   a. Result: _____<u>N/A</u>_____    b. Date of decision: _____

   c. Case number or citation of opinion, if known: _____

   d. Issues raised:  (1) _____

            (2) _____

            (3) _____

10. If your petition makes a claim regarding your conviction, sentence, or commitment that you or your attorney did not make on appeal, explain why the claim was not made on appeal:

   _____<u>N/A</u>_____

   _____

11. Administrative Review:

   a. If your petition concerns conditions of confinement or other claims for which there are administrative remedies, failure to exhaust administrative remedies may result in the denial of your petition, even if it is otherwise meritorious. (See *In re Muszalski* (1975) 52 Cal.App.3d 500 [125 Cal.Rptr. 286].) Explain what administrative review you sought or explain why you did not seek such review:

   <u>NO ADMINISTRATIVE REMEDIES ARE AVAILABLE FOR RESOLUTION</u>

   _____

   _____

   _____

   _____

   _____

   _____

   _____

   b. Did you seek the highest level of administrative review available? ☐ Yes. ☐ No.
    *Attach documents that show you have exhausted your administrative remedies.*

LEGAL MAIL

Francisco P. Castillo
CDC # C-83763
P.O. Box 5337/F-313-L
Soledad, CA 93960
***CONFIDENTIAL LEGAL MAIL***

U.S. District Court
Northern District Clerk
450 Golden Gate Ave.
San Francisco, CA 94102
***CONFIDENTIAL LEGAL MAIL***

RECEIVED

MAY 6 2008

RICHARD W. WIEKING
NORTHERN DISTRICT OF CALIFORNIA

