C-08-2343-CW

# EXHIBIT "A"

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS

**INMATE COPY**

In the matter of the Life )
Term Parole Consideration )
Hearing of: )
                               )
FRANCISCO CASTILLO      )     CDC Number C-85768
                               )
_____)

CORRECTIONAL TRAINING FACILITY

SOLEDAD, CALIFORNIA

JUNE 27, 2007

1:10 P.M.

PANEL PRESENT:

STAN KUBOCHI, Presiding Commissioner
NOREEN BLONIEN, Deputy Commissioner

OTHERS PRESENT:

FRANCISCO CASTILLO, Inmate
MIKE GUNNING, Attorney for Inmate
SCOTT CARBAUGH, Deputy District Attorney
Correctional Officer(s) Unidentified

CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____    No       See Review of Hearing
_____    Yes    Transcript Memorandum

**SHELLEY KELBER**
**NORTHERN CALIFORNIA COURT REPORTERS**

INDEX

                                                            Page

Proceedings ............................................. 1

Case Factors ............................................ 8

Pre-Commitment Factors ................................. 11

Parole Plans ........................................... 15

Post-Commitment Factors ................................ 21

Closing Statements ..................................... 40

Recess ................................................. 48

Decision ............................................... 49

Adjournment ............................................ 58

Transcriber Certification .............................. 59

--oOo--

1

1          **P R O C E E D I N G S**

2          **DEPUTY COMMISSIONER BLONIEN:**  We're on record.

3          **PRESIDING COMMISSIONER KUBOCHI:**  We're on record

4     for the subsequent parole consideration hearing of

5     Francisco Castillo, C-A-S-T-I-L-L-O, CDC number C-85768.

6     Today's date is June 27th, we're located at the

7     Correctional Training Facility, Soledad, California, and

8     it is about 1:10 p.m.  Mr. Castillo, these proceedings

9     are recorded, from the record of this case a transcript

10    would be made and delivered to you at this institution at

11    a later time.  For purposes of assisting the transcriber,

12    we're going to go around the room, state our names, spell

13    our last name, in addition to your last name's spelling,

14    please provide us with your CDC number.  My name is Stan

15    Kubochi, K-U-B-O-C-H-I, Commissioner.

16          **DEPUTY COMMISSIONER BLONIEN:**  I'm Noreen Blonien,

17    B-L-O-N-I-E-N, I'm a deputy commissioner.

18          **ATTORNEY GUNNING:**  Mike Gunning, G-U-N-N-I-N-G,

19    I'm the attorney for Mr. Castillo.

20          **INMATE CASTILLO:**  My name is Francisco Castillo,

21    C-A-S-T-I-L-L-O, CDC number Charlie 85768.

22          **DEPUTY DISTRICT ATTORNEY CARBAUGH:**

23    Scott Carbaugh, C-A-R-B-A-U-G-H, Deputy District

24    Attorney, Los Angeles County.

25          **PRESIDING COMMISSIONER KUBOCHI:**  In addition

1    there are two officers here for security who are

2    nonparticipants. Mr. Castillo, please look at that BPT

3    1073 form, it's not necessary for you to read the entire

4    document. I will explain verbally what the document is,

5    and what its function is for, and that is to assure you

6    that any disabilities will be accommodated to allow you

7    to effectively communicate with this panel. Back in

8    March of 2007 Correctional Counselor Verdesoto,

9    V-E-R-D-E-S-O-T-O, reviewed your Central File and

10   Correctional Counselor Verdesoto was looking to see if

11   there was any prior documentation of any physical

12   disabilities that required assistance for this hearing

13   and checked the box indicating that upon review of your

14   Central File it did not appear to Correctional Counselor

15   Verdesoto that you needed any accommodations for your

16   hearing. In addition I note your signature with a date

17   of 3/1 of '07, with a check box, I do not need any

18   assistance for my hearing. Did all of that happen?

19          INMATE CASTILLO: Yes, sir.

20          PRESIDING COMMISSIONER KUBOCHI: And as I speak

21   to you now, do you have any hearing problems?

22          INMATE CASTILLO: No, I don't, sir.

23          PRESIDING COMMISSIONER KUBOCHI: Have any vision

24   problems?

25          INMATE CASTILLO: No, sir.

3

1     **PRESIDING COMMISSIONER KUBOCHI:**  You have a GED

2     and you also have been tested at greater than tenth grade

3     reading level, and I will assume by your accomplishments

4     in the academics that you can read and write English.

5     **INMATE CASTILLO:**  Yes, sir.

6     **PRESIDING COMMISSIONER KUBOCHI:**  And that you're

7     not going to have any problem reading any documents if

8     required to do so during this hearing, is that correct?

9     **INMATE CASTILLO:**  That's correct, sir.

10    **PRESIDING COMMISSIONER KUBOCHI:**  And I am going

11    to ask you whether or not, from a physical standpoint,

12    you have any pain or discomfort?

13    **INMATE CASTILLO:**  No, sir.

14    **PRESIDING COMMISSIONER KUBOCHI:**  How about any

15    disabilities physically?

16    **INMATE CASTILLO:**  No, sir.

17    **PRESIDING COMMISSIONER KUBOCHI:**  And have you

18    consumed anything in the last 48 hours that could

19    interfere with your ability to think clearly/

20    **INMATE CASTILLO:**  No, sir.

21    **PRESIDING COMMISSIONER KUBOCHI:**  Today's hearing

22    is being conducted pursuant to the Penal Code and the

23    Rules and Regulations of the Board of Parole Hearings

24    that apply to suitability hearings of life inmates.  The

25    purpose of today's hearing is to once again consider your

4

1    suitability for parole.  In doing so we will look at the

2    number and the nature of crimes for which you were

3    committed, your prior criminal history; I will be

4    reviewing with you your personal and social history

5    before your incarceration and your parole plans.  In

6    regard to your parole plans, please let us know what

7    those plans are as of today, regardless of any

8    information that's been documented in the past.  In

9    addition, at any time throughout this hearing, if you

10   think of documents that you believe would support a

11   finding of suitability, provide them to Mr. Gunning for

12   presentation on your behalf.  Commissioner Blonien will

13   be discussing with you your behavior and programming

14   since your commitment, and that includes participation in

15   academic, vocation, work assignments, and group therapy

16   and the evaluations of mental health experts.  We will

17   reach a decision today and inform you whether or not we

18   find you suitable for parole and the reasons for our

19   decision.  If you are found suitable for parole the

20   length of your confinement will be explained to you.

21   Before we recess for deliberations, questions may be

22   asked of you on the factors that I've just described.

23   Questions may come from the panel; the district attorney

24   may ask the panel questions and your answers, if any, to

25   the questions, will be directed to the panel.  This is

5

1   not adversarial.  It is not a case where you are against

2   the board or you're against the DA in a finding of

3   suitability.  We're just trying to gather facts here.

4   Before closing, your attorney, Mr. Gunning, may ask you

5   questions and before recessing the district attorney's

6   representative makes a final statement.  Mr. Gunning will

7   tell us why you are suitable for release; and you will be

8   given an opportunity to tell us why you feel you're

9   suitable for parole.  We're going to then recess, clear

10  the room, deliberate; once we reach a decision we're

11  going to bring everybody back in, we're going to announce

12  the decision.  You'll be given a written copy of the

13  decision that becomes final in 120 days.  And as to any

14  appeal rights, please bring those to the attention of

15  your attorney, Mr. Gunning, he's an excellent attorney

16  and he's very knowledgeable about your rights in regard

17  to parole suitability hearings.  The California Code of

18  Regulations states that regardless of time served, a life

19  inmate shall be found unsuitable for, and denied, parole,

20  if in the judgment of the panel the inmate would pose an

21  unreasonable risk of danger to society if released from

22  prison.  You have certain rights, Mr. Castillo; those

23  rights include the right of notice to this hearing.  Were

24  you given notice by Correctional Counselor Verdesoto of

25  your parole suitability hearing?

6

1          INMATE CASTILLO:  Yes, sir.

2          PRESIDING COMMISSIONER KUBOCHI:  And you also

3    have the right to review your Central File, were you

4    given an opportunity to do so?

5          INMATE CASTILLO:  Yes, I was, sir.

6          PRESIDING COMMISSIONER KUBOCHI:  And you also

7    have an additional right to have your case heard by an

8    impartial panel, are you prepared to proceed this

9    afternoon with this panel?

10          INMATE CASTILLO:  Yes, sir.

11          PRESIDING COMMISSIONER KUBOCHI:  Mr. Castillo,

12    this is a subsequent parole consideration hearing, and

13    you are not required to admit or discuss you offense.

14    That is, you don't have to talk about the facts of the

15    life crime.  I want you to understand that this panel

16    does accept as true the findings of the Los Angeles

17    County Superior Court, do you understand that?

18          INMATE CASTILLO:  I understand, sir.

19          PRESIDING COMMISSIONER KUBOCHI:  Our board report

20    indicates that you were received into the Department of

21    Corrections from Los Angeles County Superior Court for a

22    conviction in docket number A965649, and that the offense

23    in the information that resulted in your life sentence

24    was for a conviction of Penal Code Section 187, murder in

25    the second degree.  Also an enhancement, use of a knife,

7

1    pursuant to Penal Code Section 12022(b).  Your life term

2    began on November 2nd, 1988; your minimum eligible parole

3    date is November 2nd, 1998.  Commissioner Blonien, is

4    there any confidential material that will be relied upon

5    by this panel in reaching a decision?

6            **DEPUTY COMMISSIONER BLONIEN:**  No, there's not.

7            **PRESIDING COMMISSIONER KUBOCHI:**  Mr. Castillo,

8    I've passed along a hearing checklist to your attorney,

9    Mr. Gunning, as well as the district attorney.

10           **PRESIDING COMMISSIONER KUBOCHI:**  Thank you.  You

11   delivered papers at some point in time in your prior

12   existence, either now or in a previous life,

13   Mr. Carbaugh.  The purpose of this hearing checklist is

14   to assure you that the information in my board packet

15   about you, the crime and your behavior since prison, has

16   been shared with your attorney, Mr. Gunning.  I don't

17   know anything about you that hasn't been shared with

18   Mr. Gunning, do you understand that?

19           **INMATE CASTILLO:**  Yes, sir.

20           **PRESIDING COMMISSIONER KUBOCHI:**  Mr. Gunning,

21   will Mr. Castillo be discussing the facts of the murder

22   case with this panel?

23           **ATTORNEY GUNNING:**  He will not.

24           **PRESIDING COMMISSIONER KUBOCHI:**  Mr. Castillo,

25   you have a statutory right to not talk about the murder,

8

1   and by my review of the file, it occurred on or about

2   February 24th, 1988.  Further, that your birth date

3   appears to be about February 20th, 1965, you were about 23

4   years old at the time of the crime, is that correct?

5           **INMATE CASTILLO:**  Yes, sir.

6           **PRESIDING COMMISSIONER KUBOCHI:**  In regard to the

7   events on February 24th, 1988, resulting in the murder of

8   the victim in this case, we will honor your right not to

9   talk about that murder.  However, I do want an

10  understanding that this panel, in discussing your

11  personal life, your personal history, before and after

12  the murder, that, in discussing those facts before and

13  after, those questions don't violate your right not to

14  talk about the murder, you understand that?

15          **INMATE CASTILLO:**  I understand, sir.

16          **PRESIDING COMMISSIONER KUBOCHI:**  In other words,

17  we can ask you in January 1988, looking back on that time

18  period at the present, do you believe that you had an

19  alcohol problem?  That's a month before the crime, but

20  that question doesn't violate your right not to talk

21  about the crime, do you understand that?

22          **INMATE CASTILLO:**  I understand, sir.

23          **PRESIDING COMMISSIONER KUBOCHI:**  The purpose of

24  that question would be to obtain facts about your

25  personal life that could impact the finding of

9

1    suitability.   In regard to the facts of the case, I'm

2    looking at the board report of June 2004, for a summary

3    of the crime.   That states:

4            "On February 24[th], 1988, at approximately

5            7:45 p.m. the victim's wife, Linda

6            McCardy, last name is M-C, capital

7            C-A-R-D-Y, returned to her home at 375

8            North Ridgewood Place, in Hollywood.

9            When she entered the den of the house she

10           discovered the body of her deceased

11           husband, victim John McCardy, who was

12           seated in a chair in the living room."

13   One moment, there's a -- what I'm going to do is,

14   we're not going to take a recess, the, the door and the

15   doorframe do not fit closely and any breeze in the room

16   here makes the door rattle.   To reiterate:

17           "Upon returning to her home Linda McCardy

18           entered the den of the house and observed

19           her husband, John, seated in a chair in

20           the living room.   As she checked the

21           victim's pulse she saw a male seated on

22           the couch in the living room near the

23           victim.   Thinking that this person was

24           also deceased she went to the den, where

25           she picked up the phone and called 911.

10

| | |
|---|---|
| 1 | While on the phone she heard footsteps in |
| 2 | the living room and then observed the |
| 3 | male who had been seated on the couch |
| 4 | walking out the front door of the |
| 5 | residence.  The suspect fled on foot, |
| 6 | there was extensive ransacking to the |
| 7 | upstairs and downstairs area of the |
| 8 | house.  Noted missing in the days |
| 9 | following the murder was $100 in currency |
| 10 | taken from the victim and one wristwatch |
| 11 | valued at $75.  After investigation, the |
| 12 | detective utilized the department's |
| 13 | computer system to identify a friend of |
| 14 | the victim, based on a possible name, |
| 15 | physical description, tattoo and possible |
| 16 | birth date of 2/20/65.  Detectives |
| 17 | located the CI&I arrest record for |
| 18 | Francisco Parnala Castillo, Jr.  Parnala |
| 19 | is spelled P-A-R-N-A-L-A, who has a birth |
| 20 | date of 2/20 of '65.  Fingerprints taken |
| 21 | from the subject tentatively matched the |
| 22 | prints lifted from a cigarette case that |
| 23 | was in the victim's residence.  The tread |
| 24 | pattern on the subject's tennis shoes |
| 25 | matched the pattern of a bloody shoeprint |

1          on the victim's floor.  There was a --

2          I'm paraphrasing -- there was a photo

3          identification process shown to the

4          victim's wife, who identified

5          Mr. Castillo's photo as being the same

6          person she had seen at the door on

7          February 24th, 1988."

8          I'm doing that only because I don't know, maybe

9    it was February 2nd, 1988, I have noted typographical

10   errors in some board packages.  Whether that date is 2/2

11   of '88 or 2/24 of '88 is irrelevant because we're not

12   here to retry Mr. Castillo's guilt or innocence.

13          "A family housekeeper also positively

14          identified the photo of Mr. Castillo as

15          the person who had visited the victim on

16          2/19 of '88.  Detectives searched the

17          area outside the subject's father's

18          apartment and recovered a blue and black

19          long sleeved shirt from beneath the

20          stairwell.  The subject's father said

21          that the subject had slept in that area

22          on the eve of the murder.  Both the

23          tennis shoes and the shirt tested

24          positive for the presence of blood.

25          Prior to being interviewed by detectives

12

1           on 3/3 of '88, Mr. Castillo was advised

2           of his rights and he waived them.  The

3           interview was tape-recorded and after

4           being confronted with some contradictory

5           statements, Mr. Castillo admitted to

6           stabbing the victim.  Mr. Castillo told

7           the police that he and the victim had

8           been drinking vodka on the day of the

9           homicide for quite a while and that he

10          and the victim were intoxicated."

11          The probation report filed with Los Angeles

12   County indicates, sir, that on September 1st, 1982, Los

13   Angeles City Police arrested you for auto theft in

14   violation of Penal Code Section 487.3 of the Penal Code

15   and also 10851 of the Vehicle Code, unlawfully driving a

16   motor vehicle.  A juvenile petition was filed in

17   September of 1982, you advised probation that as to this

18   case the matter was certified to for prosecution in adult

19   court and that you were given 90 days in the county jail.

20   As an adult, on October 21st, 1983, an arrest for 11550 of

21   the Health and Safety Code, by the Los Angeles Police

22   Department, being under the influence of a controlled

23   substance, and that you advised probation that this

24   offense involved your use of PCP.  On January 9th, 1984,

25   arrest by Los Angeles Police Department, violation was

13

1    459 of the Penal Code, burglary.  Then on April 5th, 1984,

2    you were convicted of burglary and the degree of burglary

3    was first degree and the caption of the probation

4    department says that you entered a residence, stole some

5    change, a camera and a radio.  You were observed walking

6    down the street carrying a radio and was taken into

7    custody by the victim and a witness.  That you were

8    returned to prison three times for parole violations

9    based upon this conviction.  The first two times were for

10    using controlled substances and the last time was a

11    result of the homicide.  The information in regard to

12    that burglary conviction, besides the three violations of

13    parole, indicate that you were on parole on the date of

14    the homicide.  In regard to your personal history I'm

15    looking all the way back to a board report of 2000 for a

16    detailed -- oh, excuse me, I'm actually looking at the

17    psychological evaluation of 2002, 2000 -- and that

18    psychological evaluation was done by doctor C-O-A-T-E.  I

19    was looking for more details in regard to your personal

20    history.  That you told Dr. Coate that you were raised by

21    your mother and father in Michigan until the age of 13,

22    when your mother died of cancer and the father, and the

23    family moved to California to be close to your father's

24    parents.  That would have been your father's,

25    grandparents to you.  You reported an extremely close

14

1   relationship with your mother and that after her death

2   your life drastically changed.  Your father retired from

3   the Coast Guard and he was rarely at home.  After the

4   death of you mother, your father had difficulty handling

5   the loss, as well as taking care of six children.  You

6   were the second oldest of six children and that you had

7   been in and out of law enforcement, probation, facilities

8   since your teenage years.  You have described your home

9   life as very, as having conflict, and was full of stress,

10  as your father drank heavily and abused both your mother

11  and the children.  You described your teenage years as

12  living in fear and not having anyone to confide in.

13  After the death of your mother the physical abuse by your

14  father escalated to the point that the children were

15  taken out of the home by social services, or juvenile

16  authorities and placed in the care of your mother's

17  grandmother.  The grandmother could not handle the

18  responsibility of raising six children and ultimately the

19  children in the family were separated and placed in

20  different foster care homes.  You ran away from foster

21  care and stayed with friends and you, to use the phrasing

22  of the psychologist, were on the street.  You do not make

23  contact with your brothers and sisters, although you do

24  exchange holiday cards, but you don't receive much

25  correspondence from any of them.  Who visits you here,

15

1   sir?

2        INMATE CASTILLO:  I haven't had a visit since

3   I've been incarcerated, sir.

4        PRESIDING COMMISSIONER KUBOCHI:  Okay.  Do you

5   maintain any contact with anybody on the outside?

6        INMATE CASTILLO:  Occasionally I write my

7   youngest sister and my nieces, daughters of my sister.

8        PRESIDING COMMISSIONER KUBOCHI:  Okay, and why do

9   you not have more contact with anybody?  That's not being

10  held against you, I'm just asking.

11       INMATE CASTILLO:  I understand that.  I have no

12  address or any sense of where they're at.  I do have a

13  brother that's incarcerated in another prison and he

14  writes me.  We have correspondence approval through the

15  mail system.

16       PRESIDING COMMISSIONER KUBOCHI:  How would you

17  describe your personality?

18       INMATE CASTILLO:  My personality?

19       PRESIDING COMMISSIONER KUBOCHI:  Yeah, outgoing,

20  loner?

21       INMATE CASTILLO:  Well, it's changed throughout

22  the years since I've been incarcerated and if you go back

23  before the committed offense, I could say that I was

24  lost, I didn't have no sense of direction.  But, given

25  the time since I've been incarcerated I've actually taken

16

1   the time to actually reflect on why I'm here and to

2   understand that and I could say, I would say that I'm

3   actually outgoing, but also -- what's another way of

4   saying that -- caring?  For the things I do, and the

5   things -- and knowing it's important to make up for my

6   mistakes.

7        PRESIDING COMMISSIONER KUBOCHI:  How would you

8   characterize your ability to get along with people in a

9   group setting?

10       INMATE CASTILLO:   In a group setting?  Although

11  that we have differences there's people in a group

12  setting that I have differences, and, I have no problems

13  getting along with people.

14       PRESIDING COMMISSIONER KUBOCHI:  I'll just go

15  into parole plans now, sometimes we wait to see what your

16  marketable skills were in prison, but you're very able to

17  articulate and make, make any adjustments in that regard.

18  I'm sure that we're not going to duplicate the areas that

19  we cover.  Tell me about your parole plans, and where do

20  you see yourself upon release?  Three years from that?

21  And five years away from now, if released?

22       INMATE CASTILLO:   If I were to be released, I

23  understand it's important to have a residence to parole

24  to.  I understand through the assistance of my, my parole

25  agent, that, that I can receive assistance through

17

1   welfare.

2           PRESIDING COMMISSIONER KUBOCHI:   Mm-hmm.

3           INMATE CASTILLO:   And also other employment

4   agencies for job opportunities.   I plan to find a place

5   by a halfway house that has, that could also provide me

6   with group therapy, to continue with my group therapy.

7   And also, maybe also further my vocational marketable

8   skills, and --

9           PRESIDING COMMISSIONER KUBOCHI:   What, what

10  marketable skills do you believe you have to offer?

11          INMATE CASTILLO:   Well, actually, I've actually

12  participated in taking a vocational trade here in this

13  prison and I understand that's a marketable skill and I

14  also took the time to achieve my GED since being

15  incarcerated, this past few years, because understanding

16  that not having an education it would be difficult when I

17  get, am, released, or, if I am released, to get a job.

18  Or even, to, even a place of residence.

19          PRESIDING COMMISSIONER KUBOCHI:   Now tell me

20  about this, in view of that burglary conviction, that

21  residence burglary conviction, you had three violations

22  of parole.   Didn't it start sinking in on you that, that,

23  unless you straightened up back then that, that they were

24  just going to yank you back into custody.

25          INMATE CASTILLO:   Yes, sir.   During the time of

18

1   the burglary, not remembering the date, but because I was

2   young, I was immature, I was uneducated.  I had no sense

3   of what I was doing all the time and, and pretty much

4   didn't really care, it seemed like, about what I was

5   doing.

6         PRESIDING COMMISSIONER KUBOCHI:  Now, the

7   practice is that you would be returned to the county of

8   commitment, in this case it was LA.  Have you put much

9   thought as to where, what county you think you could

10  thrive in?  Have you put any thought, like I says, I want

11  you to tell me where you see yourself upon release, three

12  years from that date, and five years from that date.

13        INMATE CASTILLO:  I would like to be closer to

14  wherever I have any relatives and Los Angeles is probably

15  the place where I would seek residence and continue to

16  achieve those things that I need to, to do, to live a

17  life that is true and right and, but, understanding, that

18  you know, you know, it's difficult to go into a place and

19  not knowing how it's changed in the past years.

20        PRESIDING COMMISSIONER KUBOCHI:  It's changed a

21  lot.

22        INMATE CASTILLO:  Yes, it has.  And knowing that,

23  you know, even technology has changed.  Even people,

24  people in the surroundings of where I was brought up,

25  that's no longer there, pretty much.

19

1        **PRESIDING COMMISSIONER KUBOCHI:**  That might be a

2  positive, though, in some regards.

3        **INMATE CASTILLO:**  Yes, but, I believe that --

4        **PRESIDING COMMISSIONER KUBOCHI:**  We're going to

5  take a time out, your attorney has a coughing spell --

6                        (Off the record)

7        **DEPUTY COMMISSIONER BLONIEN:**  Okay, we're back on

8  record.

9        **PRESIDING COMMISSIONER KUBOCHI:**  Yeah,

10  Mr. Castillo, we're talking about your parole plans and,

11  like I says, what I want to hear from you is where you

12  see yourself upon release, three years after that and

13  five years after that.

14        **INMATE CASTILLO:**  To even see that far is, it's

15  actually difficult, but, three years before that, three

16  years from that and five years after that?  I see myself

17  living a responsible life, a productive life.

18        **PRESIDING COMMISSIONER KUBOCHI:**  Doing what,

19  though, for a living?

20        **INMATE CASTILLO:**  Well, actually, I, you know, I

21  know there's work available for it, in every area and, I

22  don't have, what is it called, anything that I'm seeking

23  as a career.  But, knowing that there are jobs available,

24  just working, I would like one day to become a heavy

25  equipment operator.

20

1    **PRESIDING COMMISSIONER KUBOCHI:**  That's a good

2    choice.

3    **INMATE CASTILLO:**  Or even, I've actually, maybe

4    even owning my own home.  I know it's difficult to even

5    see that from where I stand or where I'm sitting, but

6    knowing that it's going to take a lot of hard work,

7    patience, and doing what's right.  And, basically, that's

8    pretty much it, to be able to support, not just myself,

9    maybe help out my family.

10    **PRESIDING COMMISSIONER KUBOCHI:**  Now, the one

11    thing before we move on to other aspects of this hearing

12    is that, in looking at some of your parole plans -- first

13    of all, I want you to realize that nobody picks their

14    family and so that it's not held against you that you

15    don't have a lot of letters here from your family, don't

16    even worry about that.  What I do want you to think

17    about, from my own experience, is that you should start

18    contacting the county, and start getting the assistance

19    of your correctional counselor, because there's many

20    nonprofit organizations in the county that get money from

21    people like the welfare department, I think in LA it's

22    the Department of Social Services -- they get grants to

23    conduct training.  Truck driving, I don't know about

24    heavy equipment, and they have other types of training

25    programs at low cost or aimed at low income people, and

21

1    you might want to start exploring that right away.

2    Because you might find one that has heavy equipment

3    training at little or no cost, and you should start

4    looking at this while you're on the inside.

5          INMATE CASTILLO:  I understand, sir.

6          PRESIDING COMMISSIONER KUBOCHI:  Because I saw

7    just the post, the postage thing on the envelope, is

8    you're going to rely a lot on government agencies, and

9    the Department of Parole to get you that assistance to

10   get headed in those areas, but you might want to start

11   getting those started now.

12         INMATE CASTILLO:  I understand, sir.  I presented

13   this letter that I received by the Department of

14   Corrections, Rehabilitations, Parole Division because,

15   because I was searching for what are my options.

16         PRESIDING COMMISSIONER KUBOCHI:  Right.

17         INMATE CASTILLO:  And I do understand that the

18   county does provide these type of programs and even

19   grants that will assist me and I do have, I do have

20   addresses, a listing of addresses and places that I can

21   contact at this time.

22         PRESIDING COMMISSIONER KUBOCHI:  Well, you're

23   going to have to start contacting them and then have a

24   list of their responses.  Even if nothing's available

25   now, or even if they say they can't say anything until

22

1    you walk through their door.

2            **INMATE CASTILLO:**  I understand, sir.

3            **PRESIDING COMMISSIONER KUBOCHI:**  One final thing

4    in that area is that I think it's advisable for you to

5    look into residence, transitional housing.  Just as you

6    pointed out, they have trained people who are counselors,

7    there's going to be people, professionals there who you

8    could talk to, with the frustrations of starting out all

9    on your own, which you are going to do.  And you're going

10    to find the transition's going to be a lot easier.

11    Sometimes it's easier than trying to find a relative to

12    stay with.

13            **INMATE CASTILLO:**  I understand, sir.

14            **PRESIDING COMMISSIONER KUBOCHI:**  Because a

15    relative's got their own problems, you know, their own

16    family, their own economic needs.  But you're going to

17    have to start looking for where those are now; what type

18    of living circumstances, what type of, what type of staff

19    do they have and what the cost is, and how long you could

20    stay there.  An example is, is that there could be a

21    recognized alcohol substance abuse residence program that

22    accepts people transitioning from prison, they might have

23    a cost of 2500, but they waive it in certain

24    circumstances and you might qualify for that.  You have

25    to start finding out now.

23

1          INMATE CASTILLO:  I understand, sir, thank you.

2          PRESIDING COMMISSIONER KUBOCHI:  With that, we're

3    going to go to Commissioner, to review your behavior

4    since your incarceration.

5          DEPUTY COMMISSIONER BLONIEN:  Mr. Castillo, this

6    is your second subsequent hearing, and, as I was going

7    through your file, I went through your counselor's report

8    and the board packet.  I went through your C-File, read

9    all of your psych reports that were in here and I was

10   wondering what happened.  Your last appearance before the

11   board was actually June 7th, of 2001, and on 3/21/04 you

12   came and asked for a new psych and one was done on

13   8/25/04, but you didn't come to the board until 3/28/06

14   and you asked for a new psych.  And then on 1/31/07 you

15   came to the board and it was postponed because you didn't

16   have a new psych, what happened?

17         INMATE CASTILLO:  I'm only going by the

18   assistance of my attorney during that time.  I discussed

19   with him why, you know, the postponement, but they, they

20   pointed out that it's necessary to have an updated psych.

21   So I, back in, I think it was 2004 --

22         DEPUTY COMMISSIONER BLONIEN:  Mm-hmm.

23         INMATE CASTILLO:  -- I was supposed to appear

24   before the board and they said because it was dated the

25   year of 2000 --

24

1          **DEPUTY COMMISSIONER BLONIEN:**  Mm-hmm.

2          **INMATE CASTILLO:**  -- that they need to update it.

3    In 2005, actually in 2004, I did have one updated.

4          **DEPUTY COMMISSIONER BLONIEN:**  Right.

5          **INMATE CASTILLO:**  By Dr. Gleason -- and when I

6    was --

7          **DEPUTY COMMISSIONER BLONIEN:**  August of '04.

8          **INMATE CASTILLO:**  So, in 2005, when 2005 came,

9    they said it was a year and a half old, that it's too

10   old.  What I mean by they is the attorney that I had at

11   that time that was representing me, advised me that I

12   should postpone and then he also mentioned that if I

13   happened to go into the board and, because you don't have

14   a new psych report, that they will request a new psych

15   report.  So when I went in 2006, I was, I was told that

16   they still don't have a new psych report on me.  And,

17   finally I guess I was appointed a psychologist from

18   Sacramento through the Board of Prison Terms, and I think

19   it was conducted by Dr. Starrett.

20         **DEPUTY COMMISSIONER BLONIEN:**  Correct.

21         **INMATE CASTILLO:**  And, and this is where I'm at

22   right now.

23         **DEPUTY COMMISSIONER BLONIEN:**  I got it.  I was

24   looking for something bad.  I was looking for some reason

25   why you didn't want to come to the board and trying to

25

1    figure out how this happened.  So, now that you explained

2    it -- also, when I saw you out there, you were waiting,

3    you were reading, what were you reading?

4            INMATE CASTILLO:  I was reading my Bible.

5            DEPUTY COMMISSIONER BLONIEN:  And what part were

6    you reading?

7            INMATE CASTILLO:  Actually, I was reading Psalms

8    34.

9            DEPUTY COMMISSIONER BLONIEN:  To calm you down?

10           INMATE CASTILLO:  Yes.

11           DEPUTY COMMISSIONER BLONIEN:  Well, you seem very

12   calm, so --

13           INMATE CASTILLO:  Thank you.

14           DEPUTY COMMISSIONER BLONIEN:  It's my job to go

15   over what you've been doing in the institution, and I've

16   got to go back to 2001, so six years, because you haven't

17   had a hearing in that six years.  I did look at, and I

18   did read, your hearing, to see if anything in there came

19   up and their recommendations to you were that you remain

20   disciplinary free, which you have.  You haven't had one

21   115 in your entire period of incarceration.  To get your

22   GED, which you have.  To look at different self-help

23   groups, especially in the arena of life skills and

24   self-esteem, or anything that would help you deal with

25   stress, one-on-one in therapy, I think the commissioner

26

1    said to deal with the ghosts of your past.  So, your

2    counselor's report by Counselor Corona, dated 03/07, was

3    used.  I used all three psych reports.  The ones by

4    Dr. R. S. Coate, C-O-A-T-E, dated 9/8 of 2000,

5    Martha Gleason, G-L-E-A-S-O-N, dated 8/25/04, and

6    Dr. Richard Starrett, S-T-A-R-R-E-T-T, dated 06 of '07.

7    You declined to do an Olsen Review, the last one you did

8    was 6/1/05, according to my records, is that right?

9              INMATE CASTILLO:  Yes.

10             DEPUTY COMMISSIONER BLONIEN:  Well, the

11   commissioner and your attorney and I paid very special

12   attention because there was someone else's inmate

13   intertwined -- not in your C-File but in your late mail,

14   so we're assured ourselves that you're only going to get

15   the information about you and not another inmate with a

16   name similar to yours.

17             INMATE CASTILLO:  Thank you.

18             DEPUTY COMMISSIONER BLONIEN:  You've had two 128s

19   and they're so old they're torn in bits in your C-File.

20   If you'd done an Olsen review of your C-File, you would

21   see that those are what's left of your 128s, little

22   pieces.  And the last one, 9/15/85, so you've been

23   disciplinary free for 22 years, so you're to be commended

24   for that.

25             INMATE CASTILLO:  Thank you.

27

1          **DEPUTY COMMISSIONER BLONIEN:**  In terms of

2     education, we talked about your GED.  As I was going

3     through your (inaudible) scores and your academic

4     progress, I was surprised it was -- you just got it,

5     because I think you were able to get it a long time ago.

6          **INMATE CASTILLO:**  Thank you.

7          **DEPUTY COMMISSIONER BLONIEN:**  And you got very

8     high grades when you took it.  In terms of vocations;

9     you've completed data processing.

10          **INMATE CASTILLO:**  Yes.

11          **DEPUTY COMMISSIONER BLONIEN:**  And there's a

12     sequence of classes that you go through; information

13     technology, business systems, and you have all the

14     certificates, so in your -- in our board report it shows

15     the front of the certificates.  In your C-File it shows

16     the back of your certificates, where you got all A's.

17          **INMATE CASTILLO:**  Yes.

18          **DEPUTY COMMISSIONER BLONIEN:**  Your work

19     experience; you were a sewing machine mechanic back in

20     '92, working for PIA.

21          **INMATE CASTILLO:**  Yes.

22          **DEPUTY COMMISSIONER BLONIEN:**  Which leads me to a

23     question; I don't know if you even remember what your pay

24     number was back then?

25          **INMATE CASTILLO:**  They called it, back then, an A

1   number or a B number, but it was, I was making 65 cents.

2       **DEPUTY COMMISSIONER BLONIEN:**  That's a lot of

3   money, back then.

4       **INMATE CASTILLO:**  It was.

5       **DEPUTY COMMISSIONER BLONIEN:**  And now, do you

6   have a pay number?

7       **INMATE CASTILLO:**  I'm only making $20 a month at

8   this time.

9       **DEPUTY COMMISSIONER BLONIEN:**  And as a, an inmate

10  with no family on the outside that sends you money, how

11  do you take care of all the stuff you need?

12      **INMATE CASTILLO:**  Actually, $20 can actually buy

13  me a lot.

14      **DEPUTY COMMISSIONER BLONIEN:**  Really?  I hear the

15  prices here are very high.

16      **INMATE CASTILLO:**  They are high, but, you have to

17  remember, too, being in a setting where there's other

18  people, you know, you have people that are actually

19  helping, that help out each other.  And, also through the

20  church here, they assist in helping one another that are

21  in the community.  And, I do, I tithe, and because I feel

22  that regardless of how much I have, you know, there are

23  some people that are less fortunate --

24      **DEPUTY COMMISSIONER BLONIEN:**  Mm-hmm.

25      **INMATE CASTILLO:**  -- even though that $20 doesn't

1   seem like a lot.  I understand that even on the outside

2   world, you know, $20 is not a lot of money.

3           **DEPUTY COMMISSIONER BLONIEN:**  No.

4           **INMATE CASTILLO:**  And you can't really depend on

5   a $20 pay number.  But, I believe that by giving, you

6   always have learned that by giving you can also receive.

7           **DEPUTY COMMISSIONER BLONIEN:**  Well maybe that

8   philosophy explains one other thing I observed in your

9   C-File.  Is that you are, and this is serious, you are

10  the first inmate that I've ever seen who looks younger

11  now, in your photo, than you do in your picture when you

12  came in to prison.

13          **INMATE CASTILLO:**  Well, actually, thank you, but

14  when I came into prison, and I've seen some of my old

15  photos, I was, it seemed like I was really run down.

16          **DEPUTY COMMISSIONER BLONIEN:**  You were a mess.

17          **INMATE CASTILLO:**  Yes, I was.

18          **DEPUTY COMMISSIONER BLONIEN:**  And coming off the

19  drinking.  And anyone who could drink two bottles of

20  vodka in one day, and continually be on drugs and

21  alcohol, it really impacts you physically.

22          **INMATE CASTILLO:**  Yes, I was actually struggling

23  out there because and I understand that it paid, it

24  actually, you know, it was difficult.

25          **DEPUTY COMMISSIONER BLONIEN:**  In terms of your

1   work.  You're a porter, you're a clerk, you've worked in

2   culinary, there's a memo from your counselor, in your '05

3   report that says Castillo continued his participation in

4   AA, laudatory chronos, in addition to Alcoholics

5   Anonymous you recently enrolled in NA; you've also

6   participated in the annual Children's Holiday Festival.

7   Castillo remained assigned as a wing porter aid, which

8   includes a variety of clerical duties, as well as

9   assisting unit correctional counselors and correctional

10  officers in performing their daily duties.  Castillo is a

11  self-motivated worker and maintains a good rapport with

12  staff and inmates alike.  He is a definite asset to the

13  wing and counseling staff.  And then he refers to other

14  chronos of 7/04, 10/04, and 1/05 -- reflect above average

15  scores in your -- and then looking now you've got

16  excellent and above average scores in your work.  So

17  you're a good worker.

18          **INMATE CASTILLO:**  Thank you.

19          **DEPUTY COMMISSIONER BLONIEN:**  And when you were

20  talking to the commissioner, about work, were you trying

21  to say that you'll settle for any job?  Just so that

22  you'll have work?  Or were you trying to say that you

23  really have no direction and you don't know what to do?

24          **INMATE CASTILLO:**  I was saying that I'm willing

25  to actually work anywhere, and no matter what the cost or

1   what the sacrifice is.  I've always been a good worker;

2   I've always worked with my hands.  Pretty much,

3   understandable, in different areas.  And if it was to go

4   out in the fields to pick vegetables and fruits, I would

5   be satisfied with that and be happy.

6          **DEPUTY COMMISSIONER BLONIEN:**  In terms of your

7   alcohol addiction, you've been in AA since 1994.  And in

8   your last hearing, Commissioner Welch questioned you on

9   the different steps and you knew them all, that he asked

10  you about.  My question is, this giant addiction that you

11  had to alcohol, that was such an amazing part of this

12  commitment offense, and then in, while incarcerated,

13  there's not one chrono that shows that you've had any

14  alcohol or substance abuse.  How do you make sure in the

15  institution, because I know it's available, that you

16  don't have any alcohol?  And how do you plan, and what do

17  you plan to use as support in the community for

18  maintaining your sobriety?

19         **INMATE CASTILLO:**  Actually, after reflecting on

20  reading my transcripts, my past transcripts, the one in

21  1997, and 2001, I reflected on the questions that were

22  asked me.  And I took the time to reflect on exactly --

23  about what they were asking.  And I saw what they saw.

24  And I did struggle, and I'm still struggling with how to

25  answer questions, and, but seeing that being true to

1   myself is very important.  If I'm going to speak a

2   certain way, I have to also live a certain way.  And it's

3   -- when you're doing this and you're saying something

4   different, it's always going to haunt you.  And I've

5   found that by the self-help groups, no just AA or NA --

6   yes, I did have a problem with drugs and alcohol, and I

7   do have the strength and the power to be able to say no.

8   And that's one of the things that I was going through

9   when I was young.  I was under a lot of peer pressure, I

10  just wanted to fit in.  I'm sorry that it's taken me this

11  long to actually admit it, but, you know, I was pretty

12  much nothing out there.  But, knowing that, I can

13  actually be someone different, better, and, and

14  trustworthy, it's something that, you know, it actually

15  makes you feel better.  I was struggling with my emotions

16  and the sense of, of fear.  I went to drugs and alcohol

17  to try to basically cover that up, but it seemed like it

18  got worse.  It became so bad that I just hit rock bottom.

19  But, just because I hit rock bottom doesn't mean that I

20  don't care for why I'm here.  I understand that --

21          **DEPUTY COMMISSIONER BLONIEN:**  Let me redirect you

22  back to my question though, and I understand what you're

23  saying.  But my question is, someone with a big problem

24  like you had, who's been clean now in the institution, so

25  there has to be some support for you in the institution

33

1    that's allowed you to make the decision that you're not

2    going to drink any more.  How do you bring that out into

3    the community where you don't have any support?

4            INMATE CASTILLO:  I truly believe, I trust in my

5    faith in God, in all things.  And you say there's no

6    support in the community; I believe that there is support

7    in the community, regardless of what -- but --

8            DEPUTY COMMISSIONER BLONIEN:  What is it?

9            INMATE CASTILLO:  It's actually, staying away

10   from it, actually, you know, staying away from those

11   things that could become a burden and --

12           DEPUTY COMMISSIONER BLONIEN:  And you're going to

13   go to AA in the community?

14           INMATE CASTILLO:  Yes, I am.  Not am I planning

15   on to, I am, because I feel that because of the people

16   that are involved, you know, without the people there's

17   no group and there's no support and by having something

18   in common, you know, and to help overcome -- because I

19   know that even in some of the meetings that there are

20   still people struggling and, but they still need help.

21   And that's one thing, everybody needs a helping hand, but

22   you're not going to be able to help another person unless

23   you help yourself and, so, I am, you know, as I says, I'm

24   not just planning on attending AA, or NA, or any other

25   program that's necessary, I will.

34

1          **DEPUTY COMMISSIONER BLONIEN:**  You've also

2    completed Alternatives to Violence, Cage Your Rage;

3    you've done individual therapy with Dr. Turini

4    (phonetic).

5          **INMATE CASTILLO:**  Yes, I have.

6          **DEPUTY COMMISSIONER BLONIEN:**  How was that?

7          **INMATE CASTILLO:**  Actually, Dr. Turini, it was,

8    it helped me come out of the shell that I was living in.

9    Thinking that, you know, always doubting myself, the fear

10   of failing, but it seemed like I was holding too much in,

11   so he kind of actually helped me understand more, more in

12   depth about who I am and even, although that it was

13   one-on-one therapy, he gave me a chance to speak and he

14   took the time to listen.  And I felt comfortable with

15   that.

16         **DEPUTY COMMISSIONER BLONIEN:**  That was in 1996,

17   right?

18         **INMATE CASTILLO:**  Yes.

19         **DEPUTY COMMISSIONER BLONIEN:**  You've also

20   completed IMPACT, you read Bible, what else do you read?

21         **INMATE CASTILLO:**  Actually I read, I have,

22   there's another, I read other spiritual books, I read,

23   there are so many that I read, receive through the mail.

24   In Touch magazine, it's a pastor that's sold on TV,

25   Stanley Reid, no, Charles Stanley, I'm sorry.  And I read

1    other spiritual books.  I, I try not to get too involved

2    in fiction or paperback books because, you know, I'm just

3    not interested.  I don't even watch too much TV.

4              DEPUTY COMMISSIONER BLONIEN:  You play sports?

5              INMATE CASTILLO:  Yes, I do.

6              DEPUTY COMMISSIONER BLONIEN:  What do you play?

7              INMATE CASTILLO:  I play, here we play flag

8    football, also softball, basketball --

9              DEPUTY COMMISSIONER BLONIEN:  I saw certificates

10   for softball in there.

11             INMATE CASTILLO:  Yes, I remember when I was

12   younger, when my father actually used to throw the ball

13   with me and basically, when I was, our family used to

14   actually participate with other families when my father

15   was in the military and play softball.  So, that actually

16   kid of helps me, you know, kind of do my time, even

17   though that it's only for a couple of months during the

18   year.

19             DEPUTY COMMISSIONER BLONIEN:  I think reading the

20   spiritual books and internalizing the values is very

21   good.  I'd also recommend that you read about re-entry

22   into the community.  You didn't have much of a chance to

23   establish yourself as a person before you came into the

24   institution, and the world has gone fast while you've

25   been in here and I think it would be really good for you

36

1    to think about re-entry and what the community is like
2    now.  And read books that would help you come up with a
3    plan for successful re-entry.  There's videos available
4    here; I know PIA has them, that I think you could get
5    access.  Just simple things like how to rent an
6    apartment, how to get a social security number, how to
7    write a resume, how to think about transportation, it's
8    very different now.
9        **INMATE CASTILLO:**  I understand.
10       **DEPUTY COMMISSIONER BLONIEN:**  It would be really
11   good, really, really good for you.  I'm looking at the
12   current psych report by Dr. Starrett.  He notes that,
13   under his diagnostic impressions, that your
14   poly-substance dependence is in institutional remission
15   and treatment, under Axis I.  Under Axis II, an
16   antisocial personality disorder that's attenuating with
17   age and maturity, that means it's diminishing.  That he
18   gives you a global assessment score of 90, which is a
19   highly functioning inmate and a highly functioning
20   individual in the community.  And concludes that this
21   inmate would be considered no higher risk for violence
22   than any other citizen within the community, especially
23   if he continues to use support services.  And then he
24   goes into detail about the test that he administered to
25   you after he reviewed your file and he talked to you.

37

1    And the PCL-R, which states your level of psychopathy,

2    that your level of psychopathy is low.  That in rating

3    you historically, the individual, on the historical

4    factors that predict future violence, the inmate would

5    rate in the moderate range.  This rating is based on the

6    inmate being involved in unstable relationships, not

7    established in a career, being a substance abuser, having

8    early maladjustment problems, and to a lesser event,

9    prior supervision failures.  So those are factors that

10   are never going to change, that's your historical.  The

11   clinical insight; in rating the inmate on the clinical

12   insight factor, the inmate would rank in the low range

13   for his propensity for future violence.  The inmate would

14   also rate in the low range on his risk assessment in

15   terms of risk management, that there is an elevation on

16   this variable due to the inmate not having his parole

17   plans completely developed, and not having a community of

18   resources.  But the inmate's overall risk assessment in

19   the future for violence has now moved from the high end

20   of the moderate range to the low range on the clinical

21   risk management factors.  So, overall, the inmate's

22   overall risk assessment in the future for violence has

23   now moved, again, from the high end to the moderate

24   range, down to the low range, on the clinical and risk

25   management factors.  In talking about, the last panel

38

1   asked the significance of alcohol and drugs as it relates

2   to the commitment offense and an estimate of the

3   prisoner's ability to refrain, the inmate openly

4   acknowledges that his use of alcohol is a major factor in

5   the commitment offense.  The inmate acknowledges that the

6   night of the offense, he and the victim drank

7   approximately two fifths of vodka.  The inmate realizes

8   that the alcohol impaired his judgment.  The inmate also

9   realizes that he was scared and over-reacted.  This

10  overreaction was due in part to his childhood of fear and

11  abuse and of being fearful of adults.  The inmate has

12  been active in AA or NA for 12 to 13 years.  The inmate

13  has been clean and sober for about 18 years.  He

14  acknowledges that substance abuse has been a major life

15  problem.  He also understands the need for a lifelong

16  treatment.  It is recommended that he continue ongoing

17  substance abuse treatment and relapse prevention as a

18  condition of his parole.  And we went back and looked at

19  the psych report by Dr. Gleason; who said the inmate's

20  violence potential within a controlled setting is

21  considered to be significantly below average relative to

22  this Level II population.  On one hand the inmate did

23  have a significant juvenile and adult history and, again,

24  factors within his environment may explain that juvenile

25  history.  However, upon the time of incarceration for the

39

1    present offense the inmate was able to soon after

2    completely turn his life around and has managed not to

3    get in any disciplinary issues for his entire

4    incarceration.  Therefore, in light of the base factors,

5    his violence potential is below average relative to his

6    Level II inmate population.  Within the community, after

7    15, 16 years of no disciplinary problems, this inmate

8    would be considered to be no higher risk for violence

9    than any other citizen within the community, especially

10   if he continues to use supportive services.  Dr. Gleason

11   said that you are confident, responsible, that you have

12   the capacity to abide by institutional standards and has

13   overwhelmingly done so during his incarceration period.

14   So that was the psych report that never even got into a

15   parole hearing because you didn't have one after the

16   psych report was done and it was a very supportive psych

17   report and she also gave you a global assessment

18   functioning score of 90.  And then I just looked back on

19   Dr. Coate, who also gave you a global assessment

20   functioning score of 90.  And it's amazing to me that a

21   person of your family background, with what you, with

22   what your reality was as a child, that you could come to

23   prison and have three psychologists in a row give you a

24   global assessment functioning score of a highly

25   functioning individual.  And that all has to be on the

40

1  work that you did while you were in prison.

2          INMATE CASTILLO:  I understand.

3          DEPUTY COMMISSIONER BLONIEN:  Because you didn't

4  come in with, with that ability.

5          INMATE CASTILLO:  I know.  I was given the

6  chance.

7          DEPUTY COMMISSIONER BLONIEN:  How do you feel

8  about getting out of prison?  Is that scary to you?

9          INMATE CASTILLO:  It is going to be scary for me.

10  As I said, I understand that, you know, change is out

11  here, everybody's grown, everything has expanded and,

12  and, so, I guess I can say I'm only ready for the

13  challenge.

14          DEPUTY COMMISSIONER BLONIEN:  And with that I'm

15  going to return back to the chair.

16          PRESIDING COMMISSIONER KUBOCHI:  Thank you.  I

17  just got a quick question, I note that you participated

18  in Dr. Bateman's Life Skills group.  It was a long time

19  ago, in 1994.  Do you remember that class?

20          INMATE CASTILLO:  Yes, I do remember of his

21  classes, they were --

22          PRESIDING COMMISSIONER KUBOCHI:  Tell me about

23  that, how many, how many classes, people in it and the

24  structure of the, the way the class was conducted.

25          INMATE CASTILLO:  If I recall there was about 13

41

1   to 15 individuals participating.  And the subjects, or

2   the themes, I think there were seven.  I'm not sure

3   exactly what they were in order, and what they involved,

4   but it was self-esteem was one of them.

5           PRESIDING COMMISSIONER KUBOCHI:  Mm-hmm.

6           INMATE CASTILLO:  Drug addiction, and alcoholics.

7           PRESIDING COMMISSIONER KUBOCHI:  Do you remember

8   how many classes there were?

9           INMATE CASTILLO:  Seven, seven classes.

10          PRESIDING COMMISSIONER KUBOCHI:  Seven.  And how

11  many minutes or hours was each class?

12          INMATE CASTILLO:  Actually, we, actually, I think

13  it was an hour, hour and a half, at a time.

14          PRESIDING COMMISSIONER KUBOCHI:  Now, these are

15  recorded, they happened a long time ago, what did you

16  think of those classes?  Did you learn anything from it?

17          INMATE CASTILLO:  Yes, I did learn something out

18  of them, and I think it has to do with who I am today.

19  By actually taking the time to listen and reflect what's

20  being explained by somebody that is actually trained in

21  that area.  And by helping us open up with each other,

22  because there was a lot of role-playing and we were given

23  the freedom to actually express what we feel of

24  everything that was brought up and so, you know, just,

25  just participating, being able to be listened to, was

42

1  actually something I really enjoyed and regardless of the

2  subject.  And, and basically that's it.

3          **PRESIDING COMMISSIONER KUBOCHI:**  Would you do it

4  over again if they had it?

5          **INMATE CASTILLO:**  Yes, I would.

6          **PRESIDING COMMISSIONER KUBOCHI:**  Okay, thanks.  I

7  have no further questions.  At this time, Mr. Castillo,

8  we're going to allow questions from anybody here.  And

9  then that's followed by final statements.  So I'm going

10  to ask Commissioner Blonien, do you have any questions on

11  any topics covered?

12          **DEPUTY COMMISSIONER BLONIEN:**  No, I asked all my

13  questions, thank you.

14          **PRESIDING COMMISSIONER KUBOCHI:**  And we're going

15  to ask Mr. Carbaugh, do you have any questions?

16          **DEPUTY DISTRICT ATTORNEY CARBAUGH:**  No, sir.

17          **PRESIDING COMMISSIONER KUBOCHI:**  And Mr. Gunning?

18          **ATTORNEY GUNNING:**  I don't, thank you.

19          **PRESIDING COMMISSIONER KUBOCHI:**  That makes it

20  unanimous, Mr. Castillo, we're now going to have final

21  statements.  You're going to be third and you're going to

22  be the last person we hear from before going into recess

23  for deliberations.

24          **INMATE CASTILLO:**  Yes, sir.

25          **PRESIDING COMMISSIONER KUBOCHI:**  Mr. Carbaugh?

43

1        **DEPUTY DISTRICT ATTORNEY CARBAUGH:**  Thank you, I

2    thought the inmate made an excellent presentation here

3    today.  His demeanor is very calm.  He's relaxed.  It's

4    funny, I was talking to Mr. Gunning in the hallway

5    earlier today and we were talking just generally about

6    doing lifer hearings.  And I think one of the things, we

7    agreed on most things, but one of the things we really

8    agreed on is the concept that probably you, as members of

9    the board feel at times, of the wasted lives concept of

10    someone who is very obviously very bright, very

11    articulate, and then does really bad stuff years ago.

12    You wonder what the potential could have been, and I

13    would imagine the inmate probably thinks about that too,

14    once in a while.  Of all the things he could have done

15    had the decisions been better back in, back in those

16    days.  And it's just as a member of society you could

17    have seen this person at this stage in his life without

18    the crime being very successful in business, or life, and

19    all sorts of things, and what an extreme shame that is.

20    And I'm just, you know, talking as a member of the

21    community.  I, as I said as a moment ago, I thought he

22    came across very well, very articulate, very bright, very

23    calm.  There would be issues that are of some concern.  I

24    think the commissioner hit on them a little bit earlier

25    in the hearing, about the job plans and sort of a lack of

44

1   specifics there, that's an issue.  Another issue to me is

2   when the life crime was committed he was on parole for a

3   serious felony, a residential burglary.  He was on parole

4   and I guess violated parole two or three times and then

5   the life crime was committed.  That's a red flag to me,

6   to be very honest with you, with all the positives.  And

7   I think there are a lot of positives with this inmate.

8   That does concern me if he was to be placed on parole.

9   He didn't seem to make it the last time, although that

10  was a long time ago and those are issues of concern for

11  me and I would think they might be of concern for the

12  board too.  Thank you for your time.

13          PRESIDING COMMISSIONER KUBOCHI:  Mr. Gunning?

14          ATTORNEY GUNNING:  Thank you.  I guess I'll

15  address the panel from the standpoint of, I guess,

16  chronologically in Mr. Castillo's case because I think

17  it's probably the best way to handle it.  So I guess I'll

18  start with pre-conviction factors.  I'm not going to

19  rehearse (sic) what you already know, but, to sum it up,

20  it's quite apparent that the way he grew up severely

21  impacted his life at an early stage.  I think,

22  Commissioner, you indicated that we don't pick our

23  families and that's true.  And oftentimes we don't pick

24  how we're treated by those families either.  And given

25  the comments made by the psychologists I think it's

45

1    pretty clear that what happened to him, as the oldest

2    child in that particular family, and upon the death of

3    his mother, was pretty horrendous and that impacted his

4    life up until the time of the commitment offense, and I'm

5    sure it even does it today.  Although he's got a better

6    grip on what it was that was causing those problems now.

7    I'm not offering this by way of an excuse in any way.

8    I'm just offering it by way of explanation.  Something

9    you probably already realize, but I'm doing this for the

10   record.  Because we have to find out why people do things

11   and once we understand why they do them then we can

12   correct that behavior.  In his particular case he was

13   somebody who was lost, was the word he used with me.  And

14   I think that's an accurate assessment.  No direction,

15   little guidance, parents or otherwise, to be quite honest

16   with you.  Especially upon the death of his mother when

17   he was, at 13.  He was basically on the streets from the

18   time he was 12, or 13 years old, and at the time he

19   starts running into the law, in the early eighties.

20   Fending for himself, it's something out of Dickens in

21   some respects, when you think about how, what he was

22   living with.  On his own at that time.  I can't think of

23   many -- I would hate to be a young teenager trying to

24   survive on my own, on the streets.  And, of course, that

25   leads into his alcohol use, his drug use and that

1   eventually leads into who he hangs with, of course, and
2   then without a doubt that's one of the reasons that he
3   got involved in this commitment offense was because of
4   his obsessive drinking.  In this particular case it was
5   the use of the vodka and then Mr. McCardy lost his life
6   as a result of that and it, that's why we're here.  I
7   don't think there's any evidence in the file to indicate
8   there's any premeditation on his part; because this is a
9   second degree murder conviction.  It is a plea.  We don't
10  have any trial transcripts to speak of.  But he has
11  accepted responsibility for his involvement in this
12  particular offense and it's been since 1988.  Since he's
13  been incarcerated for the offense, we're looking at 19
14  years now, for a second degree.  At some point I think
15  the matrix becomes important in his particular case, from
16  the standpoint of suitability and the use of the
17  commitment offense against him, to deny parole.  And then
18  he's made a remarkable transition since he's been
19  incarcerated and it's ironic to think that somebody has
20  to loose his life for another individual to better their
21  lives.  It's just a horrendous, it's a terrible thing to
22  contemplate, but that's what's happened here.  Since his
23  incarceration, it's obvious that he changed his life.
24  He's got great work skills, he's got vocational skills;
25  it took him a long time to get his GED, but he got that.

1   Good psychological evaluations, good self-help

2   programming; been in AA for an extensive period of time.

3   His faith is important to him.  Probably something he

4   didn't have before.  So, in addressing, you know, the

5   DA's comments about his being on parole and, you know,

6   concerns, I understand that but at the same time, he has

7   different coping skills now than he had before.  He's

8   developed them over a long period of time, he's now 42,

9   he's not 23 any more.  So, he's made remarkable progress,

10  I would ask you to give him credit for that.  I would

11  concur that he needs to work a little harder perhaps on

12  the parole plans.  He's making an effort, he's being

13  proactive, but I think, in his particular case, where the

14  structure's not out there, he needs to go into a

15  transitional housing in some capacity.  Because while

16  he's in the housing, he can stay there for months at a

17  time, receive the, the therapy he needs; group therapy to

18  include whatever, whatever residual effects are left over

19  from his family, but also the alcohol and drug use issues

20  as well.  But outside of that I think he's made

21  remarkable progress and I think he's very, very close to

22  being a viable candidate for parole.  And I'll submit.

23          **PRESIDING COMMISSIONER KUBOCHI:**  Thank you,

24  Mr. Gunning.  Mr. Castillo, this is your opportunity to

25  address the panel.

48

1           **INMATE CASTILLO:**  Thank you.  First of all, for
2    the record, I would like to first take the time to
3    acknowledge the family of John McCardy, the
4    representatives of John McCardy, and district attorney
5    and commissioners of the Board of Prison Terms.  It's
6    always difficult to be faced with something that's so
7    tragic, so tragic, and devastating.  And to have to
8    reflect on what I've done.  I'm very sorry.  I'm sorry
9    for the pain I've caused, the burden that I have been to
10   the families involved, the system, the law enforcements,
11   and everybody that was affected by what I've done.  I
12   will continue to strive to do whatever's possible to
13   better myself, to be a better person, to do what's right.
14   To the best of my ability I will be supportive when
15   there's needed support.  And if I was given the chance to
16   parole, I will continue to strive to do what is right.  I
17   understand that there's nothing that will outweigh for
18   what I'm here for, but to strive, not just for myself but
19   in remembrance of why I'm here.  To do what's right and
20   to the best of my ability.  Thank you.
21           **PRESIDING COMMISSIONER KUBOCHI:**  Thank you very
22   much.  Mr. Castillo, we're going to be in recess, it is
23   2:25 p.m.
24                         **R E C E S S**
25                         --o0o--

49

1        **CALIFORNIA BOARD OF PAROLE HEARINGS**

2                    **D E C I S I O N**

3        **DEPUTY COMMISSIONER BLONIEN:**  We are back on

4    record.

5        **PRESIDING COMMISSIONER KUBOCHI:**  We're back

6    to state the decision reached in the matter of Francisco

7    Castillo.  Mr. Castillo, we're going to deny you parole

8    for one year.  There is no doubt that we're impressed

9    with all the work you've done and the main thing to work

10    on, to carry out with you today, is that you've

11    accomplished every goal you've set out in the

12    rehabilitation field that is personal.  You got to work

13    on your parole plans.

14        **INMATE CASTILLO:**  Yes, sir.

15        **PRESIDING COMMISSIONER KUBOCHI:**  And what I, what

16    I'm going to just brainstorm with you is -- the rules

17    would say that you return to the county of commitment,

18    okay.  So there's two issues in regard to any, any parole

19    plans, residence and what I call self-sufficiency.  You

20    don't need to have a job offer.  But you want to be able

21    to establish that you're self-sufficient.  With a lot of

22    humility and sincerity you are willing to take any job,

23    which is good.  But, I'm going to break it into two

24    parts.  So therefore you're going to want to consider

25    **FRANCISCO CASTILLO    C-85768    DECISION PAGE 1    6/27/07**

50

1    parole plans in Los Angeles County.  One thing that we

2    didn't bring up, is we noticed that you have a Bible.

3    Now the law, the rules say, oh, we can't have any

4    recommendations based on religion.  You're carrying a

5    Bible, we only want to relate to you, you might consider

6    whether or not your faith has a church, you know, the

7    organization -- I'm not going to get into technicalities,

8    but the organization of your church in LA may have, and

9    may sponsor or may be associated with a residence

10   program.  I've seen that in other cases.  Where there's

11   legitimate residence, transitional residence programs for

12   a combination -- it could be homeless, substance abuse,

13   people transitioning from institutions.  We've seen the

14   stuff from the parole, it's going to be solid.  You also

15   might consider non-profit groups and you can talk to the

16   correctional counselor you could talk to your religious

17   people.  A for-instance, and I'm certainly not

18   recommending it, is, there's non-profits like Delancey

19   Street that have residence programs in Los Angeles.  Now,

20   in that regard, because I like to break things down to

21   finite detail, there's going to be some residence,

22   transitional housing programs that will say until you

23   show up to our doorstep we can't commit that you're going

24   to have a bed space, because they have a lot of people

25   **FRANCISCO CASTILLO    C-85768    DECISION PAGE 2    6/27/07**

51

1    asking for bed spaces that are limited.  But that's not

2    going to be a deterrent, that's understandable, that's

3    their rules.  But at least find out what those, what

4    groups, what they're admission standards are, how long

5    you can stay there, if there's any cost, whether they'd

6    waive the cost.  I've seen waivers, I've seen ones where

7    it's 2500 a month, but since you're transitioning out, we

8    know all about you, we're going to waive our cost, or

9    they're going to -- you can work here to work off the

10   cost or whatever.  But, and make sure you ask all those

11   questions.  And what kind of staff they have.  Whether

12   there's somebody there that's a trained psychologist, job

13   counselor, etcetera, etcetera.  So that opens up that.

14   Now, from a -- your, your faith, since you mentioned

15   you've met people from the outside here through your

16   religion, maybe there's other local ones that you can

17   work with parole, once they investigate, anywhere where

18   your church is, that has a residence program.  So really

19   start using your imagination to expand on that.  What

20   you're looking for is a reputable organization that

21   operates transitional housing, what I call transitional

22   housing.  People from, transitioning from an institution

23   back into society.  It can include homeless or whatever.

24   You're going to find that those institutions may be a

25   **FRANCISCO CASTILLO    C-85768    DECISION PAGE 3    6/27/07**

52

1   better fit than if everybody's a lifer, for instance, and

2   it's directed to you by Paroles, okay.  In regard to

3   self-sufficiency, that is, as I've indicated, the

4   regulations don't require you to have a job, but you're

5   going to want to consider the marketable skills you've

6   developed here and to determine what type of jobs you

7   want on the outside.  If you've learned a trade, see what

8   the trade unions are.  If you've leaned a skill, what

9   type of skill's there; the brochures as far as your

10  training once you get out is pretty good.  But then

11  that's a cart and a horse; you know, unless you have

12  housing that's not going to charge you, you're not going

13  to be able to go to a free vocational program that parole

14  and the local government agencies lined up.  That's why

15  you have to put some thought into that.

16          INMATE CASTILLO:  I understand.

17          PRESIDING COMMISSIONER KUBOCHI:  Okay, so I think

18  it's the housing first then start exhausting what type of

19  job opportunities there are.  Because it's important, I

20  think, for you to understand how dedicated and

21  level-headed and how much stress you have to cope with by

22  starting that job search now.  In other words, get the

23  rejections over with now.  In other words, write to these

24  trade unions or whatever and let them say, until you walk

25  **FRANCISCO CASTILLO    C-85768    DECISION PAGE 4    6/27/07**

53

1    through our door we don't want to talk to you, or we have

2    no openings now.  Start that now, because that way you

3    can convince the panel that's an additional factor of

4    your maturity and your ability to cope with stress.  Your

5    plans right now, they sound good, but if I was in your

6    position I wouldn't trust anybody but myself to get

7    myself residence and job opportunities.  In other words

8    you don't want the image that if we released you on

9    August 1st, that you're going to be curbside right outside

10   of Soledad, right there on Highway 101.  That's the image

11   you don't want to project.  But willing to take any job.

12   I'm not saying that's you, but it's going to be up to you

13   to dig these resources.  Then you're going to show you're

14   self-sufficient, you're going to show the skills, coping

15   skills, that you've developed here and I think you're

16   going to have a completed picture.  Now, because all of

17   this is subject to appellate review, in looking at the

18   nature of the commitment offense and the intoxication and

19   to this day we don't even know the motivations of why the

20   homicide was committed, the parole plans right now are,

21   is the hub of the wheel.  That is, unless you get solid

22   parole plans, the problems with housing, the problems of

23   being self-sufficient, could create stress factors that

24   were documented in your prior history in regard to an

25   **FRANCISCO CASTILLO    C-85768    DECISION PAGE 5    6/27/07**

54

1    example of you being on parole for the residence burglary

2    and when you don't have food, clothing and shelter issues

3    secured, you're going to be back in a stressful situation

4    and the psychologists all say that that is a great fear.

5    For purposes of suitability, it's all positive, but I'm

6    just saying, for appellate review, why the parole plans

7    are so important.  It could, not having good parole plans

8    could trigger all these other stressors that the doctors

9    are recognizing and I'm just saying why there's other

10   issues we considered in denying you parole today, other

11   than your parole plans.  But the parole plans are at the

12   hub of these other issues that the doctors addressed;

13   including the prior failures on parole and coupled with

14   the facts surrounding the homicide that included

15   substance abuse and -- a homicide that was just committed

16   in exceptional disregard for human suffering.  In that

17   his person was murdered in his own home by a guest, which

18   was you, Mr. Castillo.  So, don't -- I told you what the

19   main issues were because legally we have to explain all

20   the reasons and all the factors we considered for denying

21   you.  But I wanted you to walk out of here with hearing

22   the most important things first.

23          INMATE CASTILLO:  Thank you, sir.

24          PRESIDING COMMISSIONER KUBOCHI:  Okay, but I'm

25   **FRANCISCO CASTILLO    C-85768    DECISION PAGE 6    6/27/07**

1    obligated to explain why we believe that you're not

2    suitable for parole today and would pose an unreasonable

3    risk if, to society, if released.  And I started off by

4    talking about the most important thing, but I don't want

5    some appellate court to think well, geez, they ignored

6    all these other positives.  Now we recognize all these

7    other positives.  We are encouraging that you continue

8    on, but we have to, legally, we have to state for the

9    record these other factors, such as the way the crime was

10   committed.  The factors involved with that as well as we

11   share the doctors' concerns that until parole plans are

12   firmed up the biggest, the biggest, the only indicators

13   for you to get re-involved with criminal behavior would

14   be a relapse into drug and alcohol.  Now, another thing,

15   in closing, that would really, I think, benefit you is

16   because you are committed to AA, do you have a sponsor in

17   AA?

18        **INMATE CASTILLO:**  I don't have a sponsor at this

19   time, but I am in search for one.

20        **PRESIDING COMMISSIONER KUBOCHI:**  Yeah, and that's

21   understandable, is, talk to the people on the outside, if

22   they come in, if you have any situation where people from

23   the outside come in to participate in AA, about a relapse

24   prevention program.  I'm not saying it's a condition for

25   **FRANCISCO CASTILLO    C-85768    DECISION PAGE 7    6/27/07**

1    release, but what that is, is it's actually something you

2    put together for you that describes the stresses in life

3    that you anticipate, that you had in the past, that

4    affect you, the coping mechanisms that you've developed

5    through your commitment to AA and rehabilitation that

6    will allow you to handle this stress in a nondestructive

7    manner.  And then your commitment to pursuing AA on the

8    outside.  It's actually, it's actually something that you

9    write for yourself, it's a relapse prevention plan.  And

10   I think in doing so you're going to eliminate any doubt

11   that the psychologists have.  And like I says, I'm only

12   explaining this in a lengthy manner because I, we're not

13   elaborating all the reasons why we made our decision,

14   because I didn't want to make you feel that there's all

15   these other things that you didn't satisfy us in, in, in

16   your rehabilitation.  Because that would be paint a

17   negative picture.  You've impressed us positively -- you

18   know, there's a word, it's like a, what do they call -- a

19   cyclone?

20            INMATE CASTILLO:  Yes.

21            PRESIDING COMMISSIONER KUBOCHI:  That, that, the

22   parole plans are the eye of the hurricane.  If you can

23   control that every other issue will get blown away.

24   Without solid parole plans, the cyclone of problems start

25   FRANCISCO CASTILLO    C-85768    DECISION PAGE 8    6/27/07

57

1    taking off again, and that's why I didn't elaborate too

2    much into the life crime and all these other factors.

3    Because I don't want you walking out of here doubting

4    whether you impressed us with your rehabilitation and I

5    wanted you to make sure that the two things that you

6    really have to work on, parole plans and relapse

7    prevention plan.  And talk to somebody who has

8    successfully been in AA for a long time, that's why I

9    mentioned talking about the outside, because anybody on

10   the outside that has been clean and sober for 10 years on

11   the outside, has created a relapse prevention plan, I

12   guarantee you.  That's part of the final steps of

13   rehabilitation.  Which is a never-ending process by the

14   way.  That's why they call it recovering alcoholics or a

15   recovering addict.  So with that in mind, I wish you

16   luck, like I says, I never say this, I was impressed by

17   you.

18            **INMATE CASTILLO:**  Thank you, sir.

19            **PRESIDING COMMISSIONER KUBOCHI:**  Okay,

20   Commissioner?

21            **DEPUTY COMMISSIONER BLONIEN:**  Good luck to you.

22            **INMATE CASTILLO:**  Thank you.

23            **ATTORNEY GUNNING:**  Thank you.

24            **PRESIDING COMMISSIONER KUBOCHI:**  It's 2:58 and

25   **FRANCISCO CASTILLO    C-85768    DECISION PAGE 9    6/27/07**

58

1  this matter's concluded.

2        **INMATE CASTILLO:**  Thank you, sir.

3        **PRESIDING COMMISSIONER KUBOCHI:**    -- he's got a

4  shot.  Oh, I handed it to him.

5        **ATTORNEY GUNNING:**  Oh, you did?

6        **PRESIDING COMMISSIONER KUBOCHI:**  Yeah, go check

7  to see, maybe I handed him the wrong one.

8        **DEPUTY DISTRICT ATTORNEY CARBAUGH:**  That guy can

9  make it.

10        **PRESIDING COMMISSIONER KUBOCHI:**  Yeah, he will.

11        **DEPUTY DISTRICT ATTORNEY CARBAUGH:**  That guy can

12  make it.

13        **PRESIDING COMMISSIONER KUBOCHI:**  Oh he will.

14                **A D J O U R N M E N T**

15                    --o0o--

16

17

18

19

20

21  PAROLE DENIED ONE YEAR

22  THIS DECISION WILL BE FINAL ON:____OCT 2 5 2007____

23  YOU WILL BE PROMPTLY NOTIFIED, IF PRIOR TO THAT

24  DATE, THE DECISION IS MODIFIED.

25  FRANCISCO CASTILLO    C-85768    DECISION PAGE 10    6/27/07

59

## CERTIFICATE AND

## DECLARATION OF TRANSCRIBER

I, SHELLEY KELBER, a duly designated transcriber, NORTHERN CALIFORNIA COURT REPORTERS, do hereby declare and certify under penalty of perjury that I have transcribed one audio recording which covers a total of pages numbered 1 - 58, and which recording was duly recorded at CORRECTIONAL TRAINING FACILITY, SOLEDAD, CALIFORNIA, in the matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING of FRANCISCO CASTILLO, CDC Number C-85768, on JUNE 27, 2007, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned audio recording to the best of my ability.

I hereby certify that I am a disinterested party in the above-captioned matter and have no interest in the outcome of the hearing.

Dated SEPTEMBER 6, 2007 at Sacramento, California.

Shelley Kelber, Transcriber
**Northern California Court Reporters**

EXHIBIT    "B"

PSYCHOLOGICAL EVALUATION
FOR THE BOARD OF PAROLE HEARINGS
JUNE 2007 SUBSEQUENT CALENDAR
FORENSIC ASSESSMENT DIVISION
CORRECTIONAL TRAINING FACILITY

## I. IDENTIFYING INFORMATION

| | |
|---|---|
| Inmate Name: | Castillo, Francisco |
| CDC Number: | C-85768 |
| DOB (*Current Age*): | 02-20-1965 (*currently 42 years old*) |
| Controlling Offenses: | PC §187, Murder Second Degree |
| Date of Offenses (*Age at time*): | 02-24-1988 (*then age 23*) |
| Sentence: | 15 years to Life |
| County of Commitment: | Los Angeles County |
| Date Entered into CDCR: | 07-15-1988 |
| Date Received at Soledad State Prison: | October 1988 |
| Classification Score: | 19 |
| CDCR Forensic Evaluator: | Richard Starrett, Ph.D. |
| Date of Evaluation: | 04-02-2007 |

## II. SOURCES OF INFORMATION

The inmate's Central File (C-File) and Unit Health Record (UHR) were reviewed. He was interviewed for the purpose of the current evaluation on April 2, 2007. He was informed that the interview was not confidential and that a report with the results of the evaluation would be submitted to the Board of Parole Hearings (BPH) to assist in determining his suitability for parole. The inmate appeared to understand the nature and purpose of the evaluation, and the possible consequences of the interview to the best of the inmate's ability. Unless otherwise indicated, the inmate agreed to participate in the interview. For reasons not limited to the possibility that an individual may have a mental disability or condition, which may qualify under the Americans with Disabilities Act, the evaluation was conducted by a licensed psychologist. Also, it is the conclusion of the undersigned examiner that it was not necessary to provide auxiliary aids or assistance to achieve effective communication. This evaluator is not responsible for any inaccurate statements, or subsequently changed opinions, expressed by the inmate.

This current report is an addendum for update to the BPH, and only information relevant to the current assessment, and more recent to prior reports, will be addressed. The report from 2000, written for the inmate's prior BPH Subsequent Hearing, should be consulted for any questions or concerns regarding background information unless clarified otherwise below.

## III.  QUESTIONS POSED BY MOST RECENT (*2004*) BPH

After the inmate's 2004 BPH hearing, the panel asked for a full psychological evaluation; however, a BPH Form 1000(a) was not completed or located.  Questions addressed in this evaluation will include:
1) The prisoner's violence potential in the free community; and,
2) The significance of alcohol/drugs as it relates to the commitment offense and an estimate of the prisoner's ability to refrain from the use/abuse of same when released.

## IV.   INTERVIEW INFORMATION

At the outset of the interview for the purpose of this report to the Board of Parole Hearings, the planned focus was to update any information relative to the most recent full evaluation, as well as to deal with any unexamined issues relative to intrapersonal functioning at the time of the index offense.

Mr. Castillo is a 42-year-old, single, Filipino male of Christian religion.  The inmate was oriented to person, place and time.  He was alert and cooperative.  His simple registration was intact, as was his short-term memory.  His simple abstract thinking was impaired.  His mathematical ability was intact and his complex problem solving was impaired.  He did not understand proverbs.

At the current time, he denies any problems with depression, anxiety, mood swings, or symptoms of a mood disorder.  He denies any auditory or visual hallucinations, and evidences no delusional or paranoid thinking.  He denies any eating or sleeping problems.  He denies any mental health problems as a child.  He denies any suicidal or homicidal thinking.  The inmate denies that he currently has any health problems or is being treated for any health problems.

INSTITUTIONAL PROGRAMMING:  The inmate was received into California Department of Corrections on July 15, 1988.  The inmate's current classification score is lifer mandatory minimum of 19, as of October 25, 2006.  The inmate's points have always been low.  The inmate's points were highest back in the late 1980s when he was close custody.  The inmate has never received any CDC-115s, or CDC-128A Counseling Chronos.  The inmate has never had any CDC-115s for addictive behavior, violence or sex related actions while in prison.  The inmate completed six years of formal education in the community.  He received his GED in 2005, while incarcerated.  The inmate has a vocational trade completion in data processing.  He is currently a clerk, or a wing aide, and has been for about the last four years.  Other jobs included being in education, PIA textiles for almost seven years, clerk, and porter.  Most of his positions have been as a clerk.  The inmate is currently involved in AA and NA, and has been since 1994 (almost 13 years).  The inmate is currently involved in a faith-based Anger Management class and Alternatives to Violence.  The inmate started his involvement in self-help groups in 1992, and has completed about six or seven group offerings.  The inmate is reportedly active in his church, and attends worship services on Sundays, Wednesdays and Thursdays.  The inmate states that he believes a number of his work duty assignments are related to his religious activities.

INSIGHT / SELF ASSESSMENT: The inmate states that he feels that his greatest personal strength is the understanding of why he is here, his ability to change himself, in terms of his actions and communications with people, and his understanding of people's problems. The inmate states that his weaknesses are his inability to forgive himself and, in the past, his use of alcohol or drugs. The inmate states his biggest accomplishments in which he takes the most pride is earning his GED. The inmate states his biggest change is his "outlook on life, not being angry anymore, and accepting responsibility for what I have done."

PAROLE PLANS IF GRANTED A RELEASE: The inmate states that he is going to parole to Los Angeles. He is looking for a halfway house, but as of yet he does not have a job offer. He has not been able to make any contacts with the community for support. The inmate plans to be active in AA, NA, self-help and his religion when he gets out. He is looking into a Victory Outreach program right now.

INMATE UNDERSTANDING OF LIFE CRIME: The inmate was charged with PC §187, Murder Second Degree.

Summary of the Crime: On 2/24/88, at approximately 1945 hours, the victim's wife, Linda McCardy, returned to her home at 375 North Ridgewood Place in Hollywood. When she entered the den of the house, she discovered the body of her deceased husband, victim John McCardy, seated in a chair in the living room. As she checked the victim's pulse, she saw a male seated on the couch in the living room near the victim. Thinking that this person was also deceased, she went to the den where she picked up a phone and called 911. While on the phone she heard footsteps in the living room and then observed the male who had been seated on the couch walking out the front door of the residence. The suspect fled on foot. There was extensive ransacking to the upstairs and downstairs areas on the house. Noted missing in the days following the murder was one hundred dollars in currency taken from the victim and one wristwatch valued at $75.00. After investigation, the detectives utilized the department's computer system to identify a friend of the victim. Based on the possible name, physical description, tattoo, and possible birth date of 2/20/65, Detectives located the CI&I arrest record for Francisco Parnala Castillo Jr., who has a birth date of 2/20/65. Fingerprints taken from the Subject tentatively matched prints lifted from a cigarette case that was in the victim's residence. The tread pattern on the Subject's tennis shoes matched the pattern of a bloody shoe print on the victim's floor. Page six (6) picture photo displays containing a photo of the Subject was shown to the victim's wife who identified the Subject's photo as being of the same person she had seen at the door on 2/2/88. A family housekeeper also positively identified the photo of the subject as being a person who had visited the victim on 2/19/88. Detectives searched the area outside the subject's father's apartment and recovered a blue and black long sleeved shirt from underneath the stairwell. The Subject's father said that the Subject had slept in that area on the eve of the murder. Both the tennis shoes and the shirt tested positive for the presence of blood. Prior to being interview by detectives on 3/3/88 the Subject was advised of his rights and he waived them. The interview was tape-recorded and after being confronted with his contradictive statements the Subject admitted to stabbing the victim. He said that he and the victim had been drinking vodka for quite a while and that he and the Subject were drunk. (*Source document: P.O.R. pages 3-6*)

"Prisoner's Version:   Upon interviewing Inmate Castillo, this writer is bringing the prisoner's statement forward from when he was in the Los Angeles County Jail. It should be noted that the Subject was in the L.A. County Jail for a Parolee at Large/Absconding and for Homicide.    When Mr. Castillo was interviewed by the LAPD homicide detectives, Subject admitted the following. Castillo waived his rights and initially stated that he had been over to the victim's residence on two occasions. Castillo stated that he did not know that the victim was dead and he did not own the blue and black plaid shirt. After confronting the suspect with the contradictory statements, he admitted that he had been over to the victim's residence on more that two occasions. He then admitted that he had stabbed the victim. He stated that on Wednesday, 2-24-88, at approximately 3 o'clock he was standing on the corner of Beverly Boulevard and San Andrew's place in Hollywood with his brother Mario, his neighbor Barney Leigh, and a friend of Barney's when he observed the victim in the liquor store parking lot at the Northeast corning of Beverly Boulevard and San Andrew's Place. He stated that he went over to the victim and they talked. He said that the victim had just purchased a pint of Vodka and appeared intoxicated. He and the victim walked to the victim's home. The victim had his bicycle with him and walked it along with them.

Upon arriving at the victim's home they went inside via the front door, which the victim unlocked using his key, and sat down in the living room. He stated that they drank vodka for quite awhile. He was now drunk. He said that the victim began telling him that he had a gun and was a good shot. He said that the victim stood up, approached him and grabbed him by the back of his neck. He said that he pushed the victim back causing him to fall into the living room armchair. He then went into the kitchen arming himself with a small kitchen knife.  He returned to the living room, approached the victim and they struggled over the small knife. The victim was able to grab the blade and break it. The suspect stated that he tossed the knife away and went back into the kitchen, arming himself with a much larger knife. He again approached the victim, who was sitting in the armchair.  As he walked up to the victim, the victim began to stand up.  Castillo pushed the victim in the chest at which time the victim was stabbed by the knife in Castillo's hands. Castillo stated that he thought that he had stabbed the victim a second time but he was not sure.

Castillo stated that he tossed that knife down and went to the upstairs bathroom where he washed his bloody hands off in the bathroom sink. He returned downstairs and armed himself with still another kitchen knife. He stated that he took this knife as he thought that the victim was still alive and he needed it for protection. He sat down on the living room couch and then passed out drunk. Castillo woke up at the sound of a voice. He jumped up and ran out of the front door of the residence, running north on Ridgwood Place, and then east on Elmwood Street. He ran home and took off his shirt throwing it under the porch at his father's apartment building. He admitted that the blue and black plaid shirt was in fact his and was the shirt he was wearing at the time of the murder.

Castillo stated that he was not sure if he killed the victim and contemplated calling the police while he was in the residence but decided against it. He stated that he did not take any property from the residence. He stated that he did not remember ransacking the location but that if he did it was not to steal anything, merely to locate the gun that the victim said he had. He said that he did not see a gun on the night of the murder, nor did he ever see any guns in the victim's possession at any time. He stated that he was sorry about what happened and did not intend to kill the victim."

In the current interview, when asking the inmate when he began getting into trouble, the inmate states that it was around 12 or 13 after his mother passed away. The inmate acknowledges being in youth authority, off and on, beginning around age of 12 or 13. The inmate acknowledges juvenile and adult criminal history. He had probation violations as a juvenile. The inmate had one probation violation as an adult.

When asking the inmate why he was getting into trouble as a young man, the inmate states that his father was in the service and gone a lot. When his father did come home, he was an alcoholic and abusive. The inmate states that after his mother's death, he got beat up very badly by his father and the children were put in foster care. From the age of 12 or 13, the other siblings were in foster care, but the inmate was on the street and/or in juvenile hall. The inmate states that, as a consequence of the father's beatings, he was afraid of adults.

The inmate was given the opportunity to read the Probation Officer's Report and his prior versions. The inmate states that he had no significant changes or additions to offer. When asking the inmate why he committed this crime, the inmate states that he was afraid of the victim. He said, "The victim was saying things that made me feel uncomfortable and he grabbed me." He added, "I got up and was going out to the kitchen, out the back door," but then he saw the knife. He came back into the room and "we struggled over the knife, and the knife got broken. I went and got another knife and pushed him down and stabbed him." When asking the inmate why he did not go out the door, he says, "I don't know." The inmate states that he did not realize that he stabbed the victim. The inmate states that he sat down and passed out at the victim's residence after the crime. The inmate states that they had consumed approximately two fifths of vodka between the two of them. The inmate states that he felt alcohol impaired his judgment, coupled with the fact that he had not eaten or sleeping.

When asking the inmate how he felt about the loss of life in this case, the inmate states that he feels terrible. He cannot change it. He said, "I've hurt a lot of people and I've committed a great sin." He said, "I have to deal with it everyday. It was a terrible thing I did to his family and my family. I have to live with it for the rest of my life. The victim's family has to live with it also. I can't change what I've done. I have to live with it."

When asking the inmate what has changed about him, so that something like this would not happen again anymore, he said, "I'm not afraid of people anymore." He said, "I've learned that I don't have to drink alcohol or do drugs to be someone. I don't have to hide my feelings anymore. My life has changed since I put God first in my life. I understand myself now and I try to do right."

MENTAL HEALTH CONCERNS OR PERSONALITY DISORDERS: The inmate has no serious mental health problems. The inmate would meet the diagnostic criteria for Polysubstance Dependence, in institutional remission and treatment. The inmate began drinking and using drugs around the age of 12 and that continued until he committed the controlling case. Alcohol was involved in the controlling case. The inmate would also meet the diagnostic criteria for Antisocial Personality Disorder, behaviorally and attitudinally subdued. The inmate started getting into trouble around the age of 12 or 13. He has multiple arrests as a juvenile and as an adult culminating in the controlling case.

## V.    DIAGNOSTIC IMPRESSION

| Axis I:   | 304.80 | Polysubstance Dependence, in institutional remission and treatment. |
|-----------|--------|---------------------------------------------------------------------|
| Axis II:  | 301.7  | Antisocial Personality Disorder, attenuating with age and maturity. |
| Axis III: |        | None known / deferred                                               |
| Axis IV:  |        | Incarceration for life term                                         |
| Axis V:   |        | GAF: 90                                                             |

## VI.   PREVIOUS EVALUATION SUMMARIES

A Psychological Evaluation for the Board of Prison Terms dated August 25, 2004, diagnoses the inmate with Polysubstance Abuse. He has been clean and sober for 15 years and was not seen as having a personality disorder. The author concludes that this inmate would be considered no higher risk for violence than any other citizen within the community, especially if he continues to use support services.

A Psychological Evaluation dated September 8, 2000 offered diagnostic impressions of Polysubstance Abuse, and Antisocial Personality Disorder, improved. The author concludes that in light of the above statements, if given the opportunity to function within an unstructured community, the inmate's violence potential increases slightly as compared to the average citizen in the community. A significant risk factor as a precursor to violence, for this inmate, would be his return to the use of alcohol or drugs as well as long standing history of violence and physical abuse.

A Psychological Evaluation dated May 27, 1997 offered no diagnostic impressions and no risk assessment.

## VII.   VIOLENCE RISK ASSESSMENT/CONCLUSIONS

The Board of Parole Hearings' questions will be addressed for each issue presented, as noted in an earlier section of this report.

1) *The prisoner's violence potential in the free community;*

The current research literature indicates that an empirically based approach to is the most reliable and valid method for assessing risk of future violence. In the present evaluation, two

separate assessment guides were used to help estimate this individual's risk for future violence in the community: the Psychopathy Check List – Revised (PCL-R) and the History – Clinical – Risk Management – 20 (HCR-20). The data for scoring these instruments were obtained from information derived in both the inmate interview and the files reviewed. These measures are widely used and are supported by years of research in the risk assessment field. They have been cross validated with various forensic populations, including United States males in correctional settings; however, the following results need to be regarded with some level of caution since some individuals may possess idiographic differences that could limit the applicability of these instruments. The evaluator has taken these factors into consideration in determining how much weight to allot each of the measures and in formulating an overall estimate of risk for future violence in the community. Estimates of risk for violence will be presented categorically: low, moderate, or high.

PCL-R:  The PCL-R was scored for level of psychopathy based on data from inmate's records and information obtained in the current interview. The inmate's level of psychopathy is **low**. There was some elevation on this scale, due primarily to the inmate's prior arrests history.

HCR-20:  The HCR-20 was scored for level of violence risk based on data from the inmate's records and information obtained in the current interview.

Historical:  In rating this individual on the historical factors that predict future violence, the inmate would rate in the <u>moderate</u> range in his propensity for future violence. This rating is based on the inmate being involved in unstable relationships, not establishing a career, being a substance abuser, having early maladjustment problems and to a lesser extent, prior supervision failures, having antisocial personality diagnoses, along with one prior violent arrest.

Clinical/Insight:  In rating the inmate on the clinical/insight factor, the inmate would rate in the low range in his propensity for future violence. The inmate has had a good response to treatment. He has developed insight into both his criminal past and his controlling offense. The inmate does not have a negative attitude. He has no active mental health symptoms and is not longer impulsive.

Risk Management:  The inmate would also rate in the low range on his risk assessment. The inmate has handle compliance, stress and destabilizers well within the institutional setting. The inmate's parole plans seem feasible. However, there is an elevation on this variable, due to the inmate not having his parole plans completely developed and not having community resources all set up.

The inmate's overall risk assessment in the future for violence has now moved from the high end of the moderate range down to the **low** range on the clinical and risk management factors.

OVERALL RISK ASSESSMENT: The inmate's level of psychopathy is *low*. The in inmate's overall risk assessment in the future for violence has now moved from the high end of the moderate range down to the *low* range on the clinical and risk management factors.

2). *The significance of alcohol/drugs as it relates to the commitment offense and an estimate of the prisoner's ability to refrain from the use/abuse of same when released;*

The inmate openly acknowledges his use of alcohol as a major factor in the committing offense. The inmate acknowledges that the night of the offense, he and the victim drank approximately two (2) fifths of vodka. The inmate realizes that the alcohol impaired his judgement. The inmate also realizes that he was scared and over reacted. This over reaction was due, in part, to his childhood of fear and abuse, and being fearful of adults. The inmate has been active in AA or NA for 12 to 13 years. The inmate has been clean and sober for about 18 years. He acknowledges that substance abuse has been a major life problem. He also understands the need for life-long treatment. It is recommended that he continue ongoing abuse treatment and relapse prevention be a condition of his parole plans.

*Dr R Starrett*

_____          ___4-30-2007_____

Richard Starrett, Ph.D., CA License # PSY-13628          Date Submitted
Contract Forensic Psychologist
Board of Parole Hearings / Forensic Assessment Division
California Department of Corrections and Rehabilitation

CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use, or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act and the Health Insurance Portability and Accountability Act (HIPAA). If you are not the intended recipient, please contact the sender and destroy all copies of this communication.

## PSYCHOLOGICAL EVALUATION FOR THE BOARD OF PRISON TERMS
### (REVISED AUGUST 1998)
### PAROLE CONSIDERATION HEARING
### SEPTEMBER 2004 LIFER CALENDAR

### CORRECTIONAL TRAINING FACILITY, SOLEDAD

Inmate Castillo has served approximately 16 years on a 16 year-to-life sentence for second-degree murder. This is an addendum report.

## PSYCHOSOCIAL ASSESSMENT

**I.    IDENTIFYING INFORMATION:**

Inmate Castillo is now a 39-year-old Filipino, single male. Religious affiliation is Christian.

**II.    DEVELOPMENT HISTORY:**

Developmental history is essentially the same as reported in the last BPT performed by R. Coate, Ph.D. on 9/8/00.

**III.    EDUCATIONAL HISTORY:**

The previous report of 9/8/00 in the education section discusses that the inmate states that "I just can't seem to pass the test, I have difficulty learning." The evaluator then concludes that school not only a struggle for him, but he also frequently made excuses to remain home with his ill mother. In this educational section it is also seen that the inmate was a Special Education student and as such, being in education for this length of time, this inmate long ago could have received a chrono stating that he has reached a plateau in his learning. However, inmate Castillo has persevered and continues to do so in order to complete his GED.

**IV – VIII.    Remain essentially unchanged. Please view the previous report of 9/00.**

**IX.    SUBSTANCE ABUSE HISTORY:**

As previously reported, inmate Castillo has had serious substance abuse problems since he was young and was also under the influence at the time of the commitment offense. Inmate Castillo has now been clean and sober for 15 years. He has completed numerous self-help groups, such as 10 years in NA and AA; in 1994 he completed a Life Skills group with Dr. Bakeman; he previously completed a 14-week impact group with Captain Guerra and also in 1986 completed a course of individual therapy with Dr. Terrini. His

SENT TO INMATE ON SEP 16 2004

INMATE COPY

CASTILLO      C-85768      CTF-CENTRAL      8/25/04      llr

CASTILLO, FRANCISCO
CDC NUMBER: C-85768
BPT PSYCHOLOGICAL EVALUATION
PAGE 2

previous psych report of 9/00 states that he gained more of an understanding of his commitment offense and the circumstances which led up to it."

### X.    PSYCHOLOGICAL AND MEDICAL HISTORY:

This report uses the heading psychiatric and medical history. It should be psychological and medical history. It should state that inmate Castillo denies any history of medical or psychological hospitalizations. He denies any psychological history or suicide attempts. The inmate did complete a course of individual psychotherapy and the behest of the Board of Prison Terms in order to fully understand the underlying causes of his commitment offense. He appears to have met that goal.

### XI.    PLANS IF GRANTED RELEASE:

The inmate states that should he be given a release date by the Board of Prison Terms he would most likely live in a half-way house and where he would be released to the County of Los Angeles. He states for work that he is qualified to do any type of construction. He is also qualified as a warehouseman. He has most recently learned and completed Vocational Data and that would also be a possibility of employment for him. When asked how he believed he would do on parole, the inmate replied that he would do great.

## CLINICAL ASSESSMENT

### XII.    CURRENT MENTAL STATUS/TREATMENT NEEDS:

Inmate Castillo appears his stated age of 39. He was appropriately dressed and groomed. He is cooperative, calm, alert; however, tentative and soft-spoken during the interview. His speech was articulate and clear and readily understandable. His flow of thought and affect were both within the normal range. There was no evidence of delusions or hallucinations. He was fully oriented and his intellectual functioning is estimated to be within the average range. There was evidence of a mood or thought disorder. His insight and judgment appear to be intact. He demonstrates good insight into his commitment offense and shows appropriate, significant remorse.

### CURRENT DIAGNOSTIC IMPRESSIONS:

| | |
|---|---|
| AXIS I: | History of poly-substance abuses, clean and sober for 15 years. |
| AXIS II: | No personality disorder. |
| AXIS III: | No physical disorders. |
| AXIS IV: | Incarceration. |
| AXIS V: | GAF equals 90 |

CASTILLO        C-85768        CTF-CENTRAL        8/25/04        lrr

CASTILLO, FRANCISCO
CDC NUMBER:  C-85768
BPT PSYCHOLOGICAL EVALUATION
PAGE 3

Would the inmate be given a parole or release date at this time, his prognosis for maintaining his present gains within the community is positive providing he acquires positive support within the community such as NA and AA.  He might also want to seek individual therapy within the community in order to assist reintegration into society.

## XIII.  REVIEW OF LIFE CRIME:

When asked about his criminal offense inmate Castillo stated that although it doesn't change anything about what he did, he states again he is very sorry for his actions.  He hopes that he will at some point his life be able to receive forgiveness for his crime.  The inmate stated he would like his victim's family to know how remorseful he is.  Inmate Castillo understands that it is not what he says, or what he feels, but what does that shows people he is a changed person

The inmate states that he is comfortable saying that he is ready to set his past aside. When asked what that meant, the inmate recounted how he has come to understand the underlying causes for his commitment offense.  These being partially mitigating circumstances in that he grew up in a horrifically abusive home, with an alcoholic father and the only person who cared for him and understood him (his mother) he watched her die of cancer at the age of 13.  He was then abused so badly he and his six siblings were removed from the home, put into foster care where he ran away and basically grew up on the streets.  The inmate has never had any kind of childhood, nor has he had the direction. He states that he has learned all of those things since he has been in prison and has reinvented not only a childhood, but also a life where 15-16 years later he states that he can now reenter society and he is confident that he can do well.

## XIV.  ASSESSMENT OF DANGEROUSNESS:

A.  The inmate's violence potential within a controlled setting is considered to be significantly below average relative to this level two population, based on several factors.  On one hand the inmate did have a significant juvenile and young adult history and again factors within his environment may explain that juvenile criminal history.  However, upon the time of incarceration for the present offense the inmate was able to soon after completely turn his life around and has managed to not get any disciplinary issues for his entire incarceration.  Therefore, in light of base factors his violence potential is below average relative to his level two inmate population.

B.  Within a community, after 15-16 years of no disciplinary problems, this inmate would be considered no higher risk for violence than any other citizen within the community, especially if he continues to use supportive services.

B.  The most significant risk factor as a precursor to violence for this inmate would be his return to the use of alcohol and/or drugs.

CASTILLO, FRANCISCO
CDC NUMBER: C-85768
BPT PSYCHOLOGICAL EVALUATION
PAGE 4

## XV.   CLINICIAN OBSERVATIONS/COMMENTS/RECOMMENDATIONS:

A. He is confident, responsible. He has the capacity to abide by institutional standards and has overwhelmingly done so during his incarceration period, as evidenced by his disciplinary free record.

B. The inmate does not have a mental disorder which would necessitate treatment either during his incarceration or following parole.

C. This inmate could strongly benefit from continued attendance at Alcoholics Anonymous and/or Narcotics Anonymous as well as mandatory testing as part of his parole plans.

*Martha E. Gleason Ph.D*

Martha E. Gleason, Ph.D.
Staff Psychologist
Correctional Training Facility, Soledad

*B. Zika, Ph.D.*

B. Zika, Ph.D.
Senior Supervising Psychologist
Correctional Training Facility, Soledad

MG/llr

D: 08/25/04
T: 08/31/04

CASTILLO          C-85768          CTF-CENTRAL          8/25/04          lrr

PSYCHOLOGICAL EVALUATION FOR THE BOARD OF PRISON TERMS
PAROLE CONSIDERATION HEARING
2000 LIFER CALENDAR

CORRECTIONAL TRAINING FACILITY, SOLEDAD
AUGUST 29, 2000

This is the fourth psychological evaluation for the Board of Prison Terms on inmate Francisco Castillo. This report is the product of a personal clinical interview with the inmate conducted on 8/29/00, as well as a review of his Central file and Unit health record. This clinical review and review of pertinent documents with the express purpose of preparing this report.

I.    IDENTIFYING INFORMATION:

Inmate Castillo is a 35 year old, single, Phillipino male who was born on 2/20/65. His reported religious affiliation is Christian. He has numerous tattoos on his chest and both forearms. He reports that common nicknames have been "junior" and "Cisco". He also denies any gang affiliation or activity.

II.    DEVELOPMENTAL HISTORY:

Inmate Castillo reports that his childhood years were essentially normal with speech and motor development milestones achieved at appropriate ages. He reports a significant childhood history of physical abuse by his father, which frequently resulted in emergency room treatment. The last incident of abuse occurred when he was 13 and his father beat him, breaking his arm. The police were called and the children were removed from the home.

III.    EDUCATIONAL HISTORY:

Educationally, inmate Castillo stated that he attended Public School and left in the middle of the Ninth Grade. Throughout his incarceration he has continued to work toward his G.E.D. However, he reports "I just can't seem to pass the test". He reports attending Special Education classes. However, he denies having any learning disability, but states "I just have difficulty learning". School has always been a struggle for him, since neither of his parents were available to encourage or support his continued learning. He denies being a disciplinary problem in school, however, as his mother became ill with cancer he frequently made excuses to remain at home to be with her. The inmate acknowledged the

CASTILLO, FRANCISCO
CDC NUMBER:     C-85768
BPT PSYCHOLOGICAL EVALUATION
PAGE TWO

importance of obtaining his G.E.D. or obtaining his diploma and continued to pursue this endeavor through a self-learning program with books and materials.

IV.   FAMILY HISTORY:

Inmate Castillo was raised by his mother and father in Michigan until the age of 13 when his mother died of cancer and the family moved to California to be closer to his paternal grandparents.   He reported an extremely close relationship with his mother as "my life changed drastically when she died".   His father was retired from the Coast Guard and was rarely at home.   However, after the death of his mother, his father had difficulty handling the loss, as well as taking care of six young children.

Inmate Castillo is the second oldest of six and has been in and out of correctional facilities since he was a teenager.   His home life was very conflictual and stressful, as his father drank heavily and abused both his mother as well as all the children.   The inmate describes his teenaged years as "living in fear and not having anyone to confide in".   After the death of his mother the physical abuse by his father escalated to the point of the children being taken out of the home by Social Services and placed in the care of their paternal grandmother.   She subsequently could not handle the responsibility of six children and they were subsequently separated and placed in alternate foster homes.   Inmate Castillo ran away from foster care and stayed with friends who were on the street.

He describes spending the majority of his adolescent years incarcerated for various crimes consisting of assault and batteries, and burglaries.   As an adult, he also served one prior incarceration for burglary where he received a two year sentence.   He does not maintain contact with his siblings and has not since they were separated as children, although he reports sending holiday cards, but rarely receives any response.

V.   PSYCHOSEXUAL DEVELOPMENT AND SEXUAL ORIENTATION:

Inmate Castillo stated that he is a heterosexual male, he denied any history of sexual aggression or high-risk behavior.

CASTILLO, FRANCISCO
CDC NUMBER:    C-85768
BPT PSYCHOLOGICAL EVALUATION
PAGE THREE

VI.    MARITAL HISTORY:

Inmate Castillo does not have a marital history, nor does he have any children from any relationships.

VII.    MILITARY HISTORY:

The inmate denied any military history.

VIII.    EMPLOYMENT AND INCOME HISTORY:

Prior to his current incarceration inmate Castillo denied having any significant employment history.   He worked at odd jobs around his neighborhood, however, he spent the majority of his years incarcerated. During his 12 years at CTF he has programmed well and has proven to be a steady and productive employee.   He worked for 6 years as a Textile Mechanic and in 1997 he worked for Inmate Assignment as a clerk.

Currently, he works in the Culinary as a clerk and has been performing this function for the past 6 years.   While providing clerical support he has taken the initiative to learn computer skills in hoping to improve his marketability when paroled.    He has received exceptional and above average reports from supervisors, often stating "he is an exceptional worker", "needs very little supervision and gets along well with fellow workers", "this inmate is steady and cooperative and always tries to do his best".

IX.    SUBSTANCE ABUSE HISTORY:

Inmate has acknowledged that he has a significant history of alcohol and drug abuse.   He reported to have started drinking at an early age and progressed to sniffing glue, and then to harder drugs such as cocaine and heroin.    The day of the committed offense he and a friend drank approximately a bottle and a half of Vodka.   The inmate reported that his substance use was a daily occurrence, frequently blacking out and becoming quite intoxicated.   His father was an untreated alcoholic and given the inmates significant history of abuse he described his addiction

CASTILLO         C-85768         CTF-C         09/08/00         rr

CASTILLO, FRANCISCO
CDC NUMBER:     C-85768
BPT PSYCHOLOGICAL EVALUATION
PAGE FOUR

as "I needed it to numb the pain". He described his childhood as being very angry and not having many outlets to talk about his pain. He has been attending Alcoholics Anonymous since 1994 and reports have indicated that he interacts well with other group members and has gained some insight into his own history and problems with drinking.

X.    PSYCHIATRIC AND MEDICAL HISTORY:

Inmate Castillo denies any history of medical or psychiatric hospitalizations. He denies any psychiatric history or suicide attempts. In 1996, however, inmate Castillo completed a course of individual psychotherapy whereby he gained more of an understanding into his committment offense and the circumstances which led up to it. He has also attended a Lifeskills Group in 1994 and he is also currently in the fourth week of a 14 week impact self-help group.

Despite his difficulties in his past, he has programmed well and adjusted positively to this incarceration. Inmate Castillo denies a history of any serious accidents or head injuries or a history of seizures or other neurological conditions. He is not taking any medication at this time.

XI.    PLANS IF GRANTED RELEASE:

Inmate Castillo plans should he be given a parole date was somewhat vague. Although he has not had much communication with his family, he was insistent that they would be supportive of him upon his release and provide him with temporary housing, until he got on his feet. When questioned further about being more specific he stated that his brother and/or aunts and uncles would want him to stay with them. However, he "doesn't want to be a burden to anyone". Given the marketable skills he has learned while incarcerated he feels that he would adjust to societies challenges quite well when paroled.

CASTILLO, FRANCISCO
CDC NUMBER:    C-85768
BPT PSYCHOLOGICAL EVALUATION
PAGE FIVE

## CLINICAL ASSESSMENT

XII.    CURRENT MENTAL STATUS / TREATMENT NEEDS:

Inmate Castillo appeared his stated age of 35, he was appropriately dressed and groomed. He was cooperative, calm and alert during the interview.    His speech was articulate and clear, and readily understandable. His flow of though and affect were both within the normal range and there was no evidence of delusions or hallucinations. He was fully oriented and his intellectual functioning was estimated to be within the average range.    There was no evidence of a mood or thought disorder.    His insight and judgment appeared to be intact.    He demonstrated good insight into his committment offense and showed significant remorse.

CURRENT DIAGNOSTIC IMPRESSIONS:

AXIS I:      Polysubstance abuse, in institutional remission.
AXIS II:     Antisocial personality disorder, improved.
AXIS III:    No contributory physical disorder.
AXIS IV:     Incarceration.
AXIS V:      GAF equals 90.

Should this inmate be given a parole or release date at this time his prognosis for maintaining his present gains from the community will be positive providing that he has adequate support in the community to aid in his adjustment, given his length of incarceration.

XIII.    REVIEW OF LIFE CRIME:

Inmate Castillo described at length the circumstances which led to the 1988 murder. He reports having an altercation with the victim and apparently stabbed him with a kitchen knife. He does not recall the incident very well and states that he was heavily intoxicated at the time and was also drinking excessively days prior to the incident. He takes full responsibility for the stabbing of the victim and feels that he is better able to deal with stress and is able to demonstrate more

CASTILLO, FRANCISCO
CDC NUMBER:    C-85768
BPT PSYCHOLOGICAL EVALUATION
PAGE SIX

self-control than when he was younger. He insightfully noted that he was unduly influenced by the wrong people and made very bad decisions while growing up.

XIV.    ASSESSMENT OF DANGEROUSNESS:

A.    His violence potential within a controlled setting is considered to be below average, relative to this Level II inmate population. This conclusion is based upon several factors.

On the one hand, he has a juvenile criminal history beginning as an early teenager and spent the majority of his adolescent years incarcerated for crimes such as assault and battery, and burglary. Two, his current offense is one of brutality and callousness, having stabbed the victim multiple times and later ransacking his house. Three, he comes from a family of prior physical abuse and has learned this to be a way of handling anger and stress. Along with the abuse he also has a signficant history of alcohol and drug use, which further heightens his risk for violence potential and impulse control problems.

However, on the other hand, in the 12 years of incarceration that the inmate has been disciplinary free from any CDC violations. He programmed well and has attended self-improvement programs and has been trying to better his situation and prepare for his potential release. He has been faced with many challenges and disappointments while incarcerated and has handled them appropriately and all without noted incidents. Therefore, in light of these factors, his violence potential is considered to be below average relative to this Level II inmate population.

B.    In light of the above stated facts, if given the opportunity to function within the unstructured community his violence potential increases slightly as compared to the average citizen in the community.

C.    The most significant risk factor as a precursor to violence for this inmate would be his return to the use of alcohol and/or drugs as well as a long-standing history of violence and physical abuse.

CASTILLO        C-85768        CTF-C        09/08/00        rr

CASTILLO, FRANCISCO
CDC NUMBER:    C-85768
BPT PSYCHOLOGICAL EVALUATION
PAGE SIX


XV.    CLINICIAN OBSERVATIONS / COMMENTS / RECOMMENDATIONS:

A.    This inmate is competent and responsible for his behavior.  He has the capacity to abide by institutional standards and has overwhelmingly done so during his incarceration period.  Because of his disciplinary free record.

B.    This inmate does not have a mental disorder which would necessitate treatment either during his incarceration or following parole.

C.    This inmate could benefit from continued attendance at Alcoholics Anonymous and/or Narcotics Anonymous as part of his parole requirement.


R. S. COATE, Psy.D.
Senior Supervising Psychologist
Correctional Training Facility, Soledad

RSC/lrr

D:  08/29/00
T:  09/08/00

# EXHIBIT "C"

**LIFE PRISONER EVALUATION REPORT
SUBSEQUENT PAROLE CONSIDERATION HEARING
MARCH 2007 CALENDAR**

**CASTILLO**                                                              **C85768**

I.    **COMMITMENT FACTORS:**

    A.    **Life Crime:** All relevant documents have been considered and all information remains the same.

        1.    **Summary of Crime:** All relevant documents have been considered and all information remains the same.

        2.    **Prisoner's Version:** All relevant documents have been considered and all information remains the same.

        3.    **Aggravating/Mitigating Circumstances:**

            a.    **Aggravating Factors:** All relevant documents have been considered and all information remains the same.

            b.    **Mitigating Factors:** All relevant documents have been considered and all information remains the same.

    B.    **Multiple Crime(s):** N/A.

        1.    **Summary of Crime:** N/A.

        2.    **Prisoner's Version:** N/A.

II.    **PRECONVICTION FACTORS:**

    A.    **Juvenile Record:** All relevant documents have been considered and all information remains the same.

    B.    **Adult Convictions and Arrests:** All relevant documents have been considered and all information remains the same.

    C.    **Personal Factors:** All relevant documents have been considered and all information remains the same.

Sent to Inmate on 12/26/08

Inmate Copy

LIFE PRISONER EVALUATION REPORT                                            2
PAROLE CONSIDERATION HEARING
MARCH 2007 CALENDAR

### III.    POSTCONVICTION FACTORS:

A.    **Special Programming/Accommodations:** N/A.

B.    **Custody History:** All relevant documents have been considered and all information remains the same. Castillo remained at CTF in the general population with Medium A Custody.

C.    **Therapy and Self-Help Activities:** Documents from previous hearings remain valid. Castillo has participated in AA/NA and attended an alternative to violence program. Refer to Postconviction Progress Report for details.

D.    **Disciplinary History:** Documents from previous hearings remain valid. Castillo continues to remain disciplinary free.

E.    **Other:** Castillo attended his Subsequent #2 Parole Consideration Hearing on 3/28/06. The hearing was postponed due to the need for a new psych evaluation as well as for Castillo to develop parole plans.

### IV.    FUTURE PLANS:

A.    **Residence:** All relevant documents have been considered and all information remains the same.

B.    **Employment:** All relevant documents have been considered and all information remains the same.

C.    **Assessment:** In review of Castillo's parole plans, this counselor does not foresee any problems provided support letters are submitted prior to his hearing.

### V.    USINS STATUS: N/A.

### VI.    SUMMARY:

A.    Prior to release the prisoner could benefit from:

1. Continuing to be disciplinary free.
2. Participation in self-help and therapy programs.
3. Upgrading vocationally and educationally.

LIFE PRISONER EVALUATION REPORT
PAROLE CONSIDERATION HEARING
MARCH 2007 CALENDAR

**B.**     This report is based upon a 2 hour review of Castillo's Central File and a
(1) hour interview with Castillo.

**C.**     Per the Olson Decision, Castillo was afforded an opportunity to review his Central
File. (Refer to CDC 128-B dated 11/30/06 in the General Chrono Section of the
Central File.)

**D.**     No accommodation was required per the Armstrong vs. Davis BPH Parole
Proceedings Remedial Plan (ARP) for effective communication.

LIFE PRISONER EVALUATION REPORT
PAROLE CONSIDERATION HEARING
MARCH 2007 CALENDAR

_____ 12/20/06
A. Corona                        Date
Correctional Counselor I

_____ 12-20-06
D. Carnazzo                      Date
Correctional Counselor II

_____ 12-20-06
I. Guerra                        Date
Facility Captain

_____ 12-22-06
D. S. Levorse                    Date
Classification and Parole Representative

BOARD OF PRISON TERMS                                                    STATE OF CALIFORNIA

## LIFE PRISONER: POSTCONVICTION PROGRESS REPORT

☐  DOCUMENTATION HEARING

☒  PAROLE CONSIDERATION HEARING

☐  PROGRESS HEARING

**INSTRUCTIONS**
TO CDC STAFF:  DOCUMENT EACH 12-MONTH PERIOD FROM THE DATE THE LIFE TERM STARTS TO PRESENT
TO BPT STAFF:  FOR EACH 12-MONTH INCREMENT APPLY THE GUIDELINES UNDER WHICH THE PAROLE DATE WAS ORIGINALLY
ESTABLISHED, ie., 0-2  MONTHS FOR PBR AND 0-4 MONTHS FOR BPT. SEE BPT §§2290 - 2292, 2410 AND 2439.

| POSTCONVICTION CREDIT | | | REASONS |
|---|---|---|---|
| YEAR | BPT | PBR | |
| 2/10/06 to 11/30/06 | | | **PLACEMENT**:  Remained at CTF in the general population. **CUSTODY**:  Medium A. **VOC. TRAINING**:  N/A. **ACADEMICS:**  Castillo  received his GED this period. **WORK RECORD**:   Continued his unit clerk/aide assignment this period. **GROUP ACTIVITIES**:  Castillo participated in AA/NA as verified by CDC 128B's dated 3/31/06, 4/10/06, 6/30/06, 7/13/06, and 9/30/06.  He also attended an Alternative to Violence Project class on 9/19/06. **PSYCH. TREATMENT**:   None noted during this period. **PRISON BEHAVIOR**:  Castillo remained disciplinary free during this period. **OTHER**:  None. |

| CORRECTIONAL COUNSELOR'S SIGNATURE | | DATE 12/12/06 |
|---|---|---|
| CASTILLO | C85768 | CTF-SOLEDAD | MAR/2007 |

# EXHIBIT "D"

37

# CALIFORNIA BOARD OF PRISON TERMS

## D E C I S I O N

**PRESIDING COMMISSIONER GILLIS:**  We're back on record.  And all those who were previously identified have returned.  And Mr. Castillo, the panel has unanimously determined that you're not suitable for parole at this time and that you would pose an unreasonable risk of danger and a threat to public safety if released.  We base the finding on the following:

The commitment offense was callous, cruel, dispassionate.  The victim was stabbed multiple times.  And these conclusions are drawn from the statement of facts wherein the prisoner after befriending the victim, went to his residence, stabbed him multiple times and either before or after the stabbing ransacked the victim's residence and property was taken.  From the previous record, the prisoner has an escalating pattern of criminal conduct and it began at an early age.  He had prior arrests as a juvenile, had a prior prison term, and in fact was on parole at the time of the life offense.  He also had an unstable social history, which included drugs and alcohol abuse, and dropping out of school at an early age.  Also society made multiple attempts to correct his criminality and none of those seemed to work.  Under

**FRANCISCO CASTILLO, C-85768  DECISION PAGE 1  09/18/97**

38

1    institutional behavior, the prisoner has programmed in

2    a limited manner.  He's not developed a marketable

3    skill, not completed his GED, or upgraded

4    educationally.  He has not had sufficient

5    participation in self-help and therapy programming.

6    The psychiatric factors, the report dated May 8, 1997,

7    by Dr. Terrini, does not totally supportive of

8    release.  And Dr. Terrini states that the prisoner's

9    violence potential is no more than the average inmate.

10    Under remarks, the panel finds the prisoner needs

11    additional therapy in order to face, discuss,

12    understand, and cope with stress and to be able to

13    come to grips with the commitment offense.  And until

14    progress is made, he continues to be a threat to

15    others.  The prisoner has made some gains, but those

16    gains are recent, and we commend you for those gains.

17    We commend you for being disciplinary free since

18    coming into the institution.  And that's quite

19    remarkable.  Also you've been a good worker and gets

20    along well with staff, we commend you for that.  But

21    these positive aspects do not outweigh the factors of

22    unsuitability.  And we also find that it's not

23    reasonable to expect that parole would be granted

24    within the next three years, so it's a three year

25    denial.  And the reason for that is the nature of the

26    commitment offense, wherein the prisoner stabbed the

27    **FRANCISCO CASTILLO, C-85768   DECISION PAGE 2   09/18/97**

1    victim multiple times and this is either during the

2    course of a burglary or a robbery and in any event the

3    victim was stabbed to death in a brutal and callous

4    manner.  Also, the prisoner has a prior prison term.

5    He failed at society's attempts.  He had been returned

6    three times for parole violations.  And then he

7    committed the life offense.  Also the psychiatric

8    report dated May the 8th 1997, by Dr. Terrini

9    indicates a need for a longer period of observation

10   and evaluation.  During the next three years we want

11   you to remain disciplinary free and I don't think

12   that's going to be a problem for you.  You've done

13   well in that area, but remain disciplinary free.

14   Mention was made here today of your ability to upgrade

15   educationally and since so you're able to do that, so

16   you ought to get your GED for your high school

17   diploma, if you're able to do that.  Also, participate

18   in any self-help and therapy programming that might

19   become available to you.  That's the formal reading of

20   the decision.  I'll give you a copy of the tentative

21   decision.  You're doing well.  You're still not quite

22   coming clean with everything about the life offense,

23   but you made a good start.  Commend you for that.

24   I'll see if any of the other panel members have any

25   comments.  Mr. Baker?

26          COMMISSIONER BAKER:  None.  Thank you.

27   FRANCISCO CASTILLO, C-85768  DECISION PAGE 3  09/18/97

40

1    PRESIDING COMMISSIONER GILLIS:  Mr. Ortega?

2    COMMISSIONER ORTEGA:  (inaudible)

3    PRESIDING COMMISSIONER GILLIS:  Okay.  You're

doing well so keep it up.  Good luck.  We'll see you

in three years.

6                        --o0o--

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    PAROLE DENIED THREE YEARS

26    EFFECTIVE DATE OF THIS DECISION _____ DEC 3 0 1997

27    FRANCISCO CASTILLO, C-85768  DECISION PAGE 4  09/18/97

# EXHIBIT "D"

37

# CALIFORNIA BOARD OF PRISON TERMS

## D E C I S I O N

PRESIDING COMMISSIONER GILLIS:  We're back on record.  And all those who were previously identified have returned.  And Mr. Castillo, the panel has unanimously determined that you're not suitable for parole at this time and that you would pose an unreasonable risk of danger and a threat to public safety if released.  We base the finding on the following:

The commitment offense was callous, cruel, dispassionate.  The victim was stabbed multiple times. And these conclusions are drawn from the statement of facts wherein the prisoner after befriending the victim, went to his residence, stabbed him multiple times and either before or after the stabbing ransacked the victim's residence and property was taken.  From the previous record, the prisoner has an escalating pattern of criminal conduct and it began at an early age.  He had prior arrests as a juvenile, had a prior prison term, and in fact was on parole at the time of the life offense.  He also had an unstable social history, which included drugs and alcohol abuse, and dropping out of school at an early age. Also society made multiple attempts to correct his criminality and none of those seemed to work.  Under

FRANCISCO CASTILLO, C-85768  DECISION PAGE 1  09/18/97

38

1    institutional behavior, the prisoner has programmed in

2    a limited manner.  He's not developed a marketable

3    skill, not completed his GED, or upgraded

4    educationally.  He has not had sufficient

5    participation in self-help and therapy programming.

6    The psychiatric factors, the report dated May 8, 1997,

7    by Dr. Terrini, does not totally supportive of

8    release.  And Dr. Terrini states that the prisoner's

9    violence potential is no more than the average inmate.

10   Under remarks, the panel finds the prisoner needs

11   additional therapy in order to face, discuss,

12   understand, and cope with stress and to be able to

13   come to grips with the commitment offense.  And until

14   progress is made, he continues to be a threat to

15   others.  The prisoner has made some gains, but those

16   gains are recent, and we commend you for those gains.

17   We commend you for being disciplinary free since

18   coming into the institution.  And that's quite

19   remarkable.  Also you've been a good worker and gets

20   along well with staff, we commend you for that.  But

21   these positive aspects do not outweigh the factors of

22   unsuitability.  And we also find that it's not

23   reasonable to expect that parole would be granted

24   within the next three years, so it's a three year

25   denial.  And the reason for that is the nature of the

26   commitment offense, wherein the prisoner stabbed the

27   **FRANCISCO CASTILLO, C-85768   DECISION PAGE 2   09/18/97**

39

1  victim multiple times and this is either during the
2  course of a burglary or a robbery and in any event the
3  victim was stabbed to death in a brutal and callous
4  manner.  Also, the prisoner has a prior prison term.
5  He failed at society's attempts.  He had been returned
6  three times for parole violations.  And then he
7  committed the life offense.  Also the psychiatric
8  report dated May the 8th 1997, by Dr. Terrini
9  indicates a need for a longer period of observation
10 and evaluation.  During the next three years we want
11 you to remain disciplinary free and I don't think
12 that's going to be a problem for you.  You've done
13 well in that area, but remain disciplinary free.
14 Mention was made here today of your ability to upgrade
15 educationally and since so you're able to do that, so
16 you ought to get your GED for your high school
17 diploma, if you're able to do that.  Also, participate
18 in any self-help and therapy programming that might
19 become available to you.  That's the formal reading of
20 the decision.  I'll give you a copy of the tentative
21 decision.  You're doing well.  You're still not quite
22 coming clean with everything about the life offense,
23 but you made a good start.  Commend you for that.
24 I'll see if any of the other panel members have any
25 comments.  Mr. Baker?
26          COMMISSIONER BAKER:  None.  Thank you.
27 FRANCISCO CASTILLO, C-85768  DECISION PAGE 3  09/18/97

40

1           **PRESIDING COMMISSIONER GILLIS:**  Mr. Ortega?

2           **COMMISSIONER ORTEGA:**  (inaudible)

3           **PRESIDING COMMISSIONER GILLIS:**  Okay.  You're

4  doing well so keep it up.  Good luck.  We'll see you

5  in three years.

6                        --o0o--

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25  **PAROLE DENIED THREE YEARS**

26  **EFFECTIVE DATE OF THIS DECISION** _____ DEC 3 0 1997

27  **FRANCISCO CASTILLO, C-85768    DECISION PAGE 4    09/18/97**

41

## CERTIFICATE AND
## DECLARATION OF TRANSCRIBER

I, JUDY C. INGRAM, a duly designated transcriber, CAPITOL ELECTRONIC REPORTING, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total one in number and cover a total of pages numbered 1 - 40, and which recording was duly recorded at CORRECTIONAL TRAINING FACILITY, SOLEDAD, CALIFORNIA, in the matter of the INITIAL PAROLE CONSIDERATION HEARING OF FRANCISCO CASTILLO, CDC Number C-85768, on September 18, 1997, and that the foregoing pages constitutes a true, complete, and accurate transcription of the aforementioned tape to the best of my ability.

I hereby certify that I am a disinterested party in the above-captioned matter and have no interest in the outcome of the hearing.

Dated October 18, 1997, at Sacramento, California.

JUDY C. INGRAM
TRANSCRIBER

46

1     CALIFORNIA BOARD OF PRISON TERMS

2             D E C I S I O N

3     **PRESIDING COMMISSIONER WELCH:** Ready?

4     **DEPUTY COMMISSIONER HARMON:** You're on record.

5     **PRESIDING COMMISSIONER WELCH:** The Panel

6     reviewed all information received from the public

7     and relied on the following circumstances in

8     concluding that the prisoner is not suitable for

9     parole and would pose an unreasonable risk of danger

10    to society or a threat to the public safety if

11    released from prison. The offense was carried out

12    in an especially cruel and callous manner. The

13    offense was carried out in a dispassionate manner.

14    The victim was abused. The offense was carried out

15    in a manner which demonstrates a callous --

16    exceptional callous disregard for human suffering.

17    The motive for the crime was inexplicable or very

18    trivial in relation to the offense. The conclusion

19    was drawn from the Statement of Facts whereby

20    Mrs. McCardy, that's M-C-C-A-R-D-Y, returned home to

21    find her husband John McCardy sitting in the living

22    room chair without a pulse. She observed another

23    individual sitting on the couch. And as she went to

24    all 911 that individual, who subsequently turned out

25    to be the prisoner, exited their house. As

26    investigation determined had been ransacked and that

27    FRANCISCO CASTILLO   C-85768 DECISION PAGE 1   6/7/01

47

1    as best could be determined that the prisoner

2    stabbed and slashed the victim.  The prisoner has

3    failed to gain from previous grants -- previous

4    grants of probation and cannot be -- and parole, and

5    cannot be counted upon to avoid criminality.  He

6    failed to profit from society's previous attempts to

7    correct his criminality, such attempts included CYA

8    commitments, prior prison terms, parole, and on

9    probation.  Unsuitable criminal history includes

10    taking a vehicle without owner's consent, hit and

11    run, under the influence of a controlled substance,

12    burglary, assault with a firearm, attempted grand

13    theft auto, and the instant offense, murder.  The

14    prisoner has failed to develop a marketable skill

15    that can be put to use upon release.  He's failed to

16    upgrade educationally and vocationally.  He has not

17    sufficiently participated in self-help programs and

18    therapy programs.  The hearing Panel notes that in

19    response to 3042 notices indicating opposition to a

20    finding of parole suitability, specifically the

21    Deputy District Attorney from Los Angeles County

22    voiced opposition to a finding of parole at this

23    time.  The Panel makes the following findings -- The

24    Panel makes the following findings:  The prisoner

25    needs therapy in order to face, discuss, understand

26    and cope with stress in a nondestructive manner.

27    **FRANCISCO CASTILLO  C-85768 DECISION PAGE 2  6/7/01**

48

1    Until progress is made the prisoner continues to be

2    unpredictable and threat to others.    Nevertheless,

3    the prisoner should be commended for being

4    disciplinary-free during his incarceration.    He

5    should also be commended for his participation in AA

6    and this prisoner has received excellent work

7    reports, and you are to be commended for that, sir.

8    However, these positive aspects of your behavior

9    does not outweigh the factors of unsuitability at

10    this time.    Your parole is denied for three years.

11    In a separate decision the hearing Panel finds that

12    the prisoner has been convicted of murder and it is

13    not reasonable to expect that parole would be

14    granted during the next three years.    The prisoner

15    committed the offense in an especially cruel manner,

16    specifically he slashed the victim, John McCurdy,

17    that's M-C-C-U-R-D-Y, and stabbed him and these

18    injuries resulted in his death.    The prisoner has a

19    history of unstable and tumultuous relationships

20    with others, mainly with his father.    He had an

21    unstable family history with his father and family.

22    The prisoner has not completed necessary

23    programming, which is essential to his adjustment

24    and needs additional time to gain such programming.

25    He has not fully and completely participated in

26    necessary self-help programs at this time.    And he

27    **FRANCISCO CASTILLO   C-85768 DECISION PAGE 3   6/7/01**

49

1    has not upgraded educationally or vocationally at

2    this time.  The Panel recommends that you remain

3    disciplinary-free.  You're doing an excellent job in

4    that area.  The Panel also recommends that you

5    upgrade vocationally and educationally.  We

6    understand that you are enrolled in a database

7    program at this time.  However, you need to complete

8    that and you need to get a GED.  It's essential that

9    you complete your high school education at least to

10    the level of receiving a GED.  A GED is essential.

11    And you need to continue participating in any other

12    self-help program that you can.  As I looked in the

13    file lifeskills seemed like a reasonable kind of

14    program for you to get involved in, teach you

15    lifeskills and self-esteem, preparing yourself for

16    parole and those kind of things.  If there is

17    another class available I recommend strongly that

18    you get into that and you fully understand the

19    meaning of what the course is all about.  I am also

20    going to recommend that you be evaluated (inaudible)

21    program.  And that's something that I think you

22    would benefit from.  We're going to put it in the

23    recommendations.  It's up to CDC and the medical

24    staff at CMC will see whether or not you are placed

25    in there.  But our reason for that is to deal with

26    and I'm not making a diagnosis, but maybe stress or

27    **FRANCISCO CASTILLO   C-85768 DECISION PAGE 4   6/7/01**

50

1   whatever it is that you need to deal with.  And I

2   can't define that now because I don't deem myself

3   qualified to do that.  But I would like to see you

4   receive some type of therapy.  And with that I --

5   that concludes the decision part of the hearing.

6   And I'll go to Commissioner Lawin, do you have any

7   comments?

8       **COMMISSIONER LAWIN:**  Yes.  Our recommendation is

9   we won't determine what level you're placed in, but

10  our recommendation is that CDC provide you with some

11  one on one therapy so that you can deal with the

12  ghosts of your past and you can work on those things

13  that seem to be troubling you that seem to haunt

14  you.  At least that's the way it seems to come

15  across in your hearing.  And one of the reasons we

16  denied you for three years is because we think you

17  have a lot of work to do, not only in vocation and

18  education, but also in maybe the psychological

19  factors as well.  We wish you good luck.

20      **INMATE CASTILLO:**  Thank you.

21      **PRESIDING COMMISSIONER WELCH:**  Commissioner

22  Harmon?

23      **DEPUTY COMMISSIONER HARMON:**  Just to wish you

24  luck, sir.  Good luck.

25      **PRESIDING COMMISSIONER WELCH:**  It's

26  approximately 1650 -- 1550.  That concludes the

27  **FRANCISCO CASTILLO  C-85768 DECISION PAGE 5 6/7/01**

51

1   hearing.

2           **INMATE CASTILLO:**   Thank you.

3                           --o0o--

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25   PAROLE DENIED THREE YEARS

26   EFFECTIVE DATE OF DECISION_____

27   FRANCISCO CASTILLO   C-85768 DECISION PAGE 6   6/7/01

52

## CERTIFICATE AND

## DECLARATION OF TRANSCRIBER

I, CONNIE MASTIN, a duly designated
transcriber, CAPITOL ELECTRONIC REPORTING, do
hereby declare and certify under penalty of perjury
that I have transcribed tape(s) which total one in
number and cover a total of pages numbered 1
through 51, and which recording was duly recorded
at CORRECTIONAL TRAINING FACILITY, at SOLEDAD,
CALIFORNIA, in the matter of the SUBSEQUENT PAROLE
CONSIDERATION HEARING of FRANCISCO CASTILLO, CDC
No. C-85768, on JUNE 7, 2001, and that the
foregoing pages constitute a true, complete, and
accurate transcription of the aforementioned
tape(s) to the best of my ability.

I hereby certify that I am a disinterested
party in the above-captioned matter and have no
interest in the outcome of the hearing.

Dated JUNE 23, 2001, at Sacramento County,
California.


Connie Mastin
Transcriber
**CAPITOL ELECTRONIC REPORTING**

# EXHIBIT "E"

# EXHIBIT  "F"

LIFE PRISONER EVALUATION REPORT
SUBSEQUENT PAROLE CONSIDERATION HEARING
JUNE 2004 CALENDAR

CASTILLO                                                            C85768

I.    **COMMITMENT FACTORS:**

A.    **Life Crime:** Los Angeles County, Case Number A965649, Murder 2nd Degree,
      PC 187. Victim: John McCardy, age 45 at time of death. Weapon used: Long
      blade knife. Subject was received into CDC on 7/15/88. Sentence: 15 to Life
      plus 1 year under 12022. MEPD: 10/30/98.

1.    **Summary of Crime:** On 2/24/88, at approximately 1945 hours, the
      victim's wife, Linda McCardy, returned to her home at 375 North
      Ridgewood Place in Hollywood. When she entered the den of the house,
      she discovered the body of her deceased husband, victim John McCardy,
      seated in a chair in the living room. As she checked the victim's pulse,
      she saw a male seated on the couch in the living room near the victim.
      Thinking that this person was also deceased she went to the den where she
      picked up a phone and called 911. While on the phone she heard footsteps
      in the living room and then observed the male who had been seated on the
      couch walking out the front door of the residence. The suspect fled on
      foot. There was extensive ransacking to the upstairs and downstairs areas
      of the house. Noted missing in the days following the murder was one
      hundred dollars in currency taken from the victim and one wristwatch
      valued at $75.00. After investigation, the detectives utilized the
      department's computer system to identify a friend of the victim. Based on
      the possible name, physical description, tattoo, and possible birthdate of
      2/20/65. Detectives located the CI&I arrest record for Francisco Parnala
      Castillo Jr., who has a birthdate of 2/20/65. Fingerprints taken from the
      Subject tentatively matched prints lifted from a cigarette case that was in
      the victim's residence. The tread pattern on the Subject's tennis shoes
      matched the pattern of a bloody shoe print on the victim's floor. Page six
      (6) picture photo display containing a photo of the Subject was shown to
      the victim's wife who identified the Subject's photo as being of the same
      person she had seen at the door on 2/2/88. A family housekeeper also
      positively identified the photo of the subject as being a person who had
      visited the victim on 2/19/88.

INMATE COPY

CASTILLO              C85768              CTF-SOLEDAD              JUN/2004

Detectives searched the area outside the subject's father's apartment and recovered a blue and black long sleeved shirt from underneath the stairwell. The Subject's father said that the Subject had slept in that area on the eve of the murder. Both the tennis shoes and the shirt tested positive for the presence of blood. Prior to being interviewed by detectives on 3/3/88 the Subject was advised of his rights and he waived them. The interview was tape recorded and after being confronted with his contradictive statements the Subject admitted to stabbing the victim. He said that he and the victim had been drinking vodka for quite a while and that he and the Subject were drunk. (P.O.R. pages 3-6).

2.    **Prisoner's Version:**  Upon interviewing Inmate Castillo, this writer is bringing the prisoner's statement forward from when he was in the Los Angeles County Jail. It should be noted that the Subject was in the L.A. County Jail for a Parolee at Large/Absconding and for Homicide. When Mr. Castillo was interviewed by the LAPD homicide detectives, Subject admitted the following. Castillo waived his rights and initially stated that he had been over to the victim's residence on two occasions. Castillo stated that he did not know that the victim was dead and he did not own the blue and black plaid shirt. After confronting the suspect with the contradictory statements, he admitted that he had been over to the victim's residence on more that two occasions. He then admitted that he had stabbed the victim. He stated that on Wednesday, 2-24-88, at approximately 3 o'clock he was standing on the corner of Beverly Boulevard and San Andrew's place in Hollywood with his brother Mario, his neighbor Barney Leigh, and a friend of Barney's when he observed the victim in the liquor store parking lot at the Northeast corner of Beverly Boulevard and San Andrew's Place. He stated that he went over to the victim and they talked. He said that the victim had just purchased a pint of Vodka and appeared intoxicated. he and the victim walked to the victim's home. The victim had his bicycle with him and walked it along with them.

Upon arriving at the victim's home they went inside via the front door, which the victim unlocked using his key, and sat down in the living room. He stated that they drank vodka for quite a while. He was now drunk. He said that the victim began telling him that he had a gun and was a good shot. He said that the victim stood up, approached him and grabbed him by the back of his neck. He said that he pushed the victim back causing him to fall into the living room armchair. He then went into the kitchen arming himself with a small kitchen knife. He returned to the living room, approached the victim and they struggled over the small knife. The victim was able to grab the blade and break it. The suspect stated that he tossed the knife away and went back into the kitchen, arming himself with a

much larger knife. He again approached the victim, who was sitting in the arm chair. As he walked up to the victim, the victim began to stand up. Castillo pushed the victim in the chest at which time the victim was stabbed by the knife in Castillo's hands. Castillo stated that he thought that he had stabbed the victim a second time but he was not sure.

Castillo stated that he tossed that knife down and went to the upstairs bathroom where he washed his bloody hands off in the bathroom sink. He returned downstairs and armed himself with still another kitchen knife. He stated that he took this knife as he thought that the victim was still alive and he needed it for protection. He sat down on the living room couch and then passed out drunk. Castillo woke up at the sound of a voice. He jumped up and ran out the front door of the residence, running north on Ridgewood Place, and then east on Elmwood Street. He ran home and took off his shirt throwing it under the porch at his father's apartment building. He admitted that the blue and black plaid shirt was in fact his and was the shirt he was wearing at the time of the murder.

Castillo stated that he was not sure if he killed the victim and contemplated calling the police while he was in the residence but decided against it. He stated that he did not take any property from the residence. He stated that he did not remember ransacking the location but that if he did it was not to steal anything, merely to locate the gun that the victim said he had. He said that he did not see a gun on the night of the murder, nor did he ever see any guns in the victim's possession at any time. He stated that he was sorry about what had happened and did not intend to kill the victim.

3.    **Aggravating/Mitigating Circumstances:**

a.    **Aggravating Factors:**

1.    The inmate had an opportunity to cease but continued with the crime.
2.    Subject has a criminal history.
3.    Subject was on parole at the time of the offense.

b.    **Mitigating Factors:** Crime was committed under partially excusable circumstances. Subject was under the influence of alcohol.

B.    **Multiple Crime(s):** None.

LIFE PRISONER EVALUATION REPORT
PAROLE CONSIDERATION HEARING
JUNE 2004 CALENDAR

## II.    PRECONVICTION FACTORS:

**A.    Juvenile Record:** In 1982 Castillo was involved in a Hit and Run Accident and a petition was requested. Subject stated that he requested a Public Defender and that he wanted to be tried as an adult. The court agreed. Subject was given 90 days in County Jail.

**B.    Adult Convictions:** Arrested on 10/21/83 for Under the Influence, 30 day County Jail. On 1/9/84 subject was arrested for Burglary, was found guilty, sentenced stated prison and was paroled on 2/26/85. He has had three parole violations.

**C.    Personal Factors:** Subject had completed a term for Burglary and had 3 Return to Custody parole violations prior to the instant offense. Subject was pretty much out on his own and had no sense of direction in his life. He was living with his father but his father was stressing that he become a responsible individual, secure employment, and to begin to live on his own and subsequently, subject was unable to do that for any extended period of time.

## III.    POSTCONVICTION FACTORS:

**A.    Special Programming/Accommodations:** None.

**B.    Custody History:** Castillo has remained at CTF since his arrival on 10-14-88. He has maintained Medium A Custody since 11/93 and has had "0" behavior points since 1993. He has also maintained consistent assignments.

**C.    Therapy and Self-Help Activities:** He has completed Impact Program and maintained regular AA/NA group attendance.

**D.    Disciplinary History:** He has had only two CDC 128A's in 1985 as his entire disciplinary history this incarceration.

**E.    Other:** Castillo attended a Subsequent #1 BPT hearing on 6-7-01 wherein the Board denied parole for three years and recommended to remain disciplinary free, upgrade vocation/education and participate in self help.

## IV.    FUTURE PLANS:

**A.    Residence:** Castillo is in the process of finding residence. He has contacted several half way type possibilities but no confirmation yet. Family possibilities are not plentiful at this time.

B. **Employment:** He will seek work in the construction shipping/receiving fields for which he has prior experience. He can also seek opportunities in his institutional trade.

C. **Assessment:** Castillo seems to be a very mature individual and very focused on success. Hopefully he will secure a viable residence prior to parole. He has always been able to maintain a job so that won't be a problem once he is in one.

V. **USINS STATUS:**

VI. **SUMMARY:**

A. Castillo is in his sixteenth year of a fifteen year to Life plus one year term. While incarcerated he has programmed exceptionally well and has applied his efforts towards continued development. He has completed the Vocational Data Processing Program and gained considerable knowledge in the textiles operations. In realizing alcohol played an integral role in his prior behavior, he has consistently attended AA sessions to understand and overcome the associated pitfalls. He works extremely well with staff and peers and relates in a mature and responsible manner. Castillo makes no excuses for what transpired that fateful day and has accepted full responsibility for his actions. He displays genuine and undeniable remorse for the life altering effects this crime has had on the victim's family and his own family. In looking at Castillo's prior record, one would not get the impression that the end result would be a crime of this magnitude. He has not been in any trouble during his incarceration. I believe he has matured greatly over the years and could succeed upon release. He just still needs to arrange a residence. He is attempting to solidify family relations. Castillo maintains he did not intend to kill the victim. He will forever carry a cloak of guilt within his soul for this crime and his self induced sentence will far outlast the judicially imposed term. His sorrow is genuine and he realizes he must pay a price. He is hopeful that his debt can one day soon be considered paid and be allowed to resume a life in mainstream society. He is currently working on obtaining his GED and contacting sources for living arrangements. With a residence, his vocational trade knowledge and his previous construction, shipping and receiving experience, I firmly believe Castillo will succeed in his endeavors towards re-entering society as a productive and trouble free member.

B. Prior to release the prisoner could benefit from: remaining disciplinary free and continuing some form of self help.

LIFE PRISONER EVALUATION REPORT
PAROLE CONSIDERATION HEARING
JUNE 2004 CALENDAR

**6**

C.    This report is based upon a one hour interview and a three hour complete review of the Central File.

D.    Castillo was afforded the opportunity to examine his Central File on 3-24-04 per CDC 128B dated 3-24-04 reflecting that he reviewed his file.

E.    No accommodation was required per the Armstrong vs. Davis BPT Parole Proceedings Remedial Plan (ARP) for effective communication.

# EXHIBIT "F"



SUPERIOR COURT OF CALIFORNIA

COUNTY OF SANTA CLARA

In re )
)     No.: 68038
    DONALD RAY LEWIS, )
)     ORDER
On Habeas Corpus )

## INTRODUCTION

    Petitioner alleges that he has been denied due process of law because the Board has used standards and criteria which are unconstitutionally vague in order to find him unsuitable for parole. Alternatively, he argues that those standards, even if constitutionally sound, are nonetheless being applied in an arbitrary and meaningless fashion by the Board. He relies upon evidence that in one hundred percent of 2690 randomly chosen cases, the Board found the commitment offense to be "especially heinous, atrocious or cruel", a factor tending to show unsuitability under Title 15 §2402(c)(1).

### Are the Board Criteria Unconstitutionally Vague?

    Our courts have long recognized that both state and federal due process requirements dictate that the Board must apply detailed standards when evaluating whether an individual inmate is unsuitable for parole on public safety grounds. (See *In re Dannenberg* (2005) 34

1

1  Cal.4th 1061 at p. 1096, footnote 16.) Those standards are found in

2  15 CCR §2402(c) (*Dannenberg, supra,* 34 Cal.4th at p. 1080,) and do

3  include detailed criteria to be applied by the Board when considering

4  the commitment offense:

> (c) Circumstances Tending to Show Unsuitability. The following
> circumstances each tend to indicate unsuitability for release.
> These circumstances are set forth as general guidelines; the
> importance attached to any circumstance or combination of
> circumstances in a particular case is left to the judgment of
> the panel. Circumstances tending to indicate unsuitability
> include:
>
> (1) Commitment Offense. The prisoner committed the offense in an
> especially heinous, atrocious or cruel manner. The factors to be
> considered include:
>
>> (A) Multiple victims were attacked, injured or killed in
>> the same or separate incidents.
>>
>> (B) The offense was carried out in a dispassionate and
>> calculated manner, such as an execution-style murder.
>>
>> (C) The victim was abused, defiled or mutilated during or
>> after the offense.
>>
>> (D) The offense was carried out in a manner which
>> demonstrates an exceptionally callous disregard for human
>> suffering.
>>
>> (E) The motive for the crime is inexplicable or very
>> trivial in relation to the offense.

In response to Petitioners claim that the regulations are

impermissibly vague, Respondent argues that while "especially

heinous, atrocious or cruel" might be vague in the abstract it is

limited by factors (A)-(E) of §2402(c)(1), and thus provides a

'principled basis' for distinguishing between those cases which are

contemplated in that section and those which are not. An examination

of cases involving vagueness challenges to death penalty statutes is

instructive here and shows that Respondent's position has merit:

"Our precedents make clear that a State's capital sentencing

2

scheme also must genuinely narrow the class of persons eligible for the death penalty. When the purpose of a statutory aggravating circumstance is to enable the sentencer to distinguish those who deserve capital punishment from those who do not, the circumstance must provide a principled basis for doing so. If the sentencer fairly could conclude that an aggravating circumstance applies to every defendant eligible for the death penalty, the circumstance is constitutionally infirm." (*Arave v. Creech* (1993) 507 U.S. 463, 474, citing *Maynard v. Cartwright* (1988) 486 U.S. 356, 364: "invalidating aggravating circumstance that 'an ordinary person could honestly believe' described every murder," and, *Godfrey v. Georgia* (1980) 446 U.S. 420, 428-429: "A person of ordinary sensibility could fairly characterize almost every murder as 'outrageously or wantonly vile, horrible and inhuman.'")

It cannot fairly be said that 'every murder' could be categorized as "especially heinous, atrocious or cruel" under the Board regulations, since the defining factors contained in subdivisions (A)-(E) clearly narrow the group of cases to which it applies. Although Petitioner also argues that the "vague statutory language is not rendered more precise by defining it in terms or synonyms of equal or greater uncertainty" (*People v. Superior Court (Engert)* (1982) 31 Cal.3d 797, 803, *Pryor v. Municipal Court* (1979) 25 Cal.3d 238, 249. *See also Walton v. Arizona* (1990) 497 U.S. 639, 654), the factors in those subdivisions are not themselves vague or uncertain. The mere fact that there may be some subjective component (such as "exceptionally callous" disregard for human suffering) does not render that factor unconstitutionally vague. The proper degree of definition of such factors is not susceptible of mathematical precision, but will be constitutionally sufficient if it gives meaningful guidance to the Board.

A law is void for vagueness if it "fails to provide adequate notice to those who must observe its strictures and impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and

3

1    discriminatory application."  *(People v. Rubalcava* (2000) 23
2    Cal.4th 322, 332, quoting *People ex rel. Gallo v. Acuna* (1997)
     14 Cal. 4th 1090, 1116, quoting *Grayned v. City of Rockford*
3    (1972) 408 U.S. 104, 108-109.)

4    A review of cases expressing approval of definitions to limit the
5    application of otherwise vague terms in death penalty statutes leads
6    inextricably to the conclusion that the limiting factors in §2402(c)
7    easily pass constitutional muster.  An Arizona statute was upheld
8    that provided a crime is committed in an 'especially cruel manner'
9    when the perpetrator inflicts mental anguish or physical abuse before
10   the victim's death," and that "mental anguish includes a victim's
11   uncertainty as to his ultimate fate."  *(Walton v. Arizona* (1990) 497
12   U.S. 639, 654.)  Similarly, the court in *Maynard v. Cartwright*, 486
13   U.S. at 364-365, approved a definition that would limit Oklahoma's
14   "especially heinous, atrocious, or cruel" aggravating circumstance to
15   murders involving "some kind of torture or physical abuse.  In
16   Florida, the statute authorizing the death penalty if the crime is
17   "especially heinous, atrocious, or cruel," satisfied due process
18   concerns where it was further defined as "the conscienceless or
19   pitiless crime which is unnecessarily torturous to the victim."
20   *State v. Dixon* (1973) 283 So. 2d 1 at p. 9.

21       Here, the factors in subdivisions (A)-(E) provide equally clear
22   limiting construction to the term "especially heinous, atrocious, or
23   cruel" in §2402(c).

24   <u>Has the Board Engaged in a Pattern of Arbitrary Application of the
     Criteria?</u>

25

26       As previously noted, 15 CCR §2402 provides detailed criteria for
27   determining whether a crime is "exceptionally heinous, atrocious or
28   cruel" such that it tends to indicate unsuitability for parole.  Our

4

1  courts have held that to fit within those criteria and thus serve as

2  a basis for a finding of unsuitability, the circumstances of the

3  crime must be more aggravated or violent than the minimum necessary

4  to sustain a conviction for that offense. (*In re Rosenkrantz* (2002)

5  29 Cal.4th 616, 682-683.) Where that is the case, the nature of the

6  prisoner's offense, *alone*, can constitute a sufficient basis for

7  denying parole. (*In re Dannenberg, supra*, 34 Cal.4th at p. 1095.)

8  Petitioner claims that those criteria, even if constitutionally

9  sound, have been applied by the Board in an arbitrary and capricious

10  manner rendering them devoid of any meaning whatever. The role of

11  the reviewing court under these circumstances has been addressed

12  previously in the specific context of Parole Board actions:

13  "[Courts have] an obligation, however, to look beyond the facial
   validity of a statute that is subject to possible

14  unconstitutional administration since a law though fair on its
   face and impartial in appearance may be open to serious abuses

15  in administration and courts may be imposed upon if the
   substantial rights of the persons charged are not adequately

16  safeguarded at every stage of the proceedings. We have
   recognized that this court's obligation to oversee the execution

17  of the penal laws of California extends not only to judicial
   proceedings, but also to the administration of the Indeterminate

18  Sentence Law." (*In re Rodriguez* (1975) 14 Cal.3d 639, 648,
   quoting *Minnesota v. Probate Court* (1940) 309 U.S. 270, 277.)

19

20  Similarly, in *In re Minnis* (1972) 7 Cal.3d 639, 645, the case

21  closest on point to the present situation, the California Supreme

22  Court stated: "This court has traditionally accepted its

23  responsibility to prevent an authority vested with discretion from

24  implementing a policy which would defeat the legislative motive for

25  enacting a system of laws." Where, as here, the question is whether

26  determinations are being made in a manner that is arbitrary and

27  capricious, judicial oversight "must be extensive enough to protect

28

5

1  limited right of parole applicants 'to be free from an arbitrary

2  parole decision... and to something more than mere pro-forma

3  consideration.'" (*In re Ramirez* (2001) 94 Cal.App.4th 549 at p. 564,

4  quoting *In re Sturm* (1974) 11 Cal.3d 258 at p. 268.)

5      This Court, therefore, now examines Petitioner's "as applied"

6  void for vagueness challenge.

7

8                    **The Evidence Presented**

9      A similar claim to those raised here, involving allegations of

10  abuse of discretion by the Board in making parole decisions, was

11  presented to the Court of Appeal in *In re Ramirez, supra*.  The court

12  there observed that such a "serious claim of abuse of discretion"

13  must be "adequately supported with evidence" which should be

14  "comprehensive." (*Ramirez, supra*, 94 Cal.App.4th at p. 564, fn. 5.)

15  The claim was rejected in that case because there was not "a

16  sufficient record to evaluate." (*Ibid.*)  In these cases, however,

17  there is comprehensive evidence offered in support of Petitioner's

18  claims.

19      Discovery orders were issued in five different cases involving

20  life term inmates (Petitioners) who all presented identical claims.[1]

21

22  [1] This Court takes judicial notice of the several other cases currently
    pending (Criscione #71614, Jameison #71194, Bragg #108543, Ngo #127611.)

23  which raise this same issue and in which proof was presented on this same
    point. (Evidence Code § 452(d).  See specifically, in the habeas corpus

24  context, *In re Vargus* (2000) 83 Cal.App.4th 1125, 1134-1136, 1143, in which
    judicial notice was taken of the evidence in four other cases and in which

25  the court noted: "Facts from other cases may assist petitioner in
    establishing a pattern." See generally *McKell v. Washington Mutual, Inc.*

26  (2006) 142 Cal.App.4th 1457, 1491: "trial and appellate courts ... may
    properly take judicial notice of ... established facts from both the same

27  case and other cases." And see *AB Group v. Wertin* (1997) 59 Cal.App.4th
    1022, 1036: Judicial notice taken of other cases when matters are "just as

28  relevant to the present [case] as they are to the others.")

1  The purpose of the discovery was to bring before the Court a
2  comprehensive compilation and examination of Board decisions in a
3  statistically significant number of cases.  The Board decisions under
4  examination consisted of final decisions of the Board for life-term
5  inmates convicted of first or second degree murder and presently
6  eligible for parole.  Included were all such decisions issued in
7  certain months, chosen by virtue of their proximity in time to the
8  parole denials challenged in the pending petitions.  All Board
9  decisions in the months of August, September and October of 2002,
10 July, August, September, October, November, and December of 2003,
11 January and February of 2004, February of 2005, and January of 2006
12 were compiled.  This resulted in a review of 2690 cases decided in a
13 total of 13 months.
14     The purpose of the review was to determine how many inmates had
15 actually been denied parole based in whole or in part on the Board's
16 finding that their commitment offense fits the criteria set forth in
17 Title 15 §2402(c)(1) as "especially heinous, atrocious or cruel."  A
18 member of the research team conducting the review, Karen Rega,
19 testified that in its decisions the Board does not actually cite CCR
20 rule §2402(c), but consistently uses the specific words or phrases
21 ("verbiage from code") contained therein, so that it could easily be
22 determined when that criteria was being applied.  (For example,
23 finding "multiple victims" invokes §2402(c)(1)(A); finding the crime
24 "dispassionate" "calculated" or "execution style" invokes
25 §2402(c)(1)(B); that a victim was "abused" "mutilated" or "defiled"
26 invokes §2402(c)(1)(C);  a crime that is "exceptionally callous" or
27 demonstrated a "disregard for human suffering" fits criteria
28

7

1  evidence" was noted as possibly being dispositive.  And see *People v.*

2  *Flores* (2006) 144 Cal.App.4th 625 in which a statistical survey and

3  analysis, combined into an "actuarial instrument" was substantial

4  proof.)

5        A statistical compilation and examination such as has been

6  presented in these cases is entirely appropriate and sufficient

7  evidence from which to draw sound conclusions about the Board's

8  overall methods and practices.

9

10                         **THE EXPERT'S TESTIMONY**

11        Petitioners provided expert testimony from Professor Mohammad

12  Kafai regarding the statistics and the conclusions that necessarily

13  follow from them.  Professor Kafai is the director of the statistics

14  program at San Francisco State University, he personally teaches

15  statistics and probabilities, and it was undisputed that he was

16  qualified to give the expert testimony that he did.  No evidence was

17  presented that conflicts or contradicts the testimony and conclusions

18  of Professor Kafai.  By stipulation of the parties, Professor Kafai's

19  testimony was to be admissible and considered in the cases of all

20  five petitioners.  (See page 35 of the June 1, 2007, evidentiary

21  hearing transcript.)

22        Professor Kafai testified that the samples in each case, which

23  consisted of two or three months of Board decisions, are

24  statistically sufficient to draw conclusions about the entire

25  population of life term inmates currently facing parole eligibility

26  hearings.  Given that every inmate within the statistically

27  significant samples had his or her crime labeled "'particularly

28

1  egregious'" or "especially heinous, atrocious or cruel" under Title
2  15 §2402(c)(1), it can be mathematically concluded that the same
3  finding has been made for every inmate in the entire population of
4  9,750. Although he testified that statisticians never like to state
5  unequivocally that something is proven to a 100% certainty, (because
6  unforeseen anomalies are always theoretically possible,) he did
7  indicate the evidence he had thus far examined came as close to that
8  conclusion as could be allowed. Not surprisingly, Professor Kafai
9  also testified that "more than 50% can't by definition constitute an
10 exception."

11      Having found the data provided to the expert to be sound this
12 Court also finds the expert's conclusions to be sound. In each of
13 the five cases before the Court over 400 inmates were randomly chosen
14 for examination. That number was statistically significant and was
15 enough for the expert to draw conclusions about the entire population
16 of 9,750 parole eligible inmates. The fact that the approximately
17 2000 inmates examined in the other cases also had their parole denied
18 based entirely or in part on the crime itself (§2402(c)(1)), both
19 corroborates and validates the expert's conclusion in each individual
20 case and also provides an overwhelming and irrefutable sample size
21 from which even a non expert can confidently draw conclusions.

22

23                        DISCUSSION

24      Although the evidence establishes that the Board frequently says
25 parole is denied "first," "foremost," "primarily," or "mainly,"
26 because of the commitment offense, this statement of primacy or
27 weight is not relevant to the question now before the Court.

28

1  Petitioners acknowledge that the Board generally also cites other

2  reasons for its decision.  The question before this Court, however,

3  is not whether the commitment offense is the primary or sole reason

4  why parole is denied -- the question is whether the commitment

5  offense is labeled "'particularly egregious'" and thus could be used,

6  under *Dannenberg,* primarily or exclusively to deny parole.

7      The evidence proves that in a relevant and statistically

8  significant period where the Board has considered life term offenses

9  in the context of a parole suitability determination, every such

10  offense has been found to be "particularly egregious" or "especially

11  heinous, atrocious or cruel."[2]  This evidence conclusively

12  demonstrates that the Board completely disregards the detailed

13  standards and criteria of §2402(c).  "Especially" means particularly,

14  or "to a distinctly greater extent or degree than is common."[3]  (EC §

15  451(e).)  By simple definition the term "especially" as contained in

16  section 2402(C)(1) cannot possibly apply in 100% of cases, yet that

17  is precisely how it has been applied by the Board.  As pointed out by

18  the Second District Court of Appeal, not every murder can be found to

19  be "atrocious, heinous, or callous" or the equivalent without "doing

20

21  [2] In a single case out of the 2690 that were examined Petitioner has conceded that the Board did not invoke §2402(c)(1).  This Court finds that concession to be improvidently made and the result of over caution.  When announcing the decision at

22  the initial hearing of S. Fletcher (H-10330) on 4/6/06, the commissioner did begin by stating "I don't believe this offense is particularly aggravated..."  However the commissioner proceeds to describe the crime as a drug deal to which Fletcher

23  brought a gun so "we could say there was some measure of calculation in that."  The commissioner continued by observing that the reason someone would bring a gun to a

24  drug transaction was to make sure things went according to their plan "so I guess we can say that that represents calculation and perhaps it's aggravated to that extent."  As is the Board's standard practice, by using the word 'calculated' from

25  §2402(c)(1)(b) the Board was invoking that regulation.  Certainly if Mr. Fletcher had brought a habeas petition Respondent's position would be that there is 'some

26  evidence' supporting this.  The ambiguity created by the commissioner's initial statement was cleared up several pages later when he announces that "based upon the crime coupled with ..." parole was denied for four years.  (See *In re Burns* (2006)

27  136 Cal.App.4th 1318, 1326, holding §2402(c)(1) criteria are necessary for a multi-year denial.)

28

12

1  violence" to the requirements of due process.  (*In re Lawrence* (2007)

2  150 Cal.App.4th 1511, 1557.)  This is precisely what has occurred

3  here, where the evidence shows that the determinations of the Board

4  in this regard are made not on the basis of detailed guidelines and

5  individualized consideration, but rather through the use of all

6  encompassing catch phrases gleaned from the regulations.

7

8                          THE BOARD'S METHODS

9      Because it makes no effort to distinguish the applicability of

10  the criteria between one case and another, the Board is able to force

11  every case of murder into one or more of the categories contained in

12  §2402(c).

13      For example, if the inmate's actions result in an instant death

14  the Board finds that it was done in a "dispassionate and calculated

15  manner, such as an execution-style murder."  At the same time the

16  Board finds that a murder not resulting in near instant death shows a

17  "callous disregard for human suffering" without any further analysis

18  or articulation of facts which justify that conclusion.  If a knife

19  or blunt object was used, the victim was "abused, defiled, or

20  mutilated."  If a gun was used the murder was performed in a

21  "dispassionate and calculated manner, such as an execution-style

22  murder."  If bare hands were used to extinguish another human life

23  then the crime is "particularly heinous and atrocious."

24      Similarly, if several acts, spanning some amount of time, were

25  necessary for the murder the Board may deny parole because the inmate

26  had "opportunities to stop" but did not.  However if the murder was

27  ─────────────────────────────────

[3] Princeton University World Net Dictionary (2006).

28

13

1      A "petitioner's young age at the time of the offense" must be

2  considered.  (*In re Elkins* (2006) 144 Cal.App.4th 475, 500, quoting

3  *Rosenkrantz v. Marshall* (C.D.Cal. 2006) 444 F. Supp. 2d 1063, 1065,

4  1085: "The reliability of the facts of the crime as a predictor for

5  his dangerousness was diminished further by his young age of 18, just

6  barely an adult. 'The susceptibility of juveniles to immature and

7  irresponsible behavior means their irresponsible conduct is not as

8  morally reprehensible as that of an adult.'")[5]

9      The Board's formulaic practice of stating §2402(c)(1) phrased in

10  a conclusory fashion, and then stating "this is derived from the

11  facts" without ever linking the two together, is insufficient.  (*In*

12  *re Roderick*, (2007) ___ Cal.App.4th ___ (A113370): "At minimum, the

13  Board is responsible for articulating the grounds for its findings

14  and for citing to evidence supporting those grounds." (See also *In*

15  *re Barker* (2007) 151 Cal.App.4th 346, 371, disapproving

16  "conclusorily" announced findings.)

17      After two decades, mundane "crimes have little, if any,

18  predictive value for future criminality.  Simply from the passing of

19  time, [an inmate's] crimes almost 20 years ago have lost much of

20  their usefulness in foreseeing the likelihood of future offenses than

21  if he had committed them five or ten years ago."  (*In re Lee* (2006)

22  143 Cal.App.4th 1400, 1412.)  It should be noted that this rule

---

24  willfulness and bias.  The jury had a reasonable doubt that Petitioner committed
first degree murder but under the Board's 'reasoning' and 'analysis' this puts him
in a worse position than if they had not.  Had the jury convicted him of the
greater offense Petitioner has served so much time that he would already be having

25  subsequent parole hearings on a first and the Board would not have been able to use
the 'some evidence' of first degree behavior against him.  As observed previously,

26  the Board's position in this regard is "so ridiculous that simply to state it is to
refute it."  (*Weider, supra*, 145 Cal.App.4th at p. 583.)

27  [5] This point is particularly significant in the case of Mike Ngo.  Mr. Ngo was only
18 at the time of his crime.  The impetus behind the shooting was youth group or

28

1  applies with even more force when the Board is relying on any

2  criminality that occurred before the crime.  In that situation, just

3  as with the crime itself, the Board must explain why such old events

4  have any relevance and especially when the inmate has spent a decade

5  as a model prisoner.

6      Murders situationally related to intimate relationships are

7  unfortunately commonplace because emotions are strongest in such

8  domestic settings.  When a murder occurs because of "stress unlikely

9  to be reproduced in the future" this is a factor that affirmatively

10 points towards suitability.  (In re Lawrence (2007) 150 Cal.App.4th

11 1511 and cases cited therein.)

12     "The evidence must substantiate the ultimate conclusion that the

13 prisoner's release currently poses an unreasonable risk of danger to

14 the public.  It violates a prisoner's right to due process when the

15 Board or Governor attaches significance to evidence that forewarns no

16 danger to the public."  (In re Tripp (2007) 150 Cal.App.4th 306,

17 313.)

18     The Board "cannot rely on the fact that the killing could have

19 been avoided to show the killing was especially brutal."  (In re

20 Cooper (2007) 153 Cal.App.4th 1043, 1064.)

21     The Board's focus must be upon how the inmate "actually

22 committed his crimes" not the "incorporeal realm of legal

23 constructs."  (Lee, supra, 143 Cal.App.4th at p. 1413.)  This is

24 especially significant when the murder conviction is based on the

25 felony murder rule, provocative act doctrine, or accomplice liability

26 such that the inmate did not intend to kill or may not have even been

27 gang rivalries, posturing, and threats which mature adults would not have been

28

17

1  the actual killer.

2      The Board has ample guidance before it in the decisions of the

3  various reviewing courts to constrain its abuse, but has failed to

4  avail itself of the opportunity to do so.

5

6

7      ## SEPARATION OF POWERS DOCTRINE

8      The evidence presented, as discussed above, has established a

9  void for vagueness "as applied" due process violation.  That same

10  evidence also proves a separate but related Constitutional violation

11  -- an as applied separation of powers violation.

12      The separation of powers doctrine provides "that the legislative

13  power is the power to enact statutes, the executive power is the

14  power to execute or enforce statutes, and the judicial power is the

15  power to interpret statutes and to determine their

16  constitutionality." (Lockyer v. City and County of San Francisco

17  (2004) 33 Cal.4th 1055, 1068.)  Because the evidence has proven the

18  Board is not executing/enforcing the legislature's statutes as

19  intended it is this Court's duty to intervene.  The question here is

20  whether the Board is violating the separation of powers doctrine by

21  appropriating to itself absolute power over parole matters and

22  disregarding the limits and guidelines placed by the statute.[6]

23      "Government Code section 11342.2 provides: 'Whenever by the

24  caught up in.
   [6] "It is settled that Administrative regulations that violate acts of the

25  Legislature are void and no protestations that they are merely an exercise of
   administrative discretion can sanctify them.  They must conform to the legislative

26  will if we are to preserve an orderly system of government.  Nor is the motivation
   of the agency relevant: It is fundamental that an administrative agency may not

27  usurp the legislative function, no matter how altruistic its motives are."
   (Agricultural Labor Relations Board v. Superior Court of Tulare County (1976) 16

28  Cal.3d 392, 419 quoting Morris v. Williams (1967) 67 Cal.2d 733, 737, and City of
   San Joaquin v. State Bd. of Equalization (1970) 9 Cal.App.3d 365, 374.)

1    express or implied terms of any statute a state agency has authority

2    to adopt regulations to implement, interpret, make specific or

3    otherwise carry out the provisions of the statute, no regulation

4    adopted is valid or effective unless consistent and not in conflict

5    with the statute and reasonably necessary to effectuate the purpose

6    of the statute.'    Administrative regulations that alter or amend the

7    statute or enlarge or impair its scope are void and courts not only

8    may, but it is their obligation to strike down such regulations."

9    (Pulaski v. Occupational Safety & Health Stds. Bd. (1999) 75

10   Cal.App. 4th 1315, 1341, citations omitted.)

11       The vice of overbroad and vague regulations such as are at issue

12   here is that they can be manipulated, or 'interpreted,' by executive

13   agencies as a source of unfettered discretion to apply the law

14   without regard to the intend of the people as expressed by the

15   legislature's enabling statutes.    In short, agencies usurp unlimited

16   authority from vague regulations and become super-legislatures that

17   are unaccountable to the people.    As it has sometimes been framed and

18   addressed in the case law, a vague or all encompassing standard runs

19   the risk of "violat[ing] the separation of powers doctrine by

20   'transforming every [executive decisionmaker] into a "mini-

21   legislature" with the power to determine on an ad hoc basis what

22   types of behavior [satisfy their jurisdiction].'"  (People v. Ellison

23   (1998) 68 Cal.App.4th 203, 211, quoting People v. Superior Court

24   (Caswell) (1988) 46 Cal.3d 381, 402.)

25       "It is concern about 'encroachment and aggrandizement,' the

26   [United States Supreme Court] reiterated, that has animated its

27   separation of powers jurisprudence.    'Accordingly, we have not

28

1  hesitated to strike down provisions of law that either accrete to a

2  single Branch powers more appropriately diffused among separate

3  Branches or that undermine the authority and independence of one or

4  another coordinate Branch.'" (*Kasler v. Lockyer* (2000) 23 Cal.4th

5  472, 493, quoting *Mistretta v. United States* (1989) 488 U.S. 361,

6  382.)  This articulation of the principle speaks directly to the

7  situation at hand.  The Board, by its enactment and interpretation of

8  Title 15, §2402, has appropriated to itself absolute power over

9  'lifer' matters.  Overreaching beyond the letter and spirit of the

10 Penal Code provisions, Title 15, §2402(c)(1) has been interpreted by

11 the Board to supply the power to declare every crime enough to deny

12 parole forever.  The fact that Title 15, §2402, has been invoked in

13 every case, but then sometime later not invoked, tends to show either

14 completely arbitrary and capricious behavior or that unwritten

15 standards are what really determine outcomes.  In either event, all

16 pretenses of taking guidance from, or being limited by, the

17 legislature's statutes have been abandoned.  "[I]t is an elementary

18 proposition that statutes control administrative interpretations."

19 (*Ohio Casualty Ins. Co. v. Garamendi* (2006) 137 Cal.App.4th 64, 78.)

20 Title 15 §2402 as applied, however, has no controls or limitations.

21      The PC § 3041(b) exception to the rule can only be invoked when

22 the "gravity of the current convicted offense or offenses, or the

23 timing and gravity of current or past convicted offense or offenses,

24 is such that consideration of the public safety requires a more

25 lengthy period of incarceration for this individual."  The word

26 "gravity" is a directive for comparison just as "more lengthy"

27 indicates a deviation from the norm.  While *Dannenberg* held there

28

1  does not need to be intra case comparison for the purposes of term
2  uniformity or proportionality, there necessarily has to be some sort
3  of comparison for the purposes of adhering to the legislative mandate
4  that parole is available.  The Board employs no meaningful yardstick
5  in measuring parole suitability.  This is a violation of the
6  separation of powers doctrine.  (*People v. Wright* (1982) 30 Cal.3d
7  705, 712-713.  And see *Terhune v. Superior Court* (1998) 65
8  Cal.App.4th 864, 872-873.  Compare *Whitman v. Am. Trucking Ass'ns*
9  (2001) 531 U.S. 457, 472, describing a delegation challenge as
10  existing when the legislature fails to lay down "an intelligible
11  principle to which the person or body authorized to act is directed
12  to conform.")

13
14                          RESPONDENT'S POSITION

15      The Attorney General has suggested, without pointing to any
16  concrete examples, that it is possible that the Board, when invoking
17  the crime as a reason to deny parole, is not placing it within
18  §2402(c)(1) but instead using is as some sort of 'lesser factor'
19  which, only when combined with other unsuitability criteria, can
20  contribute to a valid parole denial.  The two problems with this
21  position are, first, there is no evidentiary support for this
22  assertion, and second, it would have no impact on the constitutional
23  infirmities outlined and proven above.

24      Even if Respondent had produced evidence that the Board was
25  utilizing the crime as a 'lesser factor' which needs others to fully
26  support a parole denial, the Board would then be admitting it was
27  denying parole, in part, for the very reason that the person is

28

1    before the panel and eligible for parole in the first place - the

2    commitment offense.  Respondent's argument suggests that a crime that

3    only qualified as the *Dannenberg* "minimum necessary" could still be

4    invoked as a reason for denying parole.  Respondent argues that when

5    the crime is invoked 'not in the *Dannenberg* sense,' there must be

6    other reasons for the parole denial and the crime alone would not be

7    enough in this context.  This position is inconsistent with the law

8    and fundamental logic.

9        A crime qualifies under *Dannenberg* when it is "particularly

10   egregious," or one where "no circumstances of the offense reasonably

11   could be considered more aggravated or violent than the minimum

12   necessary to sustain a conviction for that offense."  (*Dannenberg,*

13   *supra,* 34 Cal.4th at pp. 1094-1095.)  These are the only two choices.

14   If a crime consists of only the bare elements then it is not

15   aggravated and it cannot, in and of itself, serve as a basis for

16   parole denials once the inmate becomes eligible for parole.  It is

17   the reason an inmate may be incarcerated initially for the equivalent

18   of 15 or 25 years, and then examined to determination rehabilitation

19   efforts when they come before the Board, but a crime that is no more

20   than the bare minimum cannot be factored into the equation pursuant

21   to PC § 3041(b) or any of the case law interpreting it.

22       In oral argument Respondent suggested a second way the

23   commitment offense can be used outside of §2402(c)(1).  If for

24   example a crime had its roots in gang allegiances or rivalries and

25   the inmate continued to associate with gangs while incarcerated, then

26   an aspect of the crime, even if the crime otherwise consisted of no

27   more than the minimum elements, could be combined with other behavior

28

1  to support a parole denial. Similarly, if a crime was rooted in an

2  inmate's then existing drug addiction, and the Board was to point to

3  a recent 115 involving drugs, the evidence that the inmate's drug

4  issues had not been resolved would justify a parole denial even if

5  the crime itself was not aggravated. A finding that the inmate is

6  not suitable for release under these circumstances, however, is not

7  based on the facts of the commitment offense as tending to show

8  unsuitability. It is based on the conclusion that can be drawn about

9  Petitioner's lack of rehabilitation or change since the offense, and

10  thus, his present dangerousness.

11      Respondent has not demonstrated any flaws in Petitioner's

12  methodology or analysis, nor provided any actual evidence of the

13  crime being invoked *other* than pursuant to §2402(c)(1). Drawing

14  conclusions from the Board's direct statements, or its precise

15  recitations of the §2402(c)(1) language, logically indicates an

16  invocation of §2402(c)(1), and Respondent's suggestion otherwise is

17  insupportable.

18

19                         THE QUESTION OF BIAS

20      Because the issue has been squarely presented, and strenuously

21  argued by Petitioners, this Court is obligated to rule on the charge

22  that the Board's actions prove an overriding bias and deliberate

23  corruption of their lawful duties.

24      In the discrimination and bias case of *USPS Bd. of Governors v.*

25  *Aikens* (1983) 460 U.S. 711, the United States Supreme Court

26  acknowledged "there will seldom be 'eyewitness' testimony as to the

27  [] mental processes" of the allegedly biased decisionmaker. Instead,

28

1  an examination of other cases for trends or patterns can provide the

2  necessary circumstantial evidence.  (See *Aikens, supra,* at footnote

3  2.)  Reaffirming that such circumstantial evidence will be sufficient

4  the Court stated: "The law often obliges finders of fact to inquire

5  into a person's state of mind.  As Lord Justice Bowen said in

6  treating this problem in an action for misrepresentation nearly a

7  century ago, 'The state of a man's mind is as much a fact as the

8  state of his digestion.  It is true that it is very difficult to

9  prove what the state of a man's mind at a particular time is, but if

10  it can be ascertained it is as much a fact as anything else.'"

11  (*Aikens,* at pp. 716-717, quoting *Edgington v. Fitzmaurice* (1885) 29

12  Ch. Div. 459, 483.)[7]

13      The discovery in these cases was granted in part due to the

14  Petitioners' prima facie showing of bias and the necessity that it be

15  "adequately supported with evidence" if such evidence is available.

16  (*Ramirez, supra,* 94 Cal.App.4th at p. 564, fn. 5.  See also *Nasha v.*

17  *City of Los Angeles* (2004) 125 Cal.App.4th 470, 483: "A party seeking

18  to show bias or prejudice on the part of an administrative decision

19  maker is required to prove the same 'with concrete facts.'"  And see

20  *State Water Resources Control Bd. Cases* (2006) 136 Cal.App.4th 674,

21  841: "The challenge to the fairness of the adjudicator must set forth

22  concrete facts demonstrating bias or prejudice."  See also *Hobson v.*

23

---

24  [7] As occurred in *Aikens, supra,* and as suggested in prior orders of this Court,
Respondent should have provided direct evidence from the decisionmakers.  While the
fact that a *Defendant* does not explain his or her actions cannot be held against
25  him, (*Griffin v. California* (1965) 380 U.S. 609, *Doyle v. Ohio* (1976) 426 U.S.
610,) it is appropriate to give some weight to the consideration that the Board has
26  failed to offer any direct evidence or explanation on its own behalf.  While the
case of *Hornung v. Superior Court* (2000) 81 Cal.App.4th 1095 stands for the
27  proposition that <u>Petitioner</u> may not inquire into the Board members mental
processes, Respondent is not precluded from offering such direct evidence if they
were able to testify as to their good faith and conscientious efforts.
28

24

1    *Hansen* (1967) 269 F.Supp. 401, 502, the watershed Washington D.C.

2    school desegregation case in which the court determined from a

3    statistical and factual analysis that racial bias was influencing

4    policy.)

5        In the case of *People v. Adams* (2004) 115 Cal.App.4th 243, 255,

6    a similar claim of biased decision making was asserted and it was

7    rejected because, although the defendant clearly articulated it, "he

8    has not demonstrated it. Therefore, he has failed to bear his burden

9    of showing a constitutional violation as a demonstrable reality, not

10   mere speculation." In the present cases Petitioners have provided

11   overwhelming concrete evidence. It is difficult to believe that the

12   Board's universal application of §2402(c)(1) has been an inadvertent

13   mistake or oversight on their part. It is hard to credit the Board's

14   position that it does not know its own patterns and practices reveal

15   a complete lack of standards or constraints on their power.

16   Respondent's protestations ring hollow, and it seems a statistical

17   impossibility, that the Board's use of "detailed" criteria in such a

18   fashion that they are rendered meaningless is a result of good faith

19   efforts on their part. That _every_ murder is "especially heinous,

20   atrocious or cruel," and can therefore be an exception to the rule

21   that a parole date should be set, does not seem to be an accident on

22   their part.

23       Although no court has thus far agreed with the accusation that

24   the Board approaches its duties with a predetermination and a bias,

25   no court has previously been presented the comprehensive evidence

26   outlined herein. While this Court does not turn a blind eye to the

27   reasonable conclusion that the Board's unconstitutional practices are

28

1  willful, there is another possibility.  The pattern of errors

2  demonstrated by the discovery in this case, and the continuously

3  growing body of Court of Appeal opinions finding consistent and

4  persistent abuse of discretion, may instead be caused by the fact

5  that the Board is simply overworked and substantively untrained.  The

6  impossibility of the blanket applicability of §2402(c)(1) may be only

7  the result of sloppy preparation and inadvertent carelessness.

8       The Board must first be given an opportunity to comply with the

9  necessary remedy provided by this court before it is possible to

10  enter a finding of conscious bias and illegal sub rosa policy.  To do

11  otherwise would ignore the complexities and magnitude of the largely

12  discretionary duties with which that Board is vested.

13

14                          CONCLUSION

15       The conclusive nature of the proof in this case, and the

16  suggestion of institutional bias do not preclude formulation of an

17  remedy which will guarantee adequate restrictions on, and guidance

18  for, the Board's exercise of discretion in making parole suitability

19  determinations.  The Board can be made to lawfully perform its duties

20  if given explicit instructions.

21       As noted supra, a reason the proof in this case irrefutably

22  establishes constitutional violations is because the Board does not,

23  in actual fact, operate within the limiting construction of the

24  regulations.  The Board's expansive interpretation allows it to

25  operate without any true standards.  Although numerous rulings of

26  both state and federal courts of appeal have invalidated the Board's

27  application of the §2402(c) criteria to particular facts, the Board

28

1  does not take guidance from these binding precedents and ignores them

2  for all other purposes.  In the most recent of these cases, *In re*

3  *Roderick*, (2007) ____ Cal.App.4th ____ (A113370) the First District

4  held four of five §2402 factors "found" by the Board to be

5  unsupported by any evidence.  At footnote 14 the court took the time

6  to criticize the Board for its repeated use of a "stock phrase"

7  "generically across the state."  The court also clarified that "at

8  minimum, the Board is responsible for articulating the grounds for

9  its findings and for citing to evidence supporting those grounds."

10  There is nothing in the evidence presented that would allow any

11  conclusion but that, without intervention of the Courts, the Board

12  will ignore the lessons of these rulings in the future and continue

13  to employ its formulaic approach of citing a criteria from

14  §2402(c)(1), repeating the facts of the crime, but never

15  demonstrating a logical connection between the two.    This is the

16  core problem with the Board's methodology -- they provide no

17  explanation or rationale for the findings regarding the crime itself.

18  This practice results in violence to the requirements of due

19  process and individualized consideration which are paramount to the

20  appropriate exercise of its broad discretion.

21  The only solution is one that compels the Board to identify the

22  logical connection between the facts upon which it relies and the

23  specific criteria found to apply in the individual case.    For

24  example, the Board often finds that an inmate's motive is "trivial"

25  without ever suggesting why, on these facts, that motive is not just

26  as trivial as the motive behind any other murder.  What motive is not

27  trivial?  By any definition "trivial" is a word of comparison and

28

1  only has meaning when there can be examples that are not "trivial."

2      Similarly, although the Sixth District made it plain four years

3  ago that "all [] murders by definition involve some callousness," (*In*

4  *re Smith* (2003) 114 Cal.App.4th 343, 345,) the Board has continued to

5  deny countless paroles labeling the crime "callous" without ever

6  suggesting what crime would not qualify as "callous" and without

7  consistently explaining why the individual case before it

8  demonstrates "exceptional" callousness.

9      Respondent has consistently refused to suggest what possible

10  instances of murder would *not* fit the Board's amorphous application

11  of the §2402 criteria.  Citing *Dannenberg*, Respondent insists such

12  comparative analysis is unnecessary.  Respondent fundamentally

13  misunderstands the *Dannenberg* holding.

14      The PC § 3041(b) exception to the rule can only be invoked when

15  the "gravity of the current convicted offense or offenses, or the

16  timing and gravity of current or past convicted offense or offenses,

17  is such that consideration of the public safety requires a more

18  lengthy period of incarceration for this individual."  The word

19  "gravity" is a directive for comparison just as "more lengthy"

20  indicates a deviation from the norm.  While *Dannenberg* held there

21  does not need to be intra case comparison for the purposes of term

22  uniformity or proportionality, there necessarily has to be some sort

23  of comparison for the purposes of adhering to the legislative mandate

24  that parole is available.  This is implicit in §2402 because the

25  qualifier "especially," in "especially heinous atrocious or cruel,"

26  requires that some form of comparison be made.  While the original

27  drafters of §2402 seemed to have recognized this fact, the ongoing

28

conduct of the Board has completely ignored it, and this is the essence of the due process violation Petitioners have asserted.

As noted in his dissent in the recent case of *In re Roderick*, *supra*, Justice Sepulveda would have deferred to the Board's 'exercise' of discretion because "Board members have both training and vast experience in this field.  They conduct literally thousands of parole suitability hearings each year.  The Board therefore has the opportunity to evaluate the egregiousness of the facts of a great number of commitment offenses. ...  The Board's training and experience in evaluating these circumstances far exceeds that of most, if not all, judges."  The evidence in this case, however, suggests a flaw in granting such deference.  Since the Board continues to place every murder in the category of offenses "tending to show unsuitability," something is certainly wrong.  Since the Board's vast experience is undeniable, the problem must be in the Board's training and understanding of the distinguishing features of the guidelines and criteria.  Although Justice Sepulveda presumes that Board members receive substantive training, there is no evidence before this court to suggest that it does, and substantial circumstantial evidence to suggest that it does not.

In the vast numbers of Santa Clara County cases reviewed by this Court, the Board's formulaic decisions regarding the commitment offense do not contain any explanation or thoughtful reasoning.  Instead, the Board's conclusionary invocation of words from §2402(c)(1) is linked to a repetition of the facts from the Board report by the stock phrase: "These conclusions are drawn from the statement of facts wherein ..."  Thereafter the inmate files a habeas

29

1  corpus petition and Respondent, after requesting an extension of
2  time, files a boilerplate reply asserting the Board's power is
3  "great" and "almost unlimited" and thus any "modicum" of evidence
4  suffices.  Respondent does not cite or distinguish the expanding body
5  of case law that is often directly on point as to specific findings
6  made.  Thereafter, if the writ is granted, the Board is directed to
7  conduct a new hearing "in compliance with due process" and that order
8  is appealed by Respondent.  On appeal the order is usually upheld
9  with modifications and in the end, after countless hours of attorney
10 and judicial time, the Board conducts a new two hour hearing at which
11 they abuse their discretion and violate due process in some different
12 way.

13      This system is malfunctioning and must be repaired.  The
14 solution must begin with the source of the problem.  The Board must
15 make efforts to comply with due process in the first instance.  The
16 case law published over the last five years provides ample and
17 sufficient guidelines and must be followed.  Although the Board
18 methods suggest it believes this to be optional, it is not.

19

20                        **THE REMEDY**

21      Thus, it is the order of this Court that the Board develop,
22 submit for approval, and then institute a training policy for its
23 members based on the current and expanding body of published state
24 and federal, case law reviewing parole suitability decisions, and
25 specifically the application of §2402 criteria.  In addition to
26 developing guidelines and further criteria for the substantive
27 application of §2402 the Board must develop rules, policies and
28

                            30

1  procedures to ensure that the substantive guidelines are followed.

2      This Court finds its authority to impose this remedy to flow

3  from the fundamental principles of judicial review announced over two

4  centuries ago in *Marbury v. Madison* (1803) 5 U.S. (1 Cranch) 137.

5  Citing that landmark case, the California Supreme Court has

6  recognized "Under time-honored principles of the common law, these

7  incidents of the parole applicant's right to 'due consideration'

8  cannot exist in any practical sense unless there also exists a remedy

9  against their abrogation." (*In re Sturm* (1974) 11 Cal.3d 258, 268.)

10     In *Strum* the court directed that the Board modify its rules and

11 procedures so that thereafter "The Authority will be required [,]

12 commencing with the finality of this opinion, to support all its

13 denials of parole with a written, definitive statement of its reasons

14 therefor and to communicate such statement to the inmate concerned."

15 (*Sturm* at p. 273.)

16     Similarly, in the case of *Minnis, supra*, the California Supreme

17 Court held the Board's policy of categorically denying parole to drug

18 dealers was illegal. Based on its analysis the court there was

19 clearly prepared to order that Board to modify its rules and

20 procedures however such was unnecessary because the Board

21 "voluntarily rescinded" the illegal policy. While the remedy in this

22 case is of greater scope than that necessary in either *Strum* or

23 *Minnis, supra*, so too has been the showing of a systematic abuse of

24 discretion and distortion of process.

25     The most recent case to address the court's roles and duties in

26 overseeing the parole suitability process has been *In re Rosenkrantz,*

27 *supra*, 29 Cal.4th 616. In that case the court explained that

28

31

1  judicial review of a Governor's parole determination comports with,
2  and indeed furthers, separation of powers principles because the
3  courts are not exercising "complete power" over the executive branch
4  and do not "defeat or materially impair" the appropriate exercise or
5  scope of executive duties. (*Rosenkrantz* at p. 662.)  Citing *Strum,*
6  *supra,* the court reaffirmed that a life term inmate's "due process
7  rights cannot exist in any practical sense without a remedy against
8  its abrogation." (*Rosenkrantz* at p. 664.)

9      The *Rosenkrantz* court also put forth what it believed was an
10  extreme example but which, unfortunately, has been shown to exist in
11  this case.  The court stated: "In the present context, for example,
12  judicial review could prevent a Governor from usurping the
13  legislative power, in the event a Governor failed to observe the
14  constitutionally specified limitations upon the parole review
15  authority imposed by the voters and the Legislature."  This is
16  exactly what the evidence in this case has proven.  As noted above
17  the Board has arrogated to itself absolute authority, despite
18  legislative limitations and presumptions, through the mechanism of a
19  vague and all inclusive, and thus truly meaningless, application of
20  standards.  The remedy this Court is imposing is narrowly tailored to
21  redress this constitutional violation.

22      The consequence of the Board's actions (of giving § 2402(c)(1)
23  such a broadly all encompassing and universal application) is that
24  they have unwittingly invalidated the basis of the California Supreme
25  Court's holding in *Dannenberg*.  The reason the four justice majority
26  in *Dannenberg* upheld the Board's standard operating procedures in the
27  face of the Court of Appeal and dissent position is because "the

28

1  Board must apply detailed standards when evaluating whether an

2  individual inmate is unsuitable for parole on public safety grounds."

3  (*Dannenberg* at p. 1096, footnote 16.  See also page 1080: "the

4  regulations do set detailed standards and criteria for determining

5  whether a murderer with an indeterminate life sentence is suitable

6  for parole.")  However, Petitioners in these cases have proven that

7  there are no "detailed standards" at all.  Instead the Board has

8  systematically reduced the "detailed standards" to empty words.  The

9  remedy this Court orders, that there truly be "detailed standards,"

10  requires the promulgation of further rules and procedures to

11  constrain and guide the Board's powers.  This remedy differs in

12  specifics, but not in kind, from what courts have previously imposed

13  and have always had the power to impose.

14     The Board must fashion a training program and further rules,

15  standards and regulations based on the opinions and decisions of the

16  state and federal court cases which provide a limiting construction

17  to the criteria which are applied.[8]  The Board must also make

18  provisions for the continuing education of its commissioners as new

19  case law is published and becomes binding authority.  This Court will

20  not, at this point, outline the requirements and lessons to be taken

21  from the above cases.  It is the Board's duty, in the first instance

22  to undertake this task.  The training program, and associated rules

23  and regulations, shall be served and submitted to this Court, in

24  _____

[8] While the showing and analysis in this case was limited to § 2402(c)(1), the

25  conclusions that the evidence compelled, that the Board has been carelessly

distorting and misapplying the regulations, is not so limited.  Accordingly, the

training program that is necessary for the Board can not reasonably be limited to

26  just § 2402(c)(1).  Thus, to the extent case law recognizes, clarifies and

establishes remedies for other due process violations they must also be

27  incorporated into the necessary rules and training the Board is required to abide

by.

28

33

1  writing, within 90 days.  Counsel for Petitioners, and any other

2  interested parties, may submit briefs or comments within 30 days

3  thereafter.  After receipt and review of the materials this Court

4  will finalize the training program, and associated rules, and the

5  Petitioners in these cases shall receive a new hearing before a Board

6  that does not operate with the unfettered discretion and caprice

7  demonstrated by the evidence here presented.

8                                    **ORDER**

9      For the above reasons the habeas corpus petition is granted and

10 it is hereby ordered that Petitioner be provide a new hearing which

11 shall comply with due process as outlined above.  Respondent shall

12 provide weekly updates to this Court on the progress of its

13 development of the new rules and regulations outlined above.

14

15

16

17 DATED: _Aug 30_ , 2007        _Linda R. Condron_

18                               LINDA R. CONDRON
                                 JUDGE OF THE SUPERIOR COURT

19

20 cc:  Petitioner's Attorney (Jacob Burland)
        Attorney General (Denise Yates, Scott Mather)

21

22

23

24

25

26

27

28

                                   34

# EXHIBIT "G"

bd

United States District Court
for the
Eastern District of California
December 22, 2004

* * CERTIFICATE OF SERVICE * *

2:96-cv-00783

Coleman

v.

Board of Prison Term

I, the undersigned, hereby certify that I am an employee in the Office of
the Clerk, U.S. District Court, Eastern District of California.

That on December 22, 2004, I SERVED a true and correct copy(ies) of
the attached, by placing said copy(ies) in a postage paid envelope
addressed to the person(s) hereinafter listed, by depositing said
envelope in the U.S. Mail, by placing said copy(ies) into an inter-office
delivery receptacle located in the Clerk's office, or, pursuant to prior
authorization by counsel, via facsimile.

Tami M Warwick                                    TM/PAN
Attorney General's Office for the State of California
PO Box 944255                                     AR/LKK
1300 I Street
Suite 125
Sacramento, CA 94244-2550

Ann Catherine McClintock
Federal Defender
801 I Street
Third Floor
Sacramento, CA 95814

Jack L. Wagner, Clerk

BY: _____
    Deputy Clerk

*The Judges Decision*
①

1
2
3
4
5
6
7
8            IN THE UNITED STATES DISTRICT COURT
9         FOR THE EASTERN DISTRICT OF CALIFORNIA
10   MELVYN COLEMAN,
11             Petitioner,              No. CIV S-96-0783 LKK PAN P
12        vs.
13   BOARD OF PRISON TERMS, et al.,
14             Respondent.              ORDER
15   _____/
16        Petitioner, a state prisoner proceeding pro se, has filed this application for a writ
17   of habeas corpus.  The matter was referred to a United States Magistrate Judge pursuant to 28
18   U.S.C. § 636(b)(1)(B) and Local General Order No. 262.
19        On December 22, 2004, the magistrate judge filed findings and recommendations
20   herein which were served on all parties and which contained notice to all parties that any
21   objections to the findings and recommendations were to be filed within twenty days.  Respondent
22   has filed objections to the findings and recommendations.
23        In accordance with the provisions of 28 U.S.C. § 636(b)(1)(C) and Local Rule 72-
24   304, this court has conducted a de novo review of this case.  Having carefully reviewed the
25   entire file, the court finds the findings and recommendations to be supported by the record and by
26   proper analysis.

1



*Judges delision*

1    Accordingly, IT IS HEREBY ORDERED that:

2        1. The findings and recommendations filed December 22, 2004, are adopted in

3    full; and

4        2. The petition for habeas corpus will be granted unless, within 60 days,

5    respondent provides a fair parole suitability hearing, conducted by a board free of any prejudice

6    stemming from a gubernatorial policy against parole for murderers.

7    DATED:  May 19, 2005.

8                                   /s/Lawrence K. Karlton
                                    LAWRENCE K. KARLTON
9                                   SENIOR JUDGE    –
                                    UNITED STATES DISTRICT COURT
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

2

The case pages (1-11)

1

2

3    FILED

4    DEC 2 2 2004

5

6    CLERK, U.S. DISTRICT COURT
     EASTERN DISTRICT OF CALIFORNIA
7

8              United States District Court

9              Eastern District of California

10

11

12   Melvyn H. Coleman,              No. Civ. S-96-0783 LKK PAN P

13          Petitioner,              Findings and Recommendations

14      vs.

15   Board of Prison Terms, et al.,

16          Respondents.

17                          -oOo-

18       Petitioner seeks a writ of habeas corpus.

19       In his November 14, 1997, second amended petition petitioner

20   claims his federal due process guarantee was violated because the

21   California Board of Prison Terms (Board) has failed to conduct a

22   fair parole suitability hearing.

23       In 1974 petitioner was convicted of first degree murder,

24   attempted murder, first degree robbery, first degree burglary and

25   other charges.  The victims, Mr. And Mrs. Ciewart, returned to

26   their home while petitioner was burglarizing it; he then

*the case*

1  approached before they got out of their car and robbed and shot

2  them, killing Mr. Siewart and seriously wounding Mrs. Siewart.

3  Petitioner had a prior juvenile record.

4        Under California law, a prisoner including a convicted

5  murderer serving an indeterminate term (i.e., seven years to

6  life) is entitled to a hearing before a panel composed of members

7  of the Board to determine his suitability for parole.  By

8  statute, parole at some point normally is appropriate and the

9  Board "shall set a release date unless it determines that the

10  gravity of the current convicted offense or offenses, or the

11  timing and gravity of current or past convicted offense or

12  offenses, is such that consideration of the public safety

13  requires a more lengthy period of incarceration. . . ."  Cal.

14  Penal Code § 3041(b).  Procedures  governing suitability hearings

15  are set forth in Penal Code § 3041.5 (providing prisoners with

16  notice and an opportunity to be heard and requiring a written

17  statement of reasons if the panel refuses to set a parole date).

18  Regulations prescribe factors for the panel to consider in

19  determining whether each prisoner is suitable or unsuitable for

20  parole.  15 CAC § 2281.[1]

21

22  [1] Factors supporting a finding of unsuitability include: (1) whether the
prisoner's offense for which he is confined was committed in an "especially

23  heinous, atrocious or cruel manner"; (2) the prisoner's record of violence prior
to the offense; (3) whether the prisoner has an unstable social history; (4)

24  whether the prisoner has committed sadistic sexual offenses; (5) whether the
prisoner has a lengthy history of severe mental problems related to the offense;

25  and (6) whether the prisoner has engaged in serious misconduct in prison or jail.
Factors supporting a finding of suitability include: (1) whether the prisoner has

26  a juvenile record; (2) whether the prisoner has experienced reasonably stable
relationships with others; (3) whether the prisoner shows signs of remorse; (4)

2

*the case*

1    Petitioner presents evidence that under Governors Wilson and

2   Davis the Board disregarded regulations ensuring fair suitability

3   hearings and instead operated under a sub rosa policy that all

4   murderers be found unsuitable for parole.  The record shows that

5   between 1992 and 1998 less than one percent of the prisoners in

6   this group were released on parole.  During the previous period

7   the parole rate had been about four percent.  Petitioner presents

8   sworn testimony that the policy was enforced by (1) appointing

9   Board members less likely to grant parole and more willing to

10  disregard their statutory duty; (2) removing Board members more

11  likely to grant parole; (3) reviewing decisions finding a

12  prisoner suitable and setting a new hearing before a different

13  panel; (4) scheduling rescission hearings for prisoners who had

14  been granted a parole date; (5) re-hearing favorable rescission

15  proceedings and hand-picking panels to ensure the desired

16  outcome; (6) panel members agreeing upon an outcome in advance of

17  the hearing; and (7) gubernatorial reversal of favorable parole

18  decisions.  See e.g., declaration of former BPT Commissioner

19  Albert Leddy (Leddy) paras. 5, 6, 8-17, 20 (attached as Ex. 17 to

20  petitioner's March 27, 2003, motion for discovery); deposition of

21  Leddy taken in In re Fortin, et al., San Diego Superior Court

22  _____

23  whether the prisoner committed his crime as the result of significant stress in
    his life; (5) whether the prisoner suffered from Battered Woman Syndrome when she
24  committed the crime; (6) whether the prisoner lacks any significant history of
    violent crime; (7) whether the prisoner's present age reduces the probability of
25  recidivism; (8) whether the prisoner has made realistic plans for release or has
    developed marketable skills that can be put to use on release; and (9) whether
26  the prisoner's institutional activities indicate an enhanced ability to function
    within the law upon release.  15 CAC $ 2281.

                                    3

*the case*

1  case number HSC10279 at 18-19, 47-50, 56-59, 61-63, 65-66, 88-89,
2  95, 97-99, 102, 106, 110, 118 & 126 (attached as Ex. 10 to
3  petitioner's March 27, 2003, motion for discovery); deposition of
4  former BPT Commissioner Edmund Tong taken in Kimble v. Cal. BPT,
5  C.D. Cal. case number CV 97-2752 at 42-43, 45-47, 71, 73, 80-82,
6  85-86, 96, 103, 105, 107 & 109 (lodged December 30, 2003).[2]
7      The unrefuted record shows the no-parole-for-murderers
8  policy existed and continued under Governor Davis.  In In re
9  Rosencrantz, the California Supreme Court took note of evidence
10 presented in the state trial court establishing that the Board
11 held 4800 parole suitability hearings between January 1999
12 through April 2001, granting parole to 48 murderers (one
13 percent).  29 Cal. 4th 616, 685 (2003).  Of those 48, the
14 governor reversed 47 of the Board's decisions and only one
15 murderer out of 4800 actually was released on parole.  Id.
16 Petitioner in Rosenkrantz also submitted evidence of the
17 following interview of Governor Davis reflected in the April 9,
18 1999, edition of the Los Angeles Times: " '. . . [T]he governor
19 was adamant that he believes murderers – even those with second-
20 degree convictions – should serve at least a life sentence in
21 prison. [Para.]  Asked whether extenuating circumstances should

22
23      [2]  Meanwhile, the annual cost to taxpayers of conducting these "pro forma"
    hearings is enormous, amounting to millions of dollars per year.  See Exhibit 7
24  to petitioner's March 27, 2003, motion for discovery (California Legislative
    Analyst's Office – Analysis of the 2000-01 Budget Bill for the Board of Prison
25  Terms criticizing proposed $19 million annual budget and noting huge cost of
    additional incarceration resulting from no-parole policy).
26

the Case

1  be a factor in murder sentences, the governor was blunt: "No.

2  Zero . . .  They must not have been listening when I was

3  campaigning. . . .  If you take someone else's life, forget it.

4  I just think people dismiss what I said in the campaign as either

5  political hyperbole or something that I would back away from . .

6  . .  We are doing exactly what we said we were going to do."'"

7  29 Cal. 4th at 684.

8      Respondent does not refute the alleged facts.  Instead,

9  respondent argues that, assuming arguendo prisoners in California

10 have an interest in a parole date protected by the due process

11 clause, constitutional requirements are met so long as there is

12 "some evidence" supporting the findings petitioner is unsuitable.

13 See Oppo. at 7:20 (so long as "some evidence" standard is met,

14 "the Board decisions could not have been arbitrary.")  For the

15 reasons explained, this court rejects that claim.  As this court

16 previously has found, there always will be "some evidence" that

17 can be used to explain a denial or rescission under the

18 circumstances.  Federal due process requires more.

19     California's parole scheme gives rise to a protected liberty

20 interest in release on parole.  McQuillion v. Duncan, 306 F.3d

21 895, 902 (2002); Jancsek v. Oregon Bd. of Parole, 833 F.2d 1389,

22 1390 (9th Cir. 1987); Greenholtz v. Inmates of Nebraska Penal &

23 Correctional Complex, 442 U.S. 1 (1979); Biggs v. Terhune, 334

24

25

26

*the case*

1  F.3d 910, 915 (9th Cir. 2003); In re Rosenkrantz, 29 Cal. 4th 616

2  (2003).[3]

3      Therefore, petitioner is entitled to the process outlined in

4  Greenholtz, viz., notice, opportunity to be heard, a statement of

5  reasons for decision, and limited right to call and cross-examine

6  witnesses.  The determination that petitioner is unsuitable for

7  parole must be supported by some evidence bearing some indicia of

8  reliability.

9      These guarantees do not exhaust petitioner's right to due

10  process.  The fundamental core of due process is protection

11  against arbitrary action:

12      The principal and true meaning of the phrase has never
         been more tersely or accurately stated than by Mr.
13      Justice Johnson, in Bank of Columbia v. Okely, 17 U.S.
         235, 4 Wheat. 235–244, 4 L.Ed. 449 [(1819)]: "As to the
14      words from Magna Charta, incorporated into the
         Constitution of Maryland, after volumes spoken and
15      written with a view to their exposition, the good sense
         of mankind has at last settled down to this: that they
16      were intended to secure the individual from the
         arbitrary exercise of the powers of government,
17      unrestrained by the established principles of private
         right and distributive justice."
18

19  Hurtado v. California, 110 U.S. 516, 527, (1884).  "The

20  concessions of Magna Charta were wrung from the king as

21  guaranties against the oppressions and usurpations of his

22

23      _____

         [3] That is so because the parole statute, Penal Code § 3041, uses mandatory
24  language ("The panel or board shall set a release date unless it determines"
         further incarceration is necessary in the interest of public safety) which
25  "creates a presumption that parole release will be granted," unless the
         statutorily defined determinations are made.  Board of Pardons v. Allen, 482 U.S.
26  369, 378 (1987) (quoting Greenholtz, 442 U.S. at 12).  As of 1988, by amendment
         of the state constitution, a parole date given can be withdrawn by the Governor

*the case*

1  prerogative." _Id._ at 531.  "The touchstone of due process is

2  protection of the individual against arbitrary action of

3  government." _Wolff v. McDonnell_, 418 U.S. 539, 558 (1974),

4  _citing Dent v. West Virginia_, 129 U.S. 114 (1889).

5      A government official's arbitrary and capricious exercise of

6  his authority violates the essence of due process, contrary to

7  centureis of Anglo-American jurisprudence.  See _Yick Wo v._

8  _Hopkins_, 118 U.S. 356, 369 (1886) ("When we consider the nature

9  and the theory of our institutions of government, the principles

10 upon which they are supposed to rest, and review the history of

11 their development, we are constrained to conclude that they do

12 not mean to leave room for the play and action of purely personal

13 and arbitrary power."); _United States v. Lee_, 106 U.S. 196, 220

14 (1882) ("No man in this country is so high that he is above the

15 law.  No officer of the law may set that law at defiance with

16 impunity.  All the officers of the government from the highest to

17 the lowest, are creatures of the law and are bound to obey it.

18 It is the only supreme power in our system of government, and

19 every man who by accepting office participates in its functions

20 is only the more strongly bound to submit to that supremacy, and

21 to observe the limitations which it imposes upon the exercise of

22 the authority which it gives."); _U.S. v. Nixon_, 418 U.S. 683,

23 695-96 (1974) (rule of law is "historic commitment"); _Accardi v._

24 _O'Shaughnessy_, 347 U.S. 260, 267-68 (1954) (Attorney General must

25 abide by regulations and cannot dictate immigration board's

26 exercise of discretion in decision on application to suspend

*the case*

1 deportation; remedy is new hearing where board will exercise it's

2 discretion free from bias).

3     Concomitant to the guarantee against arbitrary and

4 capricious state action is the right to a fact-finder who has not

5 predetermined the outcome of a hearing. See Withrow v. Larkin,

6 421 U.S. 35 (1975) (a fair trial in a fair tribunal is a basic

7 requirement of due process, and this rule applies to

8 administrative agencies which adjudicate as well as to courts);

9 Edwards v. Balisok, 520 U.S. 641 (1997) (recognizing due process

10 claim based on allegations that prison disciplinary hearing

11 officer was biased and would suppress evidence of innocence);

12 Bakalis v. Golembeski, 35 F.3d 318, 326 (7th Cir. 1994) (a

13 decision-making body "that has prejudged the outcome cannot

14 render a decision that comports with due process").

15     Courts too numerous to list have recognized that the right

16 to a disinterested decision-maker, who has not prejudged the

17 case, is part of the fundamental guarantee against arbitrary and

18 capricious government conduct in the California parole context.

19 See, e.g., Rosenkrantz, 29 Cal. 4th at 677 (parole decision "must

20 reflect an individualized consideration of the specified criteria

21 and cannot be arbitrary and capricious"); In re Ramirez, 94 Cal.

22 App. 4th 549, 563 (2001) ("some evidence" standard is "only one

23 aspect of judicial review for compliance with minimum standards

24 of due process" (citing Balisok) and Board violates due process

25 if its decision is "arbitrary and capricious"); In re Minnis, 7

26 Cal. 3d 639 (1972) (blanket no-parole policy as to certain

*the case*

1 category of prisoners is illegal); <u>In re Morrall</u>, 102 Cal. App.
2 4th 280 (2003) (same).  The guarantee of neutral parole officials
3 in a suitability hearing is just as fundamental as the right to a
4 neutral judge in a court proceeding.  <u>Compare</u> <u>Sellars v.</u>
5 <u>Procunier,</u> 641 F.2d 1295 (9th Cir. 1981) (holding that California
6 parole officials, analogous to judges, are entitled to absolute
7 immunity).
8     The Ninth Circuit previously has acknowledged California
9 inmates' due process right to parole consideration by neutral
10 decision-makers.  <u>See</u> <u>O'Bremski v. Maas</u>, 915 F.2d 418, 422 (9th
11 Cir. 1990).  In that case the appellate court found that a
12 neutral parole panel at a new hearing would reach the same
13 outcome and so denied relief.  The record in this case simply
14 will not permit the same conclusion.  The requirement of an
15 impartial decision-maker transcends concern for diminishing the
16 likelihood of error.  As the Supreme Court clearly held in
17 <u>Balisok</u> a decision made by a fact-finder who has predetermined
18 the outcome is <u>per se</u> invalid -- even where there is ample
19 evidence to support it.  520 U.S. at 648.
20     Petitioner presents a convincing case that a blanket policy
21 against parole for murderers prevented him from obtaining a
22 parole suitability determination made after a fair hearing.
23 Respondent offers nothing to counter petitioner's showing.
24     Accordingly, the court hereby recommends that the petition
25 for habeas corpus be granted unless, within 60 days of the
26 district court's adoption of these recommendations, respondent

9

the case

1  provides a fair parole suitability hearing, conducted by a board

2  free of any prejudice stemming from a gubernatorial policy

3  against parole for murderers.

4      Pursuant to the provisions of 28 U.S.C. § 636(b)(1), these

5  findings and recommendations are submitted to the United States

6  District Judge assigned to this case. Within 20 days after being

7  served with these findings and recommendations, respondent may

8  file written objections. The document should be captioned

9  "Objections to Magistrate Judge's Findings and Recommendations."

10 The district judge may accept, reject, or modify these findings

11 and recommendations in whole or in part.

12     Dated:  __DEC 2 1 2004__

13

14                              _____
                                Peter A. Nowinski
                                Magistrate Judge
15

16

17

18

19

20

21

22

23

24

25

26  cole0783.fnr grant